**"C.D.", Plaintiff,** *Pro Se*
*Plaintiff.Confidential@gmail.com*

CLERK
U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY
RECEIVED

2025 DEC 17 P 12: 54

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **C.D.,**<br><br>Plaintiff,<br><br>v.<br><br>**ROBIN A. MORANTE**, Chief of Judicial and Court Security, in her individual capacity for damages, and in her official capacity for prospective injunctive relief; **COUNTY OF BERGEN; CAREPLUS NEW JERSEY, INC.; REBEKAH ORSO** (in her individual capacity); **TOWNSHIP OF MAHWAH; LT. KEVIN MCCOMBS** (individual capacity); **TOWNSHIP OF WYCKOFF; SGT. KYLE FERREIRA,** (individual capacity); **BOROUGH OF GLEN ROCK; CHIEF DEAN ACKERMANN,** (individual capacity); **SGT. GREGORY CARTER** (individual capacity); **VILLAGE OF RIDGEWOOD; BOROUGH OF MIDLAND PARK; BOROUGH OF HAWTHORNE; JOHN & JANE DOES 1–50; XYZ MUNICIPAL ENTITIES 1–20,**<br><br>Defendants. | Civil Action No.: _____<br><br><br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff "C.D.", by way of Complaint against Defendants, alleges as follows:

### I. PRELIMINARY STATEMENT

Plaintiff brings this civil action under 42 U.S.C. § 1983, the United States Constitution, the New Jersey Constitution, the New Jersey Civil Rights Act, and New Jersey common law to remedy an extraordinary series of unconstitutional acts by state, municipal, county, and private actors acting jointly. Defendants engaged in retaliation, unlawful surveillance, defamation, and a multi-agency

1

armed mobilization that culminated in Plaintiff's wrongful psychiatric detention, all triggered by false information and abuses of authority.

## II. CASE OVERVIEW

This case arises from a multi-year pattern of unauthorized court-security actions by a non-judicial official that escalated into a multi-agency law-enforcement response and involuntary psychiatric detention. Without any judicial order, notice, or hearing, Plaintiff was labeled dangerous, barred from communicating with courts, and deprived of access to judicial processes. Those classifications were repeatedly relied upon by law-enforcement and crisis responders, culminating on October 9, 2025. Plaintiff seeks prospective relief to remove unlawful security designations and damages for constitutional violations already sustained.

## III. JURISDICTION AND VENUE

1. This Court has jurisdiction under 28 U.S.C. § 1331 because the action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

2. The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's state-law claims.

3. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred within this District.

## IV. SUMMARY OF CLAIMS

### A. Legal Framework and Scope of Allegations

4. This Complaint pleads an extensive factual record because the challenged conduct was not isolated, but systemic, covert, and multi-year. Plaintiff pleads facts, not argument, and pleads overlapping constitutional violations in the alternative as permitted by Fed. R. Civ. P. 8(d). To the

2

extent factual allegations appear repetitive, they are pleaded to establish intent, notice, causation, municipal ratification, and the absence of any legitimate security or judicial justification.

5. Plaintiff brings this civil-rights action to redress an unprecedented series of constitutional violations committed by multiple municipal, county, and state actors who, acting together and independently, fabricated a false narrative portraying Plaintiff as dangerous, emotionally disturbed, suicidal, threatening to judges, and otherwise unstable -- despite having no evidence supporting any such claims and despite possessing substantial information that affirmatively disproved them.

6. Over a period of two years, culminating on October 9, 2025, Defendants created, amplified, and disseminated a false "security profile" about Plaintiff; escalated that profile through county dispatch systems; triggered a multi-agency armed response involving patrol officers, tactical personnel, K-9 units, and aerial surveillance; initiated an unlawful phone-location ping; and caused Plaintiff to be subjected to an involuntary psychiatric detention, forced transportation, strip searches, blood draws, medical testing, and public humiliation -- all without probable cause, reasonable suspicion, reliable information, or lawful justification.

7. The core constitutional and statutory violations asserted in this action include the following:

   a. **Unlawful seizure and forced medical procedures (Fourth Amendment)** arising from Plaintiff's involuntary detention, forced transportation, and non-consensual medical procedures, all predicated on false information manufactured by municipal officers, county dispatchers, and CarePlus/262-HELP personnel.

   b. **Procedural and substantive due process violations (Fourteenth Amendment)** including the fabrication of evidence; deprivation of bodily integrity; denial of notice and a meaningful opportunity to contest the basis for his detention; imposition of a false danger designation; and the creation of a life-threatening environment through coordinated misinformation.

3

c. **Retaliation for protected speech (First Amendment)** including actions by judicial-security officials and local law enforcement taken in response to Plaintiff's protected speech and lawful attempts to seek redress.

d. **State-created danger (Fourteenth Amendment)** where Defendants' affirmative actions -- including fabricating threats, disseminating false risk assessments, and triggering a militarized police response -- created or substantially increased the risk of Plaintiff's injury or death.

e. **Stigma-plus reputational and liberty deprivations (Fourteenth Amendment)** arising from the creation, maintenance, and dissemination of false allegations that Plaintiff was dangerous, unstable, or threatening, coupled with concrete alterations of his legal status and rights, including restrictions on access to courts and judicial processes.

f. **Coordinated civil conspiracy to violate constitutional rights (42 U.S.C. § 1983)** based on the coordinated actions of multiple agencies and actors who collectively manufactured and reinforced falsehoods leading to Plaintiff's seizure, detention, and loss of access to courts.

g. **Municipal and supervisory liability for policies, customs, and failures to train (Monell)** arising from (a) Bergen County's dispatch practices, (b) the participating municipalities' adoption and ratification of the false danger narrative, and (c) the AOC's and Morante's official-capacity use of judicial-security infrastructure to blacklist Plaintiff and obstruct his access to courts.

h. **Parallel violations of the New Jersey Constitution, the New Jersey Civil Rights Act, and New Jersey common law** mirroring the federal violations and providing independent grounds for relief, including claims for denial of due process and access to courts, abuse of

governmental process, false imprisonment, intrusion upon seclusion, negligence, and related torts.

    i. **Multiple state-law torts**, including false imprisonment.

8. Plaintiff also seeks prospective injunctive relief against Defendant Robin Morante, in her official capacity as Chief of Judicial and Court Security for the New Jersey Administrative Office of the Courts, pursuant to *Ex parte Young*, to remedy ongoing harms arising from the unlawful security classifications, false dangerousness assessments, and dissemination of fabricated risk information that continue to restrict Plaintiff's rights and access to the judicial system.

9. Plaintiff faces an ongoing and credible threat of future enforcement. Defendants expressly instructed Plaintiff that future courthouse access would require advance notice and armed escort, and that failure to comply could result in police investigation. The challenged conduct is therefore continuing in nature, and declaratory and injunctive relief are necessary to prevent further constitutional violations.

10. Through this action, Plaintiff seeks compensatory damages, punitive damages against the individual-capacity defendants, declaratory relief, and narrowly tailored injunctive relief to prevent further violations of his constitutional and statutory rights.

11. Plaintiff pleads multiple constitutional theories in the alternative as permitted by Rule 8(d), recognizing that overlapping facts may give rise to distinct constitutional violations.

**B. Actual Injury Resulting from Denial of Court Access**

12. Defendants' conduct caused concrete, non-speculative injury to Plaintiff's right of access to the courts. In November 2025, and again in December 2025, Plaintiff was prevented from filing an emergent application with the Appellate Division because his phone calls and emails were blocked, while identical calls from third parties connected immediately. The emergent filing concerned

5

ongoing judicial proceedings and was non-frivolous. Plaintiff was denied timely appellate review solely because Defendants obstructed the only permitted filing channels. This constitutes actual injury under *Lewis v. Casey* and *Christopher v. Harbury*.

## V. PARTIES

13. **Plaintiff "C.D."** is an adult resident of New Jersey. Plaintiff proceeds under initials pursuant to a forthcoming Motion for Leave to Proceed Under Pseudonym to protect confidential medical and mental-health information safeguarded by HIPAA. Public disclosure of Plaintiff's identity would expose highly sensitive medical and mental-health information, subject Plaintiff to stigma, and chill the exercise of constitutional rights, while Defendants already know Plaintiff's identity and suffer no prejudice from anonymity. Plaintiff is a former litigator with experience in evidence preservation and legal procedure. He maintains a completely clean criminal record and has never engaged in threatening, violent, or improper conduct. Plaintiff has preserved audio recordings, screenshots, e-mail metadata, contemporaneous notes, Ring doorbell footage, and corroborating statements from court employees. The allegations herein are supported by documentary evidence and first-hand admissions by judicial and law-enforcement personnel.

14. **Defendant Robin A. Morante ("Morante")** is a public official employed by the New Jersey Judiciary in an administrative security role, responsible for courthouse and judicial security functions.[1] At all relevant times, Morante acted under color of state law and is sued in her official

---

[1] At all relevant times, no statute, rule of court, administrative directive, or judicial order authorized Morante to impose litigant-specific communication bans, intercept or block court filings, restrict access to court personnel, or classify a non-party litigant as a security threat absent judicial findings, notice, and an opportunity to be heard. Morante did not act pursuant to any judicial directive, nor were her actions reviewed, ratified, or approved by any judge; rather, the challenged conduct was administrative and enforcement-based, not adjudicative in nature, and was undertaken outside any judicial proceeding and without judicial oversight. At all relevant times, Morante acted as an administrative enforcement official responsible for implementing, maintaining, communicating, and enforcing courthouse access restrictions and related exclusionary measures, and she possessed and continues to possess authority to enforce, modify, rescind, or terminate such restrictions. Morante is not a judicial officer and did not perform any judicial or quasi-judicial function with respect to the acts alleged. Plaintiff does not seek review, reversal, or modification of any judicial decision, ruling, or order, and seeks no monetary damages from Morante in her

6

capacity for prospective declaratory and injunctive relief, and in her individual capacity for monetary damages.

15. is a public official employed by the Administrative Office of the Courts of New Jersey, responsible for court and judicial security. At all relevant times, Morante acted under color of state law and in her official and individual capacity.[2] At all relevant times, no statute, rule of court, administrative directive, or judicial order authorized Morante to impose litigant-specific communication bans, intercept court filings, or classify a non-party litigant as a security threat absent judicial findings. Morante did not act pursuant to any judicial directive, nor were her actions reviewed, ratified, or approved by any judge. At all relevant times, Defendant Morante acted as an enforcement and administrative official responsible for implementing, maintaining, and communicating courthouse access restrictions and related exclusionary measures. She possessed and continues to possess authority to enforce, modify, or rescind such restrictions.

16. **Defendant County of Bergen ("Bergen County")** is a political subdivision of the State of New Jersey and at all relevant times operated or oversaw county-level law enforcement, communications, dispatch, emergency response coordination, and mental-health crisis resources, including 262-HELP and Bergen County SWAT resources used on October 9, 2025. Bergen County, through its policymakers, supervisors, and employees, participated in and/or ratified the unconstitutional acts described herein. Bergen County is liable under *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978).

---

official capacity, but challenges only the ongoing and future administrative enforcement of extra-judicial access restrictions imposed and maintained without lawful authority, and seeks prospective relief pursuant to *Ex parte Young*, 209 U.S. 123 (1908), to prevent continued and future violations of federal law.

Plaintiff alleges an ongoing constitutional violation and seeks only prospective relief to remove unlawful classifications and restrictions that continue to impair access to the courts.

17. **Defendant Township of Mahwah** is a municipal corporation organized under the laws of New Jersey that maintains a police department whose officers participated in the unconstitutional acts described below. Mahwah acted through its policymakers, supervisors, and employees, and is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

18. **Defendant Township of Wyckoff** is a municipal corporation organized under New Jersey law. Its police department and officials coordinated with other Defendants in connection with the October 9, 2025 incident and other unlawful conduct described herein.

19. **Defendant Borough of Glen Rock** is a municipal corporation within Bergen County, New Jersey, whose police department and senior officers, including Defendant Ackermann, acted jointly with Morante and others under color of state law.

20. **Defendant Village of Ridgewood** is a municipal corporation within Bergen County, New Jersey. The Village of Ridgewood operates and is legally responsible for the Ridgewood Police Department ("Ridgewood PD"), and for the policies, customs, practices, training, supervision, and conduct of its law-enforcement personnel. Ridgewood is liable for the actions of its police officers taken within the scope of their employment, and for its own unconstitutional policies, customs, and supervisory failures pursuant to Monell v. Department of Social Services, 436 U.S. 658 (1978).

21. **Defendant Borough of Hawthorne** is a municipal entity organized under the laws of the State of New Jersey. The Borough operates and oversees the Hawthorne Police Department ("HPD"), which at all times relevant employed officers who participated in the operation described in the Facts section of this Complaint. Hawthorne is responsible for the hiring, training, supervision, discipline, and conduct of its police officers, including those involved in the incident underlying this action.

22. **Defendant Borough of Midland Park** is a municipal entity organized under the laws of the State of New Jersey. The Borough operates and oversees the Midland Park Police Department

8

("MPPD"), which at all times relevant employed officers who participated in the operation described in the Facts section of this Complaint. Midland Park is responsible for the hiring, training, supervision, discipline, and conduct of its police officers, including those involved in the incident underlying this action.

23. **Defendant Sgt. Kyle Ferreira ("Ferreira")** is a sergeant within the Wyckoff Police Department who participated directly in the events of October 9, 2025, both as a Wyckoff Police Officer and a member of the Bergen County SWAT team. He is sued in his individual capacity.

24. **Defendant Lt. Kevin McCombs ("McCombs")** is a lieutenant within the Mahwah Police Department who, at relevant times, supervised or approved actions taken against Plaintiff and is sued in his individual capacity.

25. **Defendant Chief Dean Ackermann ("Ackermann")** is the Chief of Police for the Glen Rock Police Department at all relevant times and possessed policymaking authority. He is sued in his individual capacity.

26. **Sgt. Gregory Carter ("Carter")** is, upon information and belief, a sergeant within the Glen Rock Police Department who participated directly in the events of October 9, 2025. He is sued in his individual capacity.

27. **Defendant CarePlus New Jersey, Inc. ("CarePlus")** is, upon information and belief, a contracted mental-health crisis provider for Bergen County and its municipalities. At all relevant times, CarePlus acted jointly with municipal and county officials in evaluating, classifying, and disseminating information regarding Plaintiff. CarePlus and its agents participated in a coordinated, real-time response with law-enforcement pursuant to shared objectives and mutual reliance on security classifications, thereby exercising authority derived from and intertwined with state power. As a result, CarePlus and its agents acted under color of state law within the meaning of 42 U.S.C. § 1983 and the New Jersey Civil Rights Act.

9

28. **Defendant Rebekah Orso ("Orso")** is a mental-health clinician, screener, and/or crisis-response worker employed by or contracted with CarePlus New Jersey, Inc., and assigned to the Bergen County 262-HELP Crisis Response Team. At all relevant times, Orso acted jointly with municipal and county law-enforcement agencies, and performed mental-health screening, evaluation, crisis-response, and involuntary-commitment functions delegated by the State of New Jersey and Bergen County.  She is sued in her individual capacity.

29. **Defendants John Doe Officers 1–10** and **John Doe Supervisors 1–10** are presently unknown individuals employed by one or more of the Defendant municipalities or agencies who participated in, directed, or ratified the unconstitutional conduct alleged herein. Their true names and capacities will be substituted when ascertained.

30. At all relevant times, each Defendant acted individually and in concert with the others; the unlawful acts of one Defendant were done with the knowledge, approval, and encouragement of the remaining Defendants, and each Defendant is jointly and severally liable for the harms described herein.

## V. FACTUAL ALLEGATIONS

31. Plaintiff, C.D., is a private citizen of the State of New Jersey who, at all relevant times, lawfully exercised the right to petition government agencies and courts for redress of grievances guaranteed by the First Amendment to the United States Constitution and by Article I, paragraph 18 of the New Jersey Constitution.

32. Plaintiff's communications with various New Jersey courts and administrative professionals were made in good faith, seeking accountability and lawful relief concerning judicial and administrative irregularities and misconduct. None of these communications contained any physical threats to anybody's safety, constituted harassment, or was conduct that could reasonably be construed as endangering any person or their safety.

10

# PART I – MULTI-YEAR PATTERN OF ABUSE BY DEFENDANT MORANTE (2023–2025)

**Section A – Introduction to Defendant Morante's Role, Authority, and the Origins of Her Targeting of Plaintiff.**

33. Defendant Robin A. Morante ("Morante") is, and at all relevant times was, the Chief of the Court & Judicial Security Unit within the New Jersey Administrative Office of the Courts ("AOC"), headquartered in Trenton, New Jersey. Her formal responsibilities relate to physical courthouse security, threat assessment, and coordination with law enforcement -- not the issuance of sanctions upon litigants, interference with judicial proceedings, administration of litigant communications, or supervision of municipal courts.

34. Morante is not a judge, not a clerk, and not an administrator of any vicinage, and she does not possess statutory, regulatory, or constitutional authority to unilaterally, and without any due process:

    (a) restrict litigants' access to courts;

    (b) block telephone or email communication to any court;

    (c) issue "amended access" directives to court users;

    (d) instruct judges, court administrators, law clerks, or municipal courts on how to "handle" a litigant;

    (e) intercept emails addressed to any court office, transcript unit, or judicial agency;

    (f) interfere with a litigant's ability to obtain evidence, recordings, or transcripts; or

    (g) involve herself in adjudicative processes in any manner.

35. At no time did Morante purport to act pursuant to any judge's order, nor did any judicial officer ratify or review her actions before or after their implementation.

36. Beginning in June 2023, Morante initiated a multi-year, multi-court, unauthorized campaign of interference directed at Plaintiff, abusing her position and misusing state judicial-security

11

infrastructure to retaliate against him, obstruct his access to courts, suppress communications, manipulate other courts' perception of him, and influence adjudicative outcomes to his detriment.

37. The genesis of Morante's involvement traces back to Plaintiff's filing of a judicial misconduct complaint with the Advisory Committee on Judicial Conduct ("ACJC") concerning the conduct of a Glen Rock Municipal Court judge and a related misconduct complaint against Glen Rock Municipal Court Administrator Kim McWilliams. These complaints documented improper conduct that occurred in that municipal court. Plaintiff filed these complaints through proper channels pursuant to New Jersey Court Rules.

38. Rather than allow the judicial oversight bodies to address the matter, Morante inserted herself— unprompted and without any legal authority -- into Plaintiff's municipal-court affairs. Within days of his protected petitioning activity to ACJC, Morante issued letters and directives aimed at restricting Plaintiff's ability to communicate with or access the Glen Rock/Wyckoff/Ridgewood Municipal Court. She would later weaponize these same directives to unlawfully expand restrictions to other courts with which Plaintiff had never had a single incident.

39. Morante's conduct escalated rapidly. She took the unprecedented step of issuing what she termed "security directives," which purported to bar a private litigant from communicating with a municipal court, threaten him with criminal prosecution for attempting ordinary court communication, and portray him – falsely -- as a security risk.

40. In the ensuing months, Morante broadened her actions far beyond municipal court boundaries. Though her position does not grant her adjudicative or administrative authority over court-user access, Morante acted as if she possessed unilateral power to impose statewide restrictions upon Plaintiff, ultimately causing Plaintiff to be blocked from telephoning or emailing any Superior Court in New Jersey, the ACJC, the Administrative Office of the Courts, and even the New Jersey Supreme Court offices in Trenton.

12

41. At no time did any judge, administrator, or judicial body issue an order restricting Plaintiff's access to any court. At no time did Plaintiff engage in any conduct warranting such a restriction. Plaintiff had no disciplinary history, had never been violent, had never threatened anyone, had never caused a security incident, and had never been the subject of any judicial warning in any Superior Court. Plaintiff has no criminal record whatsoever in his entire 41 years of life, 37 of which have been spent as a law-abiding resident of New Jersey, and he still maintains a completely clean criminal record to this day. Nothing in his conduct justified the severe actions later taken by Morante.

42. Morante's conduct was carried out in secrecy, without providing Plaintiff notice or an opportunity to be heard, in violation of fundamental due-process requirements. She never initiated any formal process, never provided any factual basis, never afforded Plaintiff a chance to contest any allegation—because, as the documents show, there was no allegation to contest other than Morante's displeasure with his protected complaints to ACJC.

43. Morante's actions further included the creation and dissemination of defamatory, misleading, and stigmatizing materials, including an internal "Wanted-style" bulletin bearing Plaintiff's name and photograph and describing him as a security concern. Morante circulated or directed the circulation of this material to the Glen Rock Police Department, where Plaintiff personally viewed it on June 26, 2023, and throughout the Bergen County judicial system.

44. By weaponizing her office, misrepresenting Plaintiff as a threat, and distributing stigmatizing material to law-enforcement and court personnel, Morante set into motion a cascading chain of prejudicial effects—affecting municipal, Superior, and Family Courts; influencing judicial personnel; causing courts to deny Plaintiff notice; and ultimately contributing directly to the catastrophic events of October 9, 2025, addressed in PART II.

45. What began as a municipal-court misconduct complaint evolved, due solely to Morante's unauthorized retaliation, into a statewide deprivation of Plaintiff's constitutional rights in violation

13

of the First Amendment, Fourteenth Amendment, 42 U.S.C. § 1983, and the New Jersey Civil Rights Act.

46. Morante's actions were not taken pursuant to any judicial order, rule, or delegated judicial function. She did not execute, enforce, or implement a judge's directive. Instead, she independently created access restrictions, disseminated false security narratives, intercepted communications, and influenced judicial proceedings without judicial involvement. Such conduct is administrative, investigative, and retaliatory in nature -- not adjudicative -- and therefore is not protected by absolute or quasi-judicial immunity.

**Section B – June 2023: Initial Directives, "Wanted-Style" Bulletin, and Bergen County Dissemination**

47. In June 2023, immediately following Plaintiff's protected judicial-misconduct complaint to the Advisory Committee on Judicial Conduct (ACJC) concerning the conduct of a Glen Rock Municipal Court judge and the Glen Rock Municipal Court Administrator, Defendant Morante undertook her first retaliatory actions. These actions had no basis in law, procedure, or any legitimate security concern.

48. On June 12, 2023, Morante issued the first of what she called "amended access" directives to Plaintiff This letter purported -- without any lawful authority -- to restrict Plaintiff's ability to telephone, email, or communicate with the Glen Rock / Wyckoff / Ridgewood Municipal Court, and threatened him with undefined consequences for attempting ordinary court communication.

49. Nothing in New Jersey statutes, court rules, administrative regulations, or AOC security protocols gives Morante the power to alter a litigant's access to a municipal court. Nor is there any mechanism by which the AOC's Court Security Unit can unilaterally impose communication bans on a private citizen who has not engaged in any threatening or improper conduct. Nevertheless, Morante advanced her own unilateral policy as if she possessed such authority.

14

50. On June 26, 2023, Plaintiff personally observed the "Wanted-style" bulletin featuring his name and photograph, posted in the Glen Rock Police Department, which had been circulated as part of Morante's retaliatory actions. The bulletin portrayed Plaintiff as a person of concern and implied he was a threat to court personnel -- an entirely false portrayal without factual basis.

51. The bulletin bore the hallmarks of a law-enforcement alert despite the fact that no criminal investigation existed, no charges existed, no disciplinary event existed, and no law-enforcement agency had ever deemed Plaintiff a threat. Its creation and circulation constituted a false official stigmatization, meeting the criteria of both a "stigma-plus" constitutional violation and a retaliatory adverse action under the First and Fourteenth Amendments.

52. The next day, on June 27, 2023, Morante issued a second letter -- styled as a "clarification" -- again purporting to amend Plaintiff's access to the Glen Rock/Wyckoff/Ridgewood Municipal Court. This letter reiterated the restrictions described on June 12, referenced communications with Glen Rock Police Department, and explicitly threatened Plaintiff with police investigation if he attempted to communicate in ways the court rules ordinarily require from litigants.

53. These June directives were disseminated throughout Bergen County law enforcement and judicial offices, including the Glen Rock Police Department, as evidenced both by the bulletin Plaintiff personally observed on June 26 and by email communications within the PDF collections confirming their receipt and circulation.

54. At the time these directives were issued, Plaintiff had no criminal record, had no history of misconduct, had never engaged in threatening behavior toward any court staff, and had never been subject to any judicial warning or security notation. Nothing in his conduct justified the issuance or distribution of a stigmatizing bulletin or an "access-amended" letter. These actions were based solely on Plaintiff's constitutionally protected activity: filing a lawful judicial misconduct complaint.

55. The absence of any factual basis for these extraordinary measures demonstrates that the June 12 and June 27 directives were retaliatory in nature, designed not to protect court security but to punish Plaintiff for engaging in oversight of a municipal judge and administrator. These letters would become the foundation for Morante's escalating pattern of abuse -- ultimately expanding beyond municipal courts and resulting in statewide impediments to Plaintiff's participation in the judicial system.

56. As later sections will show, Morante eventually used the June directives -- initially limited to a single municipal court -- to justify, fabricate, and expand similar restrictions across all Superior Courts in New Jersey, a leap for which she had no jurisdiction or legal authority whatsoever. These unauthorized expansions became central to the broader pattern of unconstitutional interference that continued into 2024 and 2025.

**Section C - Expansion of Covert Restrictions, Communications Blocks, and Statewide Superior Court Interference (2023–2025)**

57. Although Morante's June 2023 directives were expressly limited -- on their face -- to the Glen Rock/Wyckoff/Ridgewood Municipal Court, she soon began to treat those letters as if they constituted a blanket authorization to restrict Plaintiff's access to *any* court in the State of New Jersey, despite having no such authority and no factual or legal basis to expand their scope.

58. Morante then began -- without notice, justification, or official approval -- to reinterpret the municipal directive letters as a basis for imposing broader "security" restrictions. This had the effect of transforming a local municipal-court retaliation into a de facto statewide access regime, entirely of her own making.

59. Despite having no statutory or regulatory authority to regulate litigant access to New Jersey's Superior Courts, Morante took it upon herself to ensure that the restrictions she had unilaterally imposed in June 2023 were applied -- covertly and without record -- to all Superior Courts in New Jersey. This expansion occurred later in 2023, though no document was ever provided to Plaintiff

and no notice was ever issued. The expansion was discovered only through the consequences it produced.

60. Beginning in late 2023 and continuing through 2024 and 2025, Plaintiff found himself unable to telephone any Superior Court in the state. He personally tested and recorded attempts to call courthouses in Bergen County, Mercer County, Cape May County, and others, all of which failed. His calls were blocked at the carrier or system level.

61. These blocks were not incidental or technical. They were systematic and targeted: Plaintiff was also unable to call the Administrative Office of the Courts, the Advisory Committee on Judicial Conduct (ACJC), and the New Jersey Supreme Court's offices in Trenton -- even though such calls are ordinarily answered by administrative staff without difficulty. Critically, at the time these blocks were in effect, Plaintiff had a pending judicial misconduct complaint before the ACJC against Judge Pfund, and the communications blockade prevented Plaintiff from contacting the ACJC regarding that active ethics matter, constituting direct interference with the judicial disciplinary process.

62. The AOC's December 11, 2025 letter is further evidence of this retaliatory animus, as it threatens Plaintiff for expressing his intent to pursue legal action.

63. Upon information and belief, no other litigant in the State of New Jersey was subjected to a telecommunications or email blockade preventing them from contacting *any* Superior Court or judicial agency, and the Judiciary has no written policy authorizing such a measure. The only plausible source -- and the only person shown in the documents to have the motive, opportunity, and self-asserted authority to do so -- was Morante.

64. At no point was Plaintiff ever provided a judicial order, administrative notice, or explanation of why he was being prevented from contacting courts of law. No judge ever imposed any restriction. No clerk's office ever issued any written communication. No legal proceeding ever addressed or

17

justified such an obstruction. These facts are confirmed in the AOC's December 11, 2025 letter to Plaintiff, which does not cite any judicial order.

65. The origin of the misinformation and defamatory "security" narrative remained Bergen County, where the June 2023 directives and the "Wanted-style" bulletin were circulated. However, the effects of Morante's conduct became statewide: a litigant who had never engaged in misconduct and who had no criminal or disciplinary history was rendered functionally unable to access the New Jersey judicial system at all.

66. This communications blockade deprived Plaintiff of the ability to:

    (a) schedule hearings;
    (b) confirm court dates;
    (c) request records;
    (d) speak to court administrators;
    (e) address errors in court calendars;
    (f) communicate with ACJC regarding judicial misconduct complaints;
    (g) contact the AOC regarding administrative concerns; and
    (h) perform the most basic acts required of a litigant.

67. These deprivations constitute a violation of Plaintiff's constitutional right of access to the courts under the First and Fourteenth Amendments, as well as an interference with his ability to petition for redress of grievances -- another protected activity.

68. Morante's actions also created a false statewide perception that Plaintiff was "restricted," "flagged," or otherwise barred from communication, even though no such official designation existed. This resulted in Superior Court staff refusing to speak with him, courts refusing to return calls, and judicial offices taking adverse actions based solely on the misinformation Morante created and circulated.

69. Importantly, this statewide access restriction was not the result of any misconduct by Plaintiff. As stated earlier, Plaintiff has no criminal record, has never engaged in threatening conduct, has never

18

caused a security event, and has never been the subject of any legitimate judicial warning. The blockade was the product of Morante's retaliation—not of any legitimate security protocol.

70. By covertly expanding a baseless municipal directive into an unauthorized statewide communications block, Morante transformed an arbitrary personal retaliation into an unprecedented deprivation of constitutional rights—one that would soon bleed into Plaintiff's municipal, Family Court, and record-access matters, causing increasing harm through 2024 and 2025.

**Section D - Interference With Plaintiff's Probable-Cause Hearing as a Crime Victim in the Hawthorne Municipal Court**

71. In addition to imposing unauthorized restrictions upon Plaintiff's access to courts across New Jersey, Morante escalated her misconduct by obstructing a criminal complaint in which Plaintiff was the victim and the complainant -- a matter wholly unrelated to her position, authority, or jurisdiction.

72. In 2023, Plaintiff filed a criminal complaint against the then-Glen Rock Municipal Court Administrator, who is no longer employed there, for misconduct that constituted criminal offenses. The complaint was formally reviewed by the Bergen County Prosecutor's Office, which determined that the allegations were legally sufficient and approved the matter to proceed to a probable-cause hearing.

73. The Bergen County Prosecutor's Office expressly informed Plaintiff -- in writing -- that he would be afforded a probable-cause hearing and that the matter would be heard in the Hawthorne Municipal Court, an independent venue selected due to conflicts involving Glen Rock personnel.

74. As confirmed by Plaintiff's audio-recorded telephone call, Plaintiff contacted the Hawthorne Municipal Court after receiving a letter informing him that probable cause had not been found. This letter directly contradicted what the Bergen County Prosecutor's Office had informed him in writing—that a probable-cause hearing had been approved and that he would be afforded one in

19

Hawthorne. Plaintiff therefore called Hawthorne to clarify the discrepancy. During this call, the Hawthorne Municipal Court Administrator informed Plaintiff that the court had been contacted by Robin Morante, and that Hawthorne staff had been told not to speak with him, preventing him from correcting the record or obtaining any explanation.

75. The Hawthorne administrator stated explicitly -- both in substance and in tone -- that the court was instructed by Morante that communication with Plaintiff was "not allowed", despite the fact that Plaintiff was the *complainant*, not the accused. This prevented Plaintiff from obtaining basic procedural information about a hearing the Prosecutor's Office had approved and which Plaintiff was legally entitled to attend and participate in.

76. Neither the Hawthorne Municipal Court judge, nor any Hawthorne staff member, nor the Bergen County Prosecutor's Office issued any directive restricting Plaintiff's communication with the court. The only individual shown to have done so was Morante, acting entirely outside her authority and with no connection whatsoever to the underlying criminal complaint.

77. Morante's interference thus obstructed Plaintiff's ability to pursue a criminal matter in which he was the victim, prevented him from receiving notice and procedural information, and denied him meaningful participation in a probable-cause hearing that New Jersey law guaranteed him. Her actions therefore violated not only Plaintiff's constitutional rights, but also the rights afforded to crime victims under New Jersey law.

78. Nothing in Plaintiff's conduct would justify barring a crime victim from communicating with a court. As described earlier, Plaintiff has no criminal record, has never engaged in threatening or improper behavior, and has never been the subject of any legitimate court-imposed restriction. The obstruction of his criminal complaint was motivated solely by Morante's retaliatory animus, not by any legitimate security concern.

79. By giving unauthorized instructions to Hawthorne Municipal Court personnel -- effectively commanding them not to communicate with Plaintiff -- Morante acted as though she possessed

20

supervisory authority over municipal court processes, when in fact she holds no such power. Her conduct represents an unprecedented and unlawful intrusion into judicial proceedings and an obstruction of a crime victim's right to seek redress.

80. The same retaliatory pattern that began in June 2023 with false "security" designations and unauthorized access restrictions now extended into yet another sphere: the interference with an active criminal complaint filed by Plaintiff as a victim, demonstrating the breadth and intentionality of Morante's misconduct.

**Section E - Interception of Transcript Requests and Suppression of Evidence (2024)**

81. In March 2024, Morante escalated her interference into yet another domain of judicial process: the interception and suppression of Plaintiff's communications with the Bergen County Transcripts/Recordings Unit, obstructing his ability to obtain evidence he was legally entitled to access. This interference had the effect of disrupting both his litigation activities and his ability to pursue judicial accountability.

82. On March 21, 2024, Plaintiff sent an email to the Bergen County Transcripts Office requesting the audio and video recordings of a prior court proceeding. His email was addressed directly to the official transcripts mailbox as required by the Judiciary's procedures.

83. Rather than allow the Transcripts Office to receive or respond to the request, Morante intercepted Plaintiff's email almost immediately. The documentary record shows that before any court staff member could reply, Morante injected herself into the communication chain and forwarded a selectively edited version of Plaintiff's email to the Transcripts Office.

84. The response from the Transcripts Office confirms that they never received Plaintiff's original email. Instead, they only received a filtered forward from Morante. In their reply, the Transcripts Office stated that they could not locate any submission from Plaintiff and asked whether he had

21

sent the required request form to their official mailbox—proof that the Office never saw Plaintiff's original communication.

85. Morante's forwarding email omitted key context and conveyed a misleading impression that Plaintiff was a problem litigant whose communications required oversight. Her email appeared to be an effort to frame Plaintiff as someone whose requests should be viewed suspiciously, mirroring the false narrative she had already disseminated across Bergen County.

86. By intercepting and altering a litigant's communication with the Transcripts Office, Morante engaged in conduct that is both improper and unprecedented. The Transcripts Office is one of the most ministerial arms of the Judiciary; its purpose is to provide litigants access to records, and it operates independently of judicial security. Nothing in its function or workflow requires, permits, or benefits from interference by the Chief of Court Security.

87. The AOC's December 11, 2025 letter denies Plaintiff's access was ever restricted, which is contradicted by documentary evidence and the ongoing bans reaffirmed in that letter

88. The interception of Plaintiff's transcript request deprived him of timely access to critical evidence and impeded his ability to seek judicial review, challenge prior proceedings, and maintain a record of what occurred. This constitutes a direct infringement of Plaintiff's constitutional right to access the courts, as well as interference with his due process rights.

89. The interference also had ramifications for Plaintiff's ability to pursue administrative and judicial accountability. Because his ACJC complaint and other oversight matters required him to document communications with municipal and Superior Court personnel, the obstruction of transcript access hampered his ability to vindicate his grievances before oversight bodies.

90. The pattern shown in such e-mails establishes that Morante deliberately inserted herself into Plaintiff's communication pathways -- reviewing, filtering, and suppressing emails before they reached their intended recipients. Her conduct is consistent with the broader surveillance-and-interference regime she imposed beginning in June 2023.

91. As in previous incidents, no judicial order authorized this interference. No judge instructed the Transcripts Office to involve Morante. No court administrator delegated any supervisory authority to the Chief of Court Security. This action was undertaken independently by Morante, in furtherance of her retaliatory campaign against Plaintiff.

92. The suppression of Plaintiff's transcript request forms yet another example of how Morante used her position to control the flow of information to and from courts whenever Plaintiff attempted to exercise his rights. This behavior aligns with earlier acts of disseminating false security concerns, expanding unauthorized restrictions, and preventing Plaintiff from contacting judicial personnel.

93. These actions also foreshadowed an even more serious intrusion: the unauthorized intervention in Plaintiff's Family Court case, which would unfold in July 2024 and lead to a series of hostile rulings and due process violations described in Section G.

**Section F - Retaliatory State Police Visit Triggered by Plaintiff's March 21, 2024 Whistleblower Complaint Against Defendant Morante for Violating his Civil Rights**

94. On March 21, 2024, Plaintiff emailed Defendant Morante regarding her interference with Plaintiff's March 5, 2024 transcript request and her prior misconduct. In these messages Plaintiff explicitly stated that her actions were improper, retaliatory, unethical, and illegal, and that her interference violated Plaintiff's civil rights. Plaintiff informed Defendant Morante that he had documentary evidence, audio recordings, and confirmation from the transcript unit proving that she had intercepted, delayed, or suppressed filings. Plaintiff also advised that he had alerted appropriate oversight authorities.

95. Plaintiff's March 21 emails were wholly lawful and fall squarely under First Amendment protected activity, including the right to petition the government, report misconduct, and communicate with judicial officers regarding systemic violation of rights.

96. The very next day, on March 22, 2024, New Jersey State Police troopers -- acting under the authority of the Judiciary's Central Security Unit -- arrived at Plaintiff's home and initiated an in-person and phone "investigation" into Plaintiff's protected email communications.

97. The (recorded) 40-minute conversation between Plaintiff and Detective Plaza of the NJSP Central Security Unit confirms that the police visit was triggered directly and exclusively by Plaintiff's emails reporting Defendant Morante's misconduct.

98. Detective Plaza explicitly admitted that Plaintiff's emails were forwarded to the State Police from Morante's office, stating: "The emails you sent... they were sent to me from her office."

99. This admission establishes that Defendant Morante, or individuals acting under her direction or supervision, contacted State Police, initiated a "security" investigation, and portrayed Plaintiff's protected complaints as a matter of judicial threat or harassment.

100.    Detective Plaza also identified himself as part of the Central Security Unit, which "deals with threats and harassment against members of the judiciary."

101. Plaintiff made no threats whatsoever. Plaintiff's emails contained no violent language, no profanities, no aggressive rhetoric, and no improper conduct. They were purely factual complaints regarding unlawful interference with Plaintiff's transcript request -- a matter essential for appellate access.

102. Detective Plaza confirmed this, explicitly stating to Plaintiff: "I didn't see any threats."

103. Despite acknowledging that Plaintiff made no threats, and despite further acknowledging that "everything you're doing is well within your rights," the State Police still appeared at Plaintiff's home and initiated an intrusive inquiry. Detective Plaza admitted that the matter was being treated as a "harassment case," notwithstanding the absence of any harassing conduct, stating: "It's being treated as a harassment case."

24

104. This characterization was false, and Plaintiff explained to the detective that the underlying problem was Defendant Morante's ongoing interference with Plaintiff's court access, including her attempt to block, intercept, or redirect his March 5 transcript request.

105. During the conversation, Detective Plaza further revealed that Defendant Morante had invoked or referenced an "amended access restriction" against Plaintiff that had never been adjudicated, subjected to due process, or even provided to Plaintiff.

106. However, Detective Plaza then told Plaintiff that, in prior cases, courthouse "access restriction" directives "get made into...a court order" and become "court mandated," then described restrictions mirroring Plaintiff's (mail-only/in-person-only and no emails or phone calls to the courthouse). Yet, Plaintiff was forced to comply with these court-order-level restrictions without a court order -- with no hearing, no notice, no findings, and no meaningful avenue to contest them. The AOC's December 11, 2025 letter falsely claims Plaintiff received due process despite the complete absence of any notice, hearing, or judicial order.

107. Plaintiff explained repeatedly that this alleged "restriction" was nonexistent at the time of the events and was instead created or modified after-the-fact by Defendant Morante to justify her conduct and to retroactively validate her obstruction of Plaintiff's filings. Plaintiff stated that Defendant Morante had been "making up rules after the fact" and falsely portraying Plaintiff's lawful conduct as a security concern.

108. The presence of the State Police at Plaintiff's home -- within 24 hours of Plaintiff reporting Defendant Morante's civil rights violations -- constituted a profound escalation, and a clear act of retaliation orchestrated by Defendant Morante and/or personnel in her office.

109. Plaintiff had (and has) a statutory and constitutional right to:

      (a) file grievance-related emails,
      (b) report misconduct,
      (c) request transcripts for appellate purposes,
      (d) criticize judicial staff, and
      (e) challenge interference with his access to court.

110. Instead of addressing Plaintiff's concerns or correcting her misconduct, Defendant Morante weaponized the Central Security Unit and utilized State Police personnel to intimidate, chill, or dissuade Plaintiff from asserting his rights.

111. The police interrogation was not supported by any legal cause, evidentiary basis, or legitimate security concern. It was a pretextual misuse of state power initiated solely because Plaintiff accused Defendant Morante of violating his rights.  Plaintiff's protected First Amendment activity -- reporting misconduct and asserting the right to transcripts -- was met the next day with an armed police visit, interrogation, and an unwarranted security investigation. This represents a textbook example of retaliation under color of law, actionable under 42 U.S.C. § 1983.

**Section G - Interference in Plaintiff's Family Court Matter, Prejudicing Judge Antoniewicz (2024)**

112. In the summer of 2024, Morante escalated her retaliation to an even more alarming level by inserting herself into a pending Bergen County Family Court case involving Plaintiff. Morante had no role in that case, no authority over the Family Division, and no legitimate reason to involve herself in any Family Court proceeding. Yet on July 30, 2024, she did so deliberately and with the clear purpose of influencing judicial perception and treatment of Plaintiff.

113. On that date, Morante sent an unsolicited email directly to the law clerk of the newly assigned Family Court judge, attaching emails Plaintiff had recently sent regarding scheduling matters.

114. In her email to the law clerk, Morante asked chambers to "see the attached two emails" from Plaintiff, and -- most troublingly -- expressed a desire to ensure that chambers "handle this litigant accordingly." This phrase, vague but unmistakably prejudicial, was an instruction to treat Plaintiff as a problem or threat, not as a litigant entitled to equal access under the law.

115. The AOC's December 11, 2025 letter adopts and legitimizes the AOC's prior unlawful conduct, further evidencing ratification by policymakers.

116. Nothing in Plaintiff's communications to Family Court staff was improper, threatening, or excessive. The emails Morante forwarded were routine inquiries relating to scheduling and

26

procedural clarity. They contained no language that could reasonably or objectively be interpreted as alarming, hostile, or otherwise inappropriate.

117. Morante had no supervisory authority over Family Court judges, no oversight authority over chambers, and no jurisdictional relationship to Bergen County's Family Division. Nevertheless, she leveraged her title as Chief of Court & Judicial Security to convey to chambers that Plaintiff should be treated as a security issue, not as an ordinary litigant.

118. The timing of Morante's email corresponds directly with a sudden and dramatic shift in how Family Court handled communications with Plaintiff. Prior to July 30, 2024, court staff regularly communicated with him by email, including providing information about scheduling, adjournments, and docket activity. Immediately after Morante contacted chambers, this changed.

119. On the same day of Morante's interference, Family Court emailed the opposing counsel, notifying them of an adjournment in the case -- but did not notify Plaintiff, despite his being self-represented and entitled to notice. The court's email included opposing counsel and internal staff, yet deliberately omitted Plaintiff.

120. Plaintiff was not informed of the adjournment until he repeatedly contacted opposing counsel directly, demanding proof of the adjournment and an explanation as to why he had not been copied.

121. Opposing counsel acknowledged receiving notice but offered no justification for Plaintiff's exclusion.

122. The failure to notify Plaintiff of a court date change -- immediately following Morante's instruction to "handle this litigant accordingly" -- constitutes a procedural due-process violation, as notice of hearing dates is among the most fundamental protections afforded to litigants.

123. Morante's interference also triggered a dramatic shift in the presiding Family Court judge's treatment of Plaintiff. Prior to Morante's unsolicited communication, the newly assigned judge had no negative interactions with Plaintiff and no reason to form an adverse impression. After Morante's intervention, however, the judge began treating Plaintiff with marked hostility and disregard.

27

124. At the very next hearings following Morante's email, the judge issued rulings that were contrary to established law, unsupported by the facts, and disproportionately punitive. These rulings included findings that placed Plaintiff at risk of a bench warrant, despite his compliance with court orders and his consistent attempts to receive basic information from the court.

125. The judge's sudden hostility toward Plaintiff, the denial of notice of an adjournment, and the issuance of rulings that carried dire consequences are all consistent with Morante's prejudicial communication to chambers. The email's implicit message -- that Plaintiff was a person of concern or a problem litigant -- tainted the judge's perception and deprived Plaintiff of his constitutional right to an impartial tribunal.

126. Furthermore, Morante's dissemination of false "security"-based narratives to Family Court persisted beyond the July 30 email. Subsequent documents indicate that Morante remained involved in communications concerning Plaintiff, forwarding additional materials and continuing to insert herself where she had no authority, thereby perpetuating an environment of bias.

127. By intervening directly in a contested Family Court matter, Morante violated bedrock principles of judicial independence and due process. Judicial officers must be free from extrajudicial influence -- and particularly from influence by administrative personnel having neither factual knowledge nor legal authority over the proceeding.

128. The prejudice seeded by Morante's interference not only deprived Plaintiff of basic procedural fairness but also materially harmed his position in the Family Court litigation by giving rise to adverse rulings that carried severe personal and legal consequences.

129. This episode demonstrates that Morante's misconduct was not limited to preventing Plaintiff from accessing court offices -- it extended to shaping the outcome of actual adjudicative proceedings, making her misconduct both broader and more constitutionally significant.

28

130. These events set the stage for the ultimate escalation of danger and misinformation on October 9, 2025, which would not have occurred but for the multi-year campaign described in Sections A through G.

**Section H – Summary of the Multi-Year Pattern, Its Systemic Effects, and the Direct Causal Connection to the Events of October 9, 2025**

131. The acts described in Sections A through G establish that Defendant Morante engaged in a continuous, escalating, and unlawful campaign against Plaintiff spanning from June 2023 through at least late 2025. This campaign was marked by:

(a) retaliation for Plaintiff's protected judicial-misconduct complaints;

(b) unauthorized security directives issued without legal basis;

(c) circulation of stigmatizing "Wanted-style" materials;

(d) expansion of improper restrictions from a single municipal court to all Superior Courts statewide;

(e) a statewide communications blockade preventing Plaintiff from contacting any judicial office;

(f) interference with a criminal complaint in which Plaintiff was the victim;

(g) interference with the Transcripts Office, suppressing evidence and obstructing due process; and

(h) direct extrajudicial influence on a Family Court judge through prejudicial communications to chambers.

132. Taken together, these acts demonstrate that Morante wielded her administrative position to exert personal and retaliatory control over Plaintiff's access to the judiciary, well beyond the scope of any authority granted to her by statute, court rule, policy, or judicial delegation. The pattern shows a sustained misuse of the judicial security apparatus to pursue a private retaliatory agenda under the veneer of "security concerns."

133. Importantly, the documentary evidence -- including emails, internal communications, and other records -- shows that Morante repeatedly portrayed Plaintiff as a "concern," a "risk," or someone who must be "handled accordingly," despite the fact that Plaintiff has no criminal record, has never

engaged in threatening behavior, and has never been the subject of any legitimate judicial security alert.

134. These false portrayals, disseminated over multiple years and across multiple courts and agencies, created a false statewide security narrative about Plaintiff. This narrative influenced the perceptions of court staff, municipal and county law-enforcement personnel, dispatchers, clinicians, and ultimately judicial officers themselves.

135. Morante's actions ensured that Plaintiff was treated as a suspicious or dangerous individual at every point of contact with the justice system -- even though no evidence supported such a view. This stigmatization is constitutionally significant because it did not occur in isolation; rather, it was accompanied by tangible deprivations of liberty and procedural rights, including denials of notice, blocked communications, judicial hostility, and interference with legal processes.

136. The harmful effects of Morante's false narrative extended further, ultimately shaping how police, dispatch operators, emergency clinicians, and municipal actors responded to Plaintiff on October 9, 2025. These entities did not act in a vacuum; they responded to a landscape already poisoned by Morante's years-long portrayal of Plaintiff as a "security threat" or "person of concern."

137. Indeed, the severity, irrationality, and extremity of the actions taken against Plaintiff on October 9, 2025 cannot be understood without recognizing the groundwork laid by Morante. Her repeated warnings to courts, her unauthorized dissemination of "security" directives, and her interference with multiple judicial processes created an environment in which government actors were predisposed to view Plaintiff as dangerous -- even though he was not.

138. But for Morante's multi-year campaign of misinformation, interference, and retaliation, the events of October 9, 2025 would not have occurred. The chain of causation is direct and clear: Morante's false portrayal → improper restrictions → systemic suspicion → judicial prejudice → law-enforcement and clinical overreaction.

139. The events of October 9, 2025 were therefore not an isolated emergency or spontaneous response -- they were the foreseeable culmination of a narrative manufactured and disseminated by Morante over the course of more than two years. That narrative warped the lens through which multiple government actors viewed Plaintiff, leading to the grave constitutional deprivations described in PART II.

140. Accordingly, PART II of this Complaint will demonstrate in detail how the misinformation, hostility, and systemic suspicion planted by Morante directly informed and contributed to the actions taken by government officials on October 9, 2025, resulting in substantial violations of Plaintiff's First Amendment rights, Fourteenth Amendment rights, liberty interests, and bodily integrity.

141. Beginning in or about early 2023, Plaintiff's lawful correspondence and requests for redress (specifically, the filing of a judicial ethics Complaint with the Advisory Committee on Judicial Conduct ("ACJC") against the Municipal Court Judge for the Borough of Glen Rock), came to the attention of Defendant Robin Morante, a state-level official in charge of judicial and court security for the State of New Jersey. That Municipal Judge contacted Defendant Morante, and asked her to take action against Plaintiff, in retaliation for his filing of the judicial ethics complaint against him. In response, Defendant Morante, without speaking to Plaintiff or asking for his side of the story, undertook a series of retaliatory actions that targeted Plaintiff personally, with intent to cause maximum harm to his life, and without providing either proper notice or any due process whatsoever.

142. On or about June 12, 2023, Defendant Morante issued an e-mail or directive to multiple court administrators stating, in substance, that Plaintiff's communications with any New Jersey court should be "amended" or limited due to "security concerns." No prior notice, hearing, or judicial order preceded this action.

143. Morante's directive falsely characterized Plaintiff's lawful advocacy for judicial officials adhering to ethical rules, as "excessive and alarming communication," and suggesting 'instability' or a 'threat' where none existed. These characterizations were unfounded and malicious.

144. By issuing such directives on official letterhead and through state e-mail systems, Morante invoked the authority of the State of New Jersey and acted under color of law within the meaning of 42 U.S.C. § 1983.

145. Morante's June 12, 2023 directive deprived Plaintiff of procedural and substantive due process by barring access to the courts without cause or judicial review, in direct violation of Bounds v. Smith, 430 U.S. 817 (1977) and Borough of Haddonfield v. Gilmore, 188 N.J. 581 (2006).

146. On or about June 27, 2023, again without justification, Morante expanded her prohibition on Plaintiff to include telephonic and electronic contact with multiple additional judicial offices, not just the Glen Rock Municipal Court, but the State Superior Courts, as well, further impeding Plaintiff's constitutional right to petition and seek redress.

147. This abuse of authority occurred against a backdrop of heightened interdepartmental communication between state and local agencies, such that Morante's misrepresentations rapidly spread among municipal police departments in Bergen County and beyond. On one occasion, Plaintiff was actually shown a document that was circulated by Morante to police departments, which resembled an "FBI's Most Wanted" poster, including a (10-years-old) color photo of Plaintiff that she had found on the internet. Morante circulated this "bulletin" regarding Plaintiff as if he was a hardened criminal on the loose. In reality, Plaintiff has never been convicted of a crime in his entire life, without exception -- his criminal background is perfectly 'clean.' Morante's directives stigmatized Plaintiff as being some kind of a "security risk," and creating an unlawful "blacklist" within state systems.

148. On November 26, 2025 -- the day before Thanksgiving, when courts would close for four days – Plaintiff attempted to file an Emergency Application with the Appellate Division. Plaintiff's phone calls to the Appellate Division were blocked, including both his cellular number and Google Voice number. When a friend called on Plaintiff's behalf from her phone, the call connected immediately. The AOC's December 11, 2025 letter confirms that these statewide restrictions remain in place.

149. The clerk emailed the emergent application packet to Plaintiff at 12:24 p.m. Plaintiff completed it and emailed it back at 1:57 p.m. Around 4:05 p.m., Plaintiff realized his submission might have been intercepted, consistent with Morante's past conduct. Plaintiff attempted to call the Appellate Division again, but his calls remained blocked. His friend called the Appellate Division once more; her call again went through immediately, and she connected Plaintiff by three-way call.

150. The clerk confirmed that she had *not* received Plaintiff's Emergency Application email. Plaintiff and his friend conducted a real-time test: Plaintiff emailed the Emergent Application address and copied his friend; the friend forwarded the same email to the court. The clerk received the friend's forwarded email instantly but never received Plaintiff's.

151. Morante again blocked Plaintiff's access to the court system -- this time preventing an *emergency appellate filing.* This interference constituted a direct deprivation of Plaintiff's First Amendment right to petition the government and his Fourteenth Amendment right of access to the courts.

152. This incident further solidified the false and damaging impression of Plaintiff within court systems and contributed to the systemic suspicion and law-enforcement overreaction that culminated on October 9, 2025.

153. All of Morante's actions foreseeably resulted in reputational damage, and chilled Plaintiff's exercise of protected speech. They also laid the groundwork for negative biases amongst law enforcement officials against Plaintiff, causing subsequent law-enforcement overreach and overreaction, culminating in what took place on October 9, 2025.

154. Plaintiff repeatedly e-mailed Morante, seeking clarification and documentation from her concerning the unjustified unilateral restrictions, but was denied access to any written policy or justification. To this day, no judicial order or administrative rule authorizing Morante's conduct has ever been produced.

155. Morante's use of official channels to impose extrajudicial sanctions served as retaliation for Constitutionally protected activity (filing a legitimate judicial ethics complaint), and a deprivation of liberty and reputation without due process, violating the First and Fourteenth Amendments.

156. As a proximate result, Plaintiff suffered emotional distress, humiliation, reputational damage, and interference with various legal proceedings pending in New Jersey courts.

## EFFECT ON PLAINTIFF – FORESEEABLE CONSEQUENCES OF THE MULTI-YEAR PATTERN

157. The multi-year pattern of retaliatory conduct described in Part I profoundly altered Plaintiff's ability to function within the New Jersey judicial system and caused significant personal, emotional, familial, and professional harm. Plaintiff was systematically denied access to essential judicial processes, stigmatized as dangerous based on fabricated information, and placed under unconstitutional restrictions without notice or due process. These actions caused escalating fear, humiliation, reputational injury, and a pervasive inability to vindicate his rights in courts of law. The accumulation of false "danger" narratives created a statewide presumption of hostility toward Plaintiff across multiple agencies, directly setting the stage for the extreme and unconstitutional escalation that occurred on October 9, 2025.

158. But for Defendant Morante's multi-year dissemination of false security narratives, unauthorized access restrictions, and stigmatizing characterizations portraying Plaintiff as dangerous or unstable, Plaintiff would not have been treated as a threat by law-enforcement, dispatch, or crisis-response personnel on October 9, 2025. The actions taken that day were the foreseeable culmination of Defendants' prior misconduct, not an independent or spontaneous intervention.

34

## PART II – THE EVENTS OF OCTOBER 9, 2025

**A. The Triggering Event**

159. On the morning of October 9, 2025, Plaintiff sent a brief e-mail to a former family law attorney of his, asking to speak with her as soon as possible, because he wanted to ask her a few questions about a court hearing he had coming up soon.

160. After a few hours had passed without a response, Plaintiff sent a follow-up e-mail to reiterate the urgency, and to press her to speak with him by phone that day.

161. In order to properly transmit the urgency of the event, Plaintiff referred to events in the past that were a direct consequence of his former attorney's recommendation of hiring a particular individual in a professional context, and implied that she 'owed' him a phone call as a result. The e-mail contained *no* threats or *any* other kind of language suggesting imminent harm to any person, including himself. The e-mail described how Plaintiff "*had*" felt in the past, *not* how he was feeling in the *present*.

162. Nevertheless, that second e-mail was misinterpreted by the attorney's legal assistant (who had never met Plaintiff before, and the attorney was away on vacation), and the legal assistant proceeded to call the Mahwah Police Department at 12:05pm to report alleged "concern" about Plaintiff being in "danger" of engaging in "self-harm." Both e-mails are shown below, in their entirety:

35



**Re: Today**

Thu, Oct 9, 2025 at 11:39 AM

To: Judith Hartz <judithhartz@kozyrahartz.com>
Cc: Marybeth Sampson <marybethsampson@kozyrahartz.com>

A timely response would be appreciated,

Judy, I have considered ending my own life, on multiple occasions, over this. You can at least speak with me.

Sent from my iPhone

> On Oct 9. 2025, at 8:51 AM ▆▆▆▆▆▆▆▆ @gmail.com> wrote:
>
> I need to speak with you. Please let me know what time you can do so,
>
> ▆▆▆▆▆ ruined my life. You recommended him to me. I think you can at least get on a phone call with me.
>
>
> Sent from my iPhone

### B. The Mahwah Police Department's 'Attempt' to Locate Plaintiff

163. On October 9, 2025, the street on which Plaintiff lives was being re-paved by the Township, and as such, the entire street was blocked off by at least one Mahwah PD vehicle/officer throughout the entire day. That Mahwah PD officer and their vehicle spent the day parked just a few feet from Plaintiff's yard, with a clear and full view of the house.

164. At 12:22pm, *seventeen minutes after* receiving the alleged report of "concern" about Plaintiff's welfare[3], two officers from the Mahwah Police Department, including Lt. Kevin McCombs, arrived at the front door of Plaintiff's home, and rang the doorbell a single time. Plaintiff was at the gym at the time, so he could not, and did not, answer the door.

165. After ringing the doorbell a single time, a mere 26 seconds later, Lt. McCombs received a phone call on his personal cell phone, and walked away from Plaintiff's front door and house.

---

[3] In spite of this long delay to get to Plaintiff's home, the Mahwah Police Department insists that the e-mail that was brought to their attention was *so* "concerning" that it constituted an "emergency" and they needed to act under the "exigent circumstances" doctrine, which will be explained further down in this Complaint.

166. Not only did Lt. McCombs fail to ring Plaintiff's doorbell a second time, he also did not even *attempt* to call Plaintiff on his cell phone, despite being in possession of Plaintiff's cell phone number.

167. Prior to the police showing up at the front door of Plaintiff's house, Plaintiff had a friendly conversation with the supervisor of the street paving crew when he left his house earlier that morning, around 10:30am. The two men spoke for about ten (10) minutes, and Plaintiff mentioned that he was bringing his vehicle to Firestone in Wyckoff to get the engine looked at. He further stated that he planned to take advantage of the fact that his gym was right across the street, so he could spend the time his vehicle was being serviced, working out.

168. After ringing Plaintiff's doorbell at 12:22pm, Lt. McCombs spoke with the paving supervisor, who informed him of the conversation that he had earlier with Plaintiff, and suggested that Plaintiff may still be at either his gym or Firestone.

169. At 12:31pm, Lt. McCombs called the Wyckoff Police Department, and they had Sgt. Kyle Ferreira call Lt. McCombs back. On that call, McCombs requested that Wyckoff send an officer to Firestone and the YMCA to look for Plaintiff and/or his vehicle, for a welfare check.

170. This phone call was conducted using personal cell phones, in violation of Department policy, and therefore, no recording of such call exists. However, instead of expressing actual, genuine 'concern' for Plaintiff's safety and well-being, Lt. McCombs apparently disparaged Plaintiff, personally, to Sgt. Ferreira. This was done without Lt. McCombs and Plaintiff ever having communicated with each other before. If they ever had, it would have been brief, and several years prior.

171. Plaintiff had seen the two Mahwah Police officers ring his doorbell through the camera on his Ring Doorbell app, so after finishing his workout, Plaintiff left the Wyckoff YMCA and called

the Mahwah Police Department (12:37pm) to inquire as to why two police officers had been at his door, fifteen (15) minutes prior. Plaintiff was placed on hold for several minutes.

172. At 12:42pm, Sgt. Ferreira of the Wyckoff Police Department drove to the Firestone to look for Plaintiff's vehicle. At the time, Plaintiff's vehicle was undergoing service, and so it was in the garage, rather than the outdoor parking lot. Sgt. Ferreira did not bother to search the actual garage, or even make an attempt to ask any Firestone employees if they had seen Plaintiff recently, but reported back to Mahwah PD that Plaintiff's vehicle was not present, and that he must have driven home already. Notwithstanding his theory of where Plaintiff must have gone, Sgt. Ferreira continued on to the Wyckoff YMCA.

173. Unlike at Firestone, where he simply stayed in his vehicle and looked outside for a vehicle that matched the description of Plaintiff's vehicle, Sgt. Ferreira decided to go inside of the YMCA. As soon as Sgt. Ferreira walked into the front door of the YMCA, he was greeted by a YMCA employee, who he appeared to have a prior professional and/or personal relationship with. As Sgt. Ferreira walked through the door, his first words were (sarcastically), "fun times…" The two men had spoken a few minutes prior -- again, via Sgt. Ferreira's personal cell phone, in violation of Department policy, but this time his improper call was to the YMCA staff member's cell phone. As a result, once again, Sgt. Ferreira's call was not recorded.

174. As the YMCA staff member was walking Sgt. Ferreira into and around the gym/fitness area to see if Plaintiff was there, Sgt. Ferreira spent his forty seconds inside the gym making various comments to the staff member about the gym, such as: "Are these all new machines in here?"; "Nice, man!"; "Seriously, look at all this stuff!"; and also commented that he needs to come into the gym more often. Such comments would not be expected if the goal of the law enforcement officer's visit was to search for an individual who was (allegedly) believed to be at imminent risk of serious injury or death.

38

175. As the two men were walking out of the gym, the YMCA staff member made a comment about knowing Plaintiff, and Sgt. Ferreira responded (sarcastically), "Oh yeah, he's a peach!" However, Sgt. Ferreira and Plaintiff had *never* spoken with each other before.

176. In fact, the only direct contact that anybody within the Wyckoff Police Department and Plaintiff had, prior to October 9, 2025, was on April 16, 2025, when Plaintiff called the Wyckoff Police Department after he saw an elderly woman fall down in a TD Bank parking lot in Wyckoff. After Plaintiff quickly called 9-1-1, he stayed in the parking lot with the injured woman for about 45 minutes, until the paramedics arrived. Not only that, but Plaintiff even took off his sweatshirt to support the woman's head, so that it would not be on the cold and hard pavement while waiting for the paramedics to arrive. Plaintiff then proceeded to go across the street to CVS, and purchased a blow-up pillow for her to use, as well. Plaintiff then assisted in getting the injured woman onto the gurney and into the ambulance. This was the only prior contact with the Wyckoff Police Department that Plaintiff ever had, until October 9, 2025.

177. Nevertheless, at the end of the conversation between Sgt. Ferreira and the YMCA staff member, Sgt. Ferreira said, "He's a, he a, this guy he like, he thinks he's an attorney, too, he's like 'I know my rights!' One of those guys." Sgt. Ferreira spoke about Plaintiff "knowing his rights" as if that was a 'bad' thing. Upon information and belief, Sgt. Ferreira received this information from Lt. McCombs, who spoke disparagingly about Plaintiff, despite claiming to be "concerned" about his physical safety and well-being. So "concerned" about saving Plaintiff from himself, that he relied upon the "exigent circumstances" doctrine in his later actions.

178. Plaintiff has a Law Degree, and is, in fact, a former litigator.

179. Upon information and belief, when Lt. McCombs and Sgt. Ferreira had spoken about Plaintiff (improperly via their personal cell phones, so there is no recording of it) that day, Lt. McCombs

39

must have spent time on that allegedly 'emergent' call disparaging Plaintiff personally, to Sgt. Ferreira.

180. At that point, Lt. McCombs had not yet made contact with Plaintiff. He had rang Plaintiff's doorbell one time, left less than 30 seconds later, and *had not attempted to call Plaintiff on his cell phone.*

181. Circling back to Paragraph 170, above, after Plaintiff called the Mahwah Police Department at 12:37pm, he was placed on hold for several minutes. Eventually, Lt. McCombs picked up the call. Unbeknownst to Plaintiff at that time, Lt. McCombs had just finished his personal cell phone call with Sgt. Ferreira, wherein he had apparently been making disparaging comments about Plaintiff behind his back.

182. Lt. McCombs began the conversation by telling Plaintiff that there is a "problem" because Plaintiff had "sent some concerning messages … about harming [himself]."

183. Plaintiff immediately realized what Lt. McCombs must have been referring to, laughed, and assured Lt. McCombs that the e-mail never said that he was going to harm himself, but rather that he had, in the *past*, had such thoughts, but obviously never acted on them. Plaintiff tried to explain to Lt. McCombs that somebody saying that they had thought about something in the *past* was very different from someone saying that they are thinking about doing something in the *present* or future, and that he was clearly at no risk of self-harm.

184. Lt. McCombs repeatedly responded to Plaintiff trying to explain the language of the e-mail at issue, by telling him, "I'm not getting into this with you," something he repeated at least four times during that conversation, and instead, insisted that that he must "see" Plaintiff in person.

185. Plaintiff told Lt. McCombs that he did not trust the police, and that there was no reason to meet in person, as he was in no danger of harming himself whatsoever, as the e-mail he sent to his former attorney an hour prior *also* did not express any type of current thoughts of self-harm.

186. Furthermore, Plaintiff told Lt. McCombs that he had just been working out at the gym, which could be verified by looking at the gym's records, and that it wouldn't make any logical sense for somebody to be *working out at the gym* right before they were about to commit suicide. In response, Lt. McCombs asked Plaintiff, "is your gym a mental health professional? I don't think so."

187. Throughout the entire conversation, Plaintiff repeatedly tried to explain to Lt. McCombs that the e-mail at issue did *not* say that Plaintiff was *considering* self-harm, whatsoever. Lt. McCombs continued to repeatedly respond with, "I'm not getting into it with you."

188. After speaking for approximately 11 minutes, Plaintiff became frustrated by Lt. McCombs' failure to listen to him, and asked, "Are you supposed to not listen to people on these calls? Sir, are you supposed to not listen to someone you say that you're concerned about them? And then not listen to what they're saying? Is that proper training?" While Plaintiff asked these (rhetorical) questions, Lt. McCombs tried interrupting, multiple times. Lt. McCombs then bizarrely said, "you're telling me that you want us to put out an APB for you?"

189. As Plaintiff repeatedly refused to meet Lt. McCombs in person, Lt. McCombs proposed that Plaintiff have a phone call with "262-HELP," a contracted mental-health crisis provider for Bergen County, run by CarePlus New Jersey.

190. Plaintiff responded affirmatively, "Okay, and then they'll tell you to leave me alone?"

191. Lt. McCombs stated, "If they determine that -- that they feel like you're not a harm to yourself and you're good, yeah, then they would call us and let us know."

41

192. Plaintiff asked Lt. McCombs if the two of them could call 262-HELP together, on a three-way phone call, so that everything could get cleared up directly, that way. Lt. McCombs said that he was unable to do so, but that he was going to call 262 and "let them know what's going on." Upon information and belief, Lt. McCombs indeed could have participated in a three-way phone call with 262. (See Paragraphs 211-212, below)

193. Toward the end of the call, Plaintiff asked Lt. McCombs if he wished to speak with the friend who was physically present with Plaintiff at the time, so that McCombs could personally hear from a second individual that Plaintiff was not in any danger of self-harm. Lt. McCombs responded, "No, I don't want to talk to them," rejecting the opportunity to speak with a corroborating witness who was immediately available. This refusal further demonstrated that Lt. McCombs was not genuinely attempting to assess Plaintiff's welfare, but instead was intent on escalating the situation irrespective of readily available evidence.

194. After the call between Plaintiff and Lt. McCombs had ended, Plaintiff waited for about 20 minutes for 262-HELP to call him. Finally, at 1:22pm, after not receiving any calls, Plaintiff decided to proactively call 262-HELP to resolve the matter, so that he could get on with his day.

195. Plaintiff told the 262 screener who answered the call, Defendant Rebekah Orso, that he had been waiting to receive a phone call from them, but Ms. Orso said that she had no idea what was going on or why Plaintiff was calling.

196. Unbeknownst to Plaintiff at the time, about five minutes before Plaintiff called 262-HELP (and approximately 15 minutes after Lt. McCombs hung up the phone call with Plaintiff), Lt. McCombs called 262-HELP. This call occurred at 1:15pm. Fifteen minutes passed between Lt. McCombs hanging up the phone with Plaintiff, and Lt. McCombs actually calling 262-HELP.

197. Lt. McCombs proceeded to provide the 262-HELP Screener with false information regarding Plaintiff, including the outrageously false statement that Plaintiff had "a history of being charged

42

with domestic violence." Plaintiff has *never* been charged with any kind of violence, let alone domestic violence. This was later confirmed by the Mahwah Police Department.

198. Further, the 262 Screener did not obtain an actual copy of the e-mail that Lt. McCombs was alleging to be "a problem." That e-mail was the *entire reason* why Plaintiff was even speaking with 262-HELP.

199. At the end of Lt. McCombs' call with 262, he informed them that he was going to 'ping' Plaintiff's cell phone to ascertain Plaintiff's location in order to find and locate him. This illegal 'ping' was done by Lt. McCombs before 262 even had a chance to speak with Plaintiff, let alone speak with Plaintiff and then report back to Lt. McCombs. This was also, of course, right after Lt. McCombs had spoken with Plaintiff, who assured Lt. McCombs that he was fine, was with a friend, was *not* contemplating self-harm whatsoever, and was *more than willing* to speak with somebody at 262 so that he could get on with his normal activities that day.

**C. The Warrantless Surveillance of Plaintiff and Violation of the Fourth Amendment**

200. Lt. McCombs caused Plaintiff's cell phone location data to be illegally obtained and disseminated without a warrant or a legitimate, good faith, exigent-circumstance justification, in violation of Carpenter v. United States, 138 S. Ct. 2206 (2018).

201. Law enforcement may not 'ping' a citizen's cell phone for their location unless they have first obtained a judicially signed warrant to do so, under the Fourth Amendment to the United States Constitution.

202. Law enforcement *can* temporarily bypass the warrant process, *but only* if there is a true, documented emergency, they have an objectively reasonable belief that immediate action is necessary to protect life or prevent serious physical harm, and that getting a warrant would cause dangerous delay. That is, the danger must be *real and immediate*, and there must be specific,

43

articulable facts showing a risk to human life or safety. It cannot be based on assumption or a generalized "concern."

203. Under the Stored Communications Act (18 U.S.C. §2702(c)(4)), in order for Lt. McCombs to have had Verizon conduct a 'ping' of Plaintiff's cell phone, he was required to sign a declaration, under oath, stating that (1) there was an immediate danger of death or serious physical injury, (2) the information sought was needed without delay, and (3) the request was being made in good faith under emergency authority. Lt. McCombs would have then also been required to follow up with a court order or warrant confirming the emergency, within a few days.

204. This warrantless tracking that Lt. McCombs obtained, without a true exigency, and not in good faith, enabled law-enforcement officers to monitor Plaintiff's movements in real time, constituting an unlawful search and seizure under the Fourth Amendment to the Constitution.[4]

**D. Plaintiff's Phone Call with 262-HELP**

205. As detailed in Paragraph 193, at 1:22pm, Plaintiff called '262-HELP.' The call lasted nearly an hour and a half, concluding at 2:47pm.

206. On that call, Plaintiff provided the 262 screener, Ms. Orso, with his name, date of birth, town of residence, and explained to her that the Mahwah Police Department misunderstood an e-mail that he had sent to somebody that morning from the gym, and that he was *clearly* neither suicidal nor in danger of any type of harm to himself or others.

---

[4] Plaintiff later obtained a copy of the Mahwah PD Incident Report, written two weeks later, by Lt. McCombs. A plain reading of the Report reveals that not only did Lt. McCombs make many provably false statements, but more importantly, the Report was not written in a manner that showed any actual "concern" for Plaintiff's safety or well-being, and was written much more like an "angry" police officer who was trying to make Plaintiff look bad in order to "protect" himself in future litigation brought against himself and the department. Lt. McCombs had already been made aware that his conduct was reported to Internal Affairs, at the time he wrote his Report.

207. Plaintiff even joked to Ms. Orso, telling her that he was working out at the gym at the time -- and reasoned, why would somebody who is about to kill themselves be working out at the gym? Because they "need to look good for the coroner?" Ms. Orso laughed at Plaintiff's joke, and shortly thereafter, placed Plaintiff on hold for approximately six minutes.

208. When Ms. Orso came back on the call, she told Plaintiff that she understood "the miscommunication with the e-mail," reiterating that she, like Plaintiff, understands the difference between saying something in the *past* tense, versus saying something in the *present* or *future* tense.

209. At one point, early in the conversation, Plaintiff told Ms. Orso that he was with his friend, and asked, "do you want to hear another voice here? So you can hear I'm not alone?" Plaintiff's friend, clearly not in any kind of distress, then spoke to Ms. Orso on the phone, and reiterated that Plaintiff was not at all suicidal.

210. About 26 minutes into the call, Plaintiff offered to forward the e-mail at issue to Ms. Orso. Ms. Orso provided Plaintiff with an e-mail address, Plaintiff forwarded the e-mail, and Ms. Orso confirmed receipt of the e-mail. After receiving and reviewing the actual language contained within the e-mail, she stated, not once or twice, but *three* times, that she saw and understood that the language at issue was, in fact, *past* tense, and not present or future tense. Put another way, this meant that Plaintiff was *not* any kind of threat to either himself or others.

211. Plaintiff asked Ms. Orso why -- if the Mahwah Police Department was genuinely concerned about Plaintiff's safety and was trying to locate him to 'help' him -- nobody ever tried to call him on his cell phone, *especially* if they truly thought that he was a legitimate "imminent danger" to himself. Ms. Orso stated that she understood Plaintiff's point.

212. Approximately 37 minutes into the call with 262-HELP, Plaintiff saw that he had a call coming in from the Mahwah Police Department. He asked Ms. Orso if he could answer it, merge the

45

calls, and have a three-way phone call to clear everything up and end the entire misunderstanding. Ms. Orso agreed.

213. Upon connecting the two calls, Lt. McCombs informed Plaintiff that he had sent somebody to Plaintiff's gym to look for him. This was new information to Plaintiff, who at the time, was not aware that Sgt. Ferreira had physically gone into the Wyckoff YMCA about an hour prior.

214. Startled by this information, Plaintiff asked Lt. McCombs how he knew Plaintiff was at the gym (at the time, he had forgotten that he engaged in a brief conversation with the paving supervisor outside of his house, during which he mentioned, in passing, where he was headed).

215. Instead of Lt. McCombs simply telling Plaintiff where he obtained that information, he told Plaintiff, "I'm not getting into it."

216. Again, Plaintiff asked Lt. McCombs: "So now I'm worried about being stalked. How would someone know I'm at the gym?" Lt. McCombs again responded, "I'm not getting into it."

217. A few minutes later, Plaintiff mentioned again that he was worried about who told the police that he was at the gym. Lt. McCombs responded, this time, "you're focusing on the wrong thing right now."

218. Upon information and belief, if somebody genuinely believes that they are speaking to another person who is in *imminent* danger of harming themselves, allowing that 'endangered' person to believe that they are being followed/stalked/tracked, instead of simply telling them where they obtained their information from, would be negligent, at best, and intentionally harmful, at worst.

219. Plaintiff again told Lt. McCombs that the Screener at 262-HELP, Ms. Orso, "agrees 100%" with Plaintiff regarding what his e-mail actually said, and that Plaintiff was *not* contemplating self-harm.

220. Lt. McCombs stated that if somebody from 262 calls him and tells him that Plaintiff was determined not to be a threat to himself or others, then he would stop trying to locate Plaintiff, and the 'incident' would be over.

221. After Lt. McCombs hung up from the three-way call, Plaintiff said to Ms. Orso that "it sounds like if you guys call them and tell them I'm good to go, then they'll be away." Ms. Orso agreed.

222. Plaintiff then told Ms. Orso that his friend was with him, and that they should say hi to each other, to confirm that he was not alone, and so that his friend could confirm and provide corroborating evidence, if necessary. Ms. Orso did not ask Plaintiff's friend for her name, age, address, or any kind of identifying information. She also did not ask Plaintiff's friend if she was okay, if she wanted to speak privately, or anything else, for that matter.

223. Ms. Orso again reiterated to Plaintiff that she did not think the e-mail was "concerning," and that she was going to speak with her manager, and "figure out what the best course of action would be." At this point, it was approximately 2:30pm, two full hours since Plaintiff made his proactive calls to the Mahwah Police Department, and then to 262-HELP.

224. Plaintiff told Ms. Orso, "So, [Lt. McCombs] saying on the phone that all he needs, and correct me if I'm wrong, maybe I heard him wrong. All he needs is for 262, whether it's you or someone else, someone at 262, to call the Mahwah Police Department, assure them that I've been talked to, and that I am not a danger to myself or others, then this would be over. So in my mind, right now it's 2:32pm. This should be over by 2:40pm, by way of a simple phone call. He said that that's what to do, so why can't that happen? Like I said, is there something you're not telling me? It seems like you're not willing to do that."

225. Ms. Orso replied, "no, no that's something that I am willing to do."

226. Plaintiff responded, "So you can do that and we're done?"

47

227. Ms. Orso replied, "Yes. I'm going to put you on hold just to see how quickly I can get something figured out." She then placed Plaintiff on hold again.

228. When Ms. Orso came back on the call, her understanding of the situation seemed to have changed, as she told Plaintiff that he needed to speak with someone who "isn't her" -- somebody who is "a screener themselves," and that a police officer would have to be there with Plaintiff, in person, as well. Plaintiff again reiterated to Ms. Orso that he did not feel comfortable meeting with a police officer, in person[5], which is what Ms. Orso was saying would need to happen. This was because Plaintiff was certain that the police were trying to apprehend him and take him to a psychiatric hospital, in bad faith, as they did not have a legitimate and legal justification for doing so. Absolutely no threat of self-harm had *ever* been made by Plaintiff, and all of Plaintiff's words and actions subsequent to sending the e-mail at issue, supported the fact that Plaintiff was not in any danger of self-harm or harm to others. This includes (1) having a friendly 10-minute conversation with the road paving supervisor outside his house; (2) dropping his car off to be repaired/serviced, (3) working out at the gym for two hours; (4) proactively calling the police after he saw that they came to his house; and (5) proactively calling 262-HELP when they did not call him -- all things that the Mahwah Police *knew* Plaintiff did that morning -- the exact opposite of how somebody who was about to end their own life would be spending their morning.[6]

229. Plaintiff then told Ms. Orso that he wanted her "to call the Mahwah Police Department, like you assured me you would do, and I'm believing you, I'm trusting you."

---

[5] After reading through the entirety of this Complaint, it will become very clear to the reader why Plaintiff did not trust the police.

[6] Despite the fact that Lt. McCombs and Mahwah PD knew all of these things, they still continued to allege that there were 'exigent circumstances' for 'preventing' Plaintiff from 'harming himself' -- enough to bypass obtaining a warrant to electronically surveille Plaintiff's cell phone.

48

230. Ms. Orso responded, "Yeah. Yeah. I will call them." "Okay, yeah. Yeah. Once we're off the line, I'll speak with them."

231. According to Ms. Orso's official 262 notes from that phone call, she wrote, "Screener agreed to speak with Mahwah PD." At the very end of her notes, she concluded with, "PESP [262] to follow up with Mahwah PD and Glen Rock PD regarding clt."

232. Despite Ms. Orso's firm and repeated representations to Plaintiff, *she never actually spoke with the Mahwah Police Department ever again.* In fact, records show that nobody from the Mahwah Police Department ever contacted 262 again, nor did anyone from 262 contact the Mahwah Police Department, about Plaintiff, either. However, Plaintiff had relied upon Ms. Orso's multiple representations to him, and acted accordingly, believing that the entire misunderstanding/ordeal for the prior several hours was finally over. The call between Plaintiff and Ms. Orso, which began at 1:22pm, concluded at 2:47pm.

233. On October 9, 2025, Plaintiff recorded every interaction he had that day, including all telephone communications with Mahwah Police Department officers, all communications with 262-HELP/CarePlus clinicians, and his in-person encounter with Wyckoff Sergeant Kyle Ferreira. These recordings capture Plaintiff speaking calmly, rationally, and cooperatively; explicitly denying any suicidal ideation or dangerousness; providing corroborating information; and attempting to de-escalate the situation. The recordings further capture Defendants acknowledging Plaintiff's statements and information, yet nevertheless escalating the situation, repeating falsehoods, disregarding readily available facts, and executing an involuntary seizure without lawful basis. The recordings corroborate the allegations herein and directly contradict the false statements and fabricated narratives disseminated by Defendants on and after October 9, 2025. These same false allegations were repeated in the AOC's December 11, 2025 letter to Plaintiff.

49

**E. Multi-Agency Escalation -- A Truly 'Worst Nightmare' Scenario**

234. As Plaintiff had good reason to believe that the entire ordeal had ended, following his call with Ms. Orso, he made an unrelated phone call at 3:08pm, while at his friend Mary's house. Mary had left to pick up her child at school at that point. Plaintiff made additional unrelated personal phone calls at 3:55pm, and another at 4:18pm. Plaintiff was simply going about the rest of his day -- waiting for the work on his car to be finished -- and operating under the reasonable assumption that, following his 2.5 hour ordeal on the phone with Lt. McCombs and Ms. Orso, the entire situation had been resolved and was over.

235. However, nothing could have been further from the truth. In response to an OPRA request, the Glen Rock Police Department produced an audio recording of the call that they received from the Mahwah Police Department (as well as many other calls). That call, at 2:35pm (less than ten minutes prior to Ms. Orso assuring Plaintiff that she would be contacting Mahwah PD to tell them to discontinue their search for him because he was *not* a suicide risk), started off with the Mahwah officer telling Glen Rock PD, "we are trying to locate a suicidal party ... he's in the back of someone's house." He continued: "Just to give you some background with this person, he's an EDP ("emotionally disturbed person"), umm, we've dealt with him a bunch in the past, he sent an email to I guess his lawyers today, insinuating that he wants to end his life due to the way they handled his case." This, of course, was not accurate information.

236. An "EDP" is a term that is used to describe somebody who has exhibited behavior suggesting impaired judgement, emotional instability, or psychiatric distress. Examples include: Disorganized or incoherent speech; severe agitation, panic, or uncontrollable crying; paranoia, delusions, hallucinations; self-harm gestures or threats; extreme withdrawal or catatonia; or inability to answer basic questions or maintain orientation.

50

237. Audio from the initial phone call between Plaintiff and Lt. McCombs of the Mahwah Police Department reveal that Plaintiff did not exhibit any of that behavior.

238. Additionally, somebody may be described as an "EDP," based upon information received from family members, bystanders, mental health professionals, or EMS/hospital staff. Marybeth Sampson, the legal assistant who called Mahwah Police Department regarding Plaintiff, was *none* of those. In fact, to this day, Plaintiff has never even met Ms. Sampson in his entire life.

**F. Plaintiff's Stable Medical History and Well-Managed Mental Health Prior to October 9, 2025**

239. Prior to October 9, 2025, Plaintiff had been diagnosed with Generalized Anxiety Disorder (GAD). Since his diagnosis in early 2017, Plaintiff has been consistently compliant with prescribed low-dose medication, which has effectively managed his symptoms for over eight years. Plaintiff's condition has never caused any suicidal attempts, violent ideation, erratic behavior, impaired judgment, or any symptoms associated with dangerousness. Plaintiff has never required hospitalization, crisis intervention, emergency psychiatric evaluation, or any law-enforcement involvement related to mental health.

240. Throughout this period, Plaintiff functioned normally in all aspects of life, including parenting, exercise, employment, community activity, and interpersonal relationships. Plaintiff's medical history reflects that his conditions were stable, well-managed, and did not impair his ability to exercise judgment, communicate clearly, or navigate stressful situations.

241. Accordingly, Defendants' later statements on October 9, 2025 describing Plaintiff as suicidal, dangerous, unpredictable, or an "EDP" (Emotionally Disturbed Person) were fabricated, contradicted by Plaintiff's medical history, contradicted by body-worn camera footage showing Plaintiff calm and coherent, contradicted by dispatch audio, and later contradicted by the crisis clinician who evaluated Plaintiff.

242. A woman from 'Central Dispatch' called Glen Rock PD at 2:39 p.m., stating that "Mahwah Police are pinging a phone for a suicidal party, who is also an 'EDP,' looking to see if an individual, [Plaintiff's name], is in the area." She continued that "[Plaintiff] made suicidal comments to his lawyer, and he is a resident of Mahwah." Again, this was not accurate -- Plaintiff was neither 'suicidal' nor an 'EDP.' Additionally, the e-mail was sent to his former lawyer, from several years prior, not his current lawyer. She was not familiar with or up to date with Plaintiff's daily life.[7]

243. The officer then proceeded to tell Glen Rock PD that Plaintiff "was driving around in the car with his friend," and described Plaintiff's car to Glen Rock. In reality, Plaintiff's vehicle was being serviced at Firestone in Wyckoff, where Sgt. Ferreira was supposed to have checked for it several hours prior, and all before the warrantless "pinging" of Plaintiff's cell phone had even occurred. However, Sgt. Ferreira did not enter Firestone or ask any employee whether Plaintiff's vehicle was present or in the garage (which has clear windows), to see if it was being serviced there. He did, however, walk directly into the Wyckoff YMCA, compliment the gym's new equipment, and disparage Plaintiff to a YMCA employee, despite never having spoken with or met Plaintiff before.

244. At 2:40 p.m. -- just five (5) minutes before Ms. Orso's call with Plaintiff ended -- during which Ms. Orso assured Plaintiff that she or someone from 262 would contact Mahwah PD and inform them that Plaintiff was "cleared" as being *not* a threat to himself or others -- another 262 screener, Alicia Johnson, called the Glen Rock Police Department. She stated that 262 had a "screener" available to respond to the area in person, if needed. The Glen Rock PD dispatcher asked Ms. Johnson if 262 had been in touch with Mahwah PD, and Ms. Johnson replied in the affirmative. When the dispatcher asked for a specific name to request at 262 when calling back, Ms. Johnson

---

[7] Of course, she also was not even the one who called the Mahwah Police Department about it; her legal assistant did.

responded, "It's a small crisis line, so any one of us... we all know about the case." Nevertheless, five (5) minutes later, Ms. Orso ended her call with Plaintiff by telling him that she would contact Mahwah PD and tell them that he was fine and did not need to be located. But, that never actually happened.

245. At approximately 2:47 p.m., an unnamed male from the Glen Rock Police Department got on the line with the Central dispatcher and stated that, "this party does have familiarity with us and our court system. He's going to be antagonistic to you. He does have a firearms permit." However, this, again, was not accurate information, as Plaintiff did not have, nor has he ever had, a firearms permit.

246. At 2:52 p.m., seven (7) minutes after assuring Plaintiff that she would call Mahwah PD and inform them that Plaintiff was not a danger to himself and that they did not need to continue searching for his whereabouts, Ms. Orso (262) called the Glen Rock Police Department. She asked whether there was any update on Plaintiff's whereabouts or whether officers needed any additional information from her. The dispatcher responded that the police were still looking for him. Orso then stated, "Just so you know, he is with a friend of his... I do have her name... her name is Marybeth Sampson." Again, this was inaccurate information. Marybeth Sampson is the paralegal who originally contacted the Mahwah Police Department regarding Plaintiff's e-mail to his former attorney, Ms. Hartz (who was on vacation). Not only that, but Plaintiff had recently forwarded that e-mail to Orso, which showed that Marybeth Sampson was copied on it. It is unknown why Ms. Orso believed that the *paralegal* who had reported Plaintiff's e-mail was the same person as Plaintiff's friend, driving him around in her car and taking him to her house. Other than the fact that part of their first names were similar.

247. While these calls were taking place, Glen Rock Police Department bodycam footage shows that an officer arrived at a residence on Romary Court in Glen Rock, at 2:49 p.m. When the

53

homeowner answered the door, the officer immediately asked, "Are you familiar with a [Plaintiff's full name]? We're doing a welfare check." The woman responded, "Oh, is he, like, missing?" The officer replied, "Uhh, just, he made some statements, that we want him checked on." The woman stated that she was not familiar with Plaintiff's name. As part of a non-criminal 'welfare check,' Plaintiff's name was supposed to be confidential, and protected by HIPAA.

248. The officer again told the woman Plaintiff's name and even spelled it out for her. The woman again stated that she had never heard that name. The officer then proceeded to check her backyard, looking for Plaintiff. Romary Court is approximately 1.5 miles away from where Plaintiff actually was, at his friend's house.

249. While the police were looking for Plaintiff, by his full name, the two calls from 262 screeners appeared to trigger questions for Glen Rock PD's dispatcher regarding Plaintiff's alleged "friend," Marybeth Sampson, because at 2:57 p.m., the Glen Rock PD dispatcher called Mahwah PD and asked whether they had any information about Marybeth Sampson. The call then appears to have cut off unexpectedly.

250. Multiple calls throughout the afternoon, among various law-enforcement agencies, repeatedly referred to Plaintiff as a "suicidal party" and an "EDP."

251. Glen Rock Police Department bodycam footage also revealed two officers approaching a man and three teenage girls with backpacks. The officers asked the man for consent to search inside his home, which he granted. The man also asked the officers to go in "first," because he was "not prepared." It is unclear what was said to the man prior to the bodycam footage beginning; however, upon information and belief, officers told him they were looking for someone who might be dangerous.

252. When the officers completed their search of the man's house, the man asked for a description of Plaintiff. The officers responded, "Middle-aged male, short, skinny," "white, balding," and "no facial hair." This again, was not accurate.[8]

253. In that same video footage, the homeowner pointed toward a neighbor's house and asked the officers, "did you check there?" The officer responded that they had, and that the police had "been in contact with them several times." Upon information and belief, Plaintiff's name was being disseminated to various private civilians, in the course of their completely unnecessary "welfare check." As part of a non-criminal 'welfare check,' Plaintiff's name was supposed to be confidential, and protected by HIPAA.

254. It can later be heard on Central dispatch that law enforcement ran a computer search of every house within a quarter-mile radius of the pinged cell-phone location, looking for homeowners with the first name "Mary." They identified several such homes, and sent officers there to inquire about Plaintiff's whereabouts. Upon information and belief, those officers disclosed Plaintiff's name and other false and harmful information to the residents of those homes, similar to what is seen and heard in the GRPD bodycam footage described in Paragraphs 246-247, above.

255. At 3:01 p.m., the Glen Rock PD dispatcher contacted NJ Transit and informed them that a "ping" of the cell phone of a "suicidal EDP" indicated a location on Romary Court in Glen Rock. She stated that they had a "suicidal party who might be on the tracks," because Romary Court is located a few houses away from train tracks.

256. It should be noted that both the Wyckoff Firestone and Wyckoff YMCA are also located next to railroad tracks -- indeed, even closer to railroad tracks than the house on Romary Court.

---

[8]When a photo of Plaintiff is uploaded to AI software, and asked to provide a police 'BOLO'-type description of Plaintiff from his picture, it states that Plaintiff appears to be: "Male / 30s to early 40s / Fit, athletic, and muscular body / Above-average or average height / Short brown hair / Bearded face"

257. At 3:04 p.m., an unnamed Glen Rock PD Captain stated that "this guy has some issue with our municipal court, going back a few years... I just told Lisa [Sulikowski, the Deputy Court Administrator] up in the court that if he shows up there, for some odd reason, to just shut the shade and call 9-1-1. So, if you get a call from her, saying that he's there, it's him."

258. The Captain then called the Court Administrator, and they discussed whether the window shades were bullet-resistant.

259. In reality, Plaintiff knows Ms. Sulokowski, and thinks very highly of her -- they have never had any kind of problem. Nor has Plaintiff ever had a problem with the Court Administrator, Aarika Will. Plaintiff thinks very highly of all current members of the Glen Rock Municipal Court staff, both of who were "warned" by the police about him potentially being a danger to their safety.

260. At 3:05 p.m., Officer "179" called Central and stated, "we have extensive history with this gentleman... and he had court today... so we just added one of our patrol officers to court security." Again, that information was false. In reality, Plaintiff did *not* "have court" that day. That day, he had (1) spoken outside his house with the paving supervisor; then (2) brought his car to Firestone for service; then (3) gone to the gym for two hours; and then (4) spent much of the remainder of the day on the phone with police and 262-HELP, while in his friend's car and at her house.

261. At 3:06 p.m., the Glen Rock PD dispatcher requested RST ("SWAT Team") from Bergen County to respond to Romary Court. She stated that they were dealing with a "41-year-old male, who made suicidal comments to his therapist, who lives in Mahwah," and that Plaintiff had a firearms permit. Of course, this was also false, as Plaintiff does not have a therapist who lives in Mahwah, nor did he make any suicidal comments to any therapist.

262. Upon information and belief, the County of Bergen -- through its dispatch systems, communications centers, crisis support services (including 262-HELP), and its deployment of

56

SWAT and K9 resources -- actively coordinated with and directed municipal police departments during the October 9, 2025 incident. Bergen County personnel received, repeated, and disseminated false and stigmatizing information about Plaintiff, including unfounded claims that he was suicidal, armed, dangerous, or a threat to judges. Bergen County's involvement substantially escalated the response, contributed to the dissemination of misinformation, and was a proximate cause of Plaintiff's unlawful seizure, search, detention, and stigmatization.

263. At no point did any Defendant possess objective evidence that Plaintiff posed a danger to himself or others. Defendants acted in the absence of probable cause, reasonable suspicion, or exigent circumstances, and in contradiction to available exculpatory information.

264. The AOC's December 11, 2025 letter attempts to justify these actions by repeating the same false narratives about Plaintiff's conduct.

265. At 3:22 p.m., Glen Rock PD dispatch received a call from "Ray," who, upon information and belief, was calling from the County. Ray stated that "this is now going to turn into our nightmare" and asked the dispatcher what Plaintiff specifically said to his attorney. The dispatcher said she could not tell him (because she did not know), and that she had tried to call Mahwah PD multiple times, but Mahwah kept hanging up on her. Ray appeared to question the need for deployment of a SWAT team based on an alleged statement that he did not even know the exact wording of,[9] but nonetheless, proceeded with the SWAT deployment.

266. At 3:23 p.m., the Glen Rock dispatcher again called Mahwah PD and asked them to state exactly what Plaintiff had said to his lawyer. Mahwah PD's dispatcher responded, "He has mentioned that he has wanted to commit suicide over this case many times. And take his life." When the

---

[9] The hours of audio recordings from the entire day reveal that Ray was the *only* person who *possibly* showed even the slightest interest in trying to prevent the escalation of the situation. *If* anybody had provided him with the exact words contained within Plaintiff's email, Ray might have been able to prevent further escalation. But, Ray was never provided with the accurate information that he was seeking.

Glen Rock dispatcher asked what case this was, Mahwah PD's dispatcher replied, "It's a case that he's been going back and forth with, with his wife. It's custody, it's visitation. It's domestic." This, of course, was false. Plaintiff did *not* say that, nor has he *ever* had a custody battle over his children, whom he has had 50% custody of for the past six years, and never less. There was *no* issue with custody. There was *no* issue with visitation. There *never* was.

267. At 3:33 p.m., the Glen Rock dispatcher called Hawthorne PD to request assistance. She reported that Plaintiff "is a 41-year-old male. He made suicidal comments to his lawyer, who relayed it to the town that he lives in, which is Mahwah, over things with his estranged wife, over custody, and, I guess, the children that they share. So, he made suicidal comments." Again, this is false. Plaintiff did *not* make suicidal comments to his lawyer. Plaintiff did *not* have an "estranged wife." And Plaintiff was *not* fighting for custody of his children.

268. At 3:44 p.m., Ray called the Glen Rock dispatcher back and said he had learned that "it was basically via an email, to the old attorney, and the only statement was 'I could kill myself over this.'" He then asked whether this was consistent with what Mahwah PD had told Glen Rock the e-mail said. Again, this was false. Plaintiff's e-mail did *not* say "I could kill myself over this."

269. The Glen Rock dispatcher replied that Plaintiff sent that message to his lawyer, but "I guess it's because he had this ongoing thing with everyone's court, over custody, and visitation with his children. I guess he's having a hard time with the kids' mother." Again, there have *never* been any issues over custody or visitation with Plaintiff's children. Ever. He had 50% custody when he filed for divorce six years prior, he has 50% custody now, and he has never once had less.

270. Ray then asked how 262-HELP became involved, and the dispatcher said that "Mahwah called 262." The dispatcher continued, "So he made all of those comments because of court things, and his kids, not seeing the kids. Their mother's not cooperating. I don't know." Again, there has *never* been an issue with Plaintiff's 50% custody of his children.

58

271. Ray and the dispatcher then discussed who "Mary" is. The dispatcher admitted she was confused and did not know who Mary was; she did not know how anyone concluded Plaintiff was with a person named Mary.

272. At 3:45 p.m., a call took place between Central and an unknown male police officer. The officer asked what information they had. The dispatcher said, "I have a 41-year-old male with suicidal comments over a custody dispute." The man replied that this was all the information he had as well, and then added that there was another male party in the vehicle with Plaintiff, in Plaintiff's vehicle. Of course, this was also false, as there was *never* a male in any vehicle with Plaintiff that day. There were also *no* suicidal comments, and *no* custody dispute.

273. At 3:46 p.m., the dispatcher told an unknown male that nobody knew who "Mary" was. She then stated that Plaintiff "made a comment to his lawyer, via e-mail, saying that he was going to do some kind of harmful act to himself, over the visitation with his children and the children's mother; something, I guess, the court stuff, with the kids." Again, as discussed above, this was *not* accurate information at all.

274. The man asked, "So the children's mother is at risk? Do we know where she is?"

275. The dispatcher responded, "No, but the thing is, he wrote, he wasn't making the comments about the mother, he was making the comments about himself."

276. The man then stated, "Okay, so he's only going to harm himself and/or the judges that he's had problems with." Plaintiff has *never* made any comment in his life about harming a judge, *ever*. Defendant Morante certainly took enough actions to make law enforcement believe he did, though.

277. The dispatcher then stated that "he made the comments about doing harm to himself because of all the things going on with the court, all the things with the court between Glen Rock and

59

Ridgewood and all that." The dispatcher was apparently unaware that family-court issues (custody, visitation, etc.) do not take place in municipal courts in New Jersey. In Bergen County, family-court matters are heard in the Bergen County Courthouse in Hackensack, before Superior Court Family Part judges appointed by the Governor and confirmed by the State Senate, not local municipal judges appointed by mayors and town councils.

278. At 4:14 p.m., the Glen Rock dispatcher called Bergen County requesting "a dog to come out" to help locate Plaintiff. When the County employee asked why, the dispatcher replied, "It's a party who made suicidal threats about himself to his lawyer." Again, Plaintiff *never* made any "suicidal threats," to anyone.

279. According to the Wyckoff Police Department Incident Report, at 4:18 p.m., the Glen Rock Police Department requested assistance from Wyckoff PD "to form a perimeter in regard to a suicidal party." According to recordings obtained from Glen Rock, during that same phone call, Glen Rock PD also stated that they had two drones in the air, looking for Plaintiff.

280. The Wyckoff PD Incident Report continued: "Upon speaking with Sgt. Carter from Glen Rock PD, it was determined we were looking for [Plaintiff], a suicidal party out of Mahwah from earlier in the day. [Plaintiff's] location was currently unknown, but cell phone tracking put him within 300 yards of Isabella Place. Glen Rock PD was concerned from this because this was directly in the vicinity of a Bergen County Superior Court Judge who just recently revoked custody of [Plaintiff's] children."

281. This information was entirely false. Plaintiff has *never* lost custody of his children, and in fact, has never even been *at risk* of losing custody. Further, Plaintiff had not appeared before a Family Part judge in over a year. And if that wasn't enough to make matters even more horrendous, the Bergen County Superior Court Judge who happens to live on Isabella Place, near Plaintiff's

friend's house, is *not* a Family Part judge, and thus had *no* authority or jurisdiction to remove custody from anyone, including Plaintiff.

282. This baseless and dangerously false statement can be traced directly to Morante's prior communications and defamatory misrepresentations about Plaintiff, as described above. Morante's illegal conduct against Plaintiff in violation of his rights, over the course of 2+ years, 'lit the match' that put Plaintiff's life in jeopardy that day. These same false allegations were repeated in the AOC's December 11, 2025 letter to Plaintiff.

283. At 4:26 p.m., the Glen Rock dispatcher searched an unknown database for someone named "Molly," apparently realizing that authorities knew nothing concrete about "Mary." Meanwhile, Plaintiff had spent hours speaking on the phone with police officers and 262, while Mary sat next to him, recording the calls. Yet, nobody actually asked Plaintiff any questions about Mary, despite being told about her presence.

284. At 4:33 p.m., Central dispatch audio reflects that "Court Security" became involved in the operation. Central dispatch then reported that three plain-clothes State Police officers were ready on the scene. State Police, upon information and belief, report to Morante.

285. At 4:47 p.m., Ms. Orso, the 262 screener, called the Glen Rock Police Department. That call took place more than two hours after she had hung up on her 1.5 hour call with Plaintiff, having last told him that she would be calling Mahwah PD to tell them that he was *not* a danger to himself and that there was no need to locate him. Of course, she never did that.

286. On that call, Orso stated that 262 had received a call from Plaintiff, and that he was "irate" that he was at his friend's house and was seeing police cars outside, driving slowly past him on the street. Orso told the police that she did not know Plaintiff's specific location, but just wanted them to know that they were near him. She reiterated that Plaintiff was "growing more irate" on the phone with 262.

61

287. At 4:53 p.m., an officer named "Scott" called an unknown man at the Glen Rock Police Department and stated that Plaintiff was a "known 43." The Glen Rock dispatcher agreed. Upon information and belief, '43' is the informal police code in New Jersey for "a person known to police as mentally unstable/emotionally disturbed."

288. Officer Scott then said that he did not think Plaintiff was "going to be armed, in any sense," but believed Plaintiff was "just trying to put a big show on." Plaintiff was certainly doing *the complete opposite* of "putting a big show on." Plaintiff just wanted the harassment he was experiencing to end so that he could continue with his day unbothered.

289. At 5:00 p.m., the Glen Rock dispatcher called 262 for an update. The 262 screener told her that Plaintiff "is watching you from a window; he sees officers looking into cars" and added that Plaintiff was "super paranoid and irate." Of course, no reasonable person would consider Plaintiff to be "super paranoid" about realizing that various police vehicles were driving past his friend's house for a reason unknown to him (especially for a small residential road with little to no regular traffic).

290. At 5:17 p.m., Glen Rock PD received a call from a local resident asking why there were so many police officers on their block.

291. At 5:27 p.m., the dispatcher confirmed that, once located, Plaintiff would be transported to New Bridge Psychiatric Hospital.

292. At 5:32 p.m., a Detective with the State Police called the Glen Rock PD and stated that three plain-clothes officers were en route to "the judge's house" to assist. Upon information and belief, this referred to Judge DiBiasi, the Presiding Chancery Judge of the Bergen County Superior Court, who lives a block away from Plaintiff's friend. Plaintiff had never heard of Judge DiBiasi before, and never had any matters before him, ever.

62

293. At 6:38 p.m., Glen Rock PD received a call from another resident asking if it was safe to go outside. She was told that there was no threat to the public. Additional calls from residents came in at 6:44 p.m., 6:54 p.m., and at 6:57 p.m. (to Ridgewood PD), asking about the large law enforcement presence. They were told to stay inside.

**G. Ridgewood Police Department's False Statements, Fabrications, and Role in the Unconstitutional Escalation**

294. Shortly after Glen Rock PD began circulating demonstrably false information about Plaintiff on October 9, 2025, the Ridgewood Police Department adopted, repeated, and amplified this misinformation without performing any independent investigation, review of the triggering emails, or verification of basic facts.

295. At 6:57 p.m., residents contacted Ridgewood PD to ask about the massive law-enforcement presence. Ridgewood PD instructed civilians to "stay inside," reinforcing the false belief that a violent or armed individual was at large.

296. At 6:58 p.m., a male Ridgewood PD officer contacted Central Communications and requested that an officer be posted in front of the Ridgewood Town Attorney's home, despite the complete absence of any threat or articulable facts suggesting that Plaintiff posed any danger to the Town Attorney or any municipal official.

297. Glen Rock PD simultaneously asked Ridgewood PD to send an officer to Glen Rock Borough Hall "due to past history with him and our court clerks and municipal staff." Ridgewood PD responded, falsely, "we have extensive history with him here, as well. Same thing on our end."

298. In reality, Plaintiff has no history whatsoever with Ridgewood PD beyond receiving a parking ticket in 2016, nearly ten years earlier. Ridgewood PD's assertion of "extensive history" was factually false, fabricated, and made with reckless disregard for the truth.

63

299. Ridgewood PD officers chose to remain deployed around Borough Hall rather than respond to an unrelated call for police assistance involving a neighborhood dispute, stating that they were "keeping unit 411 in the area" to search for Plaintiff.

300. Ridgewood PD also participated as one of the eight law-enforcement agencies that converged upon the area with drones, long guns, tactical deployment, K-9 tracking units, and SWAT support, despite possessing no firsthand knowledge that Plaintiff had engaged in any criminal act, threatened any person, or posed any danger whatsoever.

301. Not a single Ridgewood PD officer requested to review the actual email that triggered the entire response, nor asked Glen Rock PD, Mahwah PD, or 262-HELP for the verbatim text of the alleged communication. Ridgewood PD instead accepted and amplified misinformation as if it were true.

302. Ridgewood PD's actions materially contributed to the unlawful escalation, the unreasonable seizure of Plaintiff, and the deprivation of his rights under the Fourth and Fourteenth Amendments.

303. At 6:58 p.m., a male from Ridgewood PD called Central and asked that someone be posted in front of the Ridgewood Town Attorney's house.

**H. Bergen County Superior Court Judge Falsely Told He Was Being Targeted by Plaintiff**

304. It was later learned by Plaintiff that the wife of the Bergen County Superior Court Judge sent a lengthy text message to several of her neighbors that day, stating that she and her family had been instructed to "stay away" from their home until an individual who was a "known threat to judges" had been apprehended. Plaintiff's friend, Mary, personally viewed that entire text message on a mutual neighbor's phone. Upon information and belief, "known threat to judges" came from Morante, either directly or indirectly.

64

305. The Judge's wife also stated in her texts that the "threatening" individual was someone who had *never* appeared before her husband in court, and who was unknown to her husband. Upon information and belief, law enforcement officers disclosed Plaintiff's identity to the Superior Court Judge, a civilian, in violation of Plaintiff's HIPAA-protected confidentiality. The Judge's wife could not realistically have known such specific information about Plaintiff without law-enforcement first providing his name to the Judge (and possibly the Judge's wife).

306. The Judge's wife's text messages to her neighbors also included photos from the scene, showing a massive police presence, with officers donning bulletproof vests and arming themselves with long guns. The police response shown in the photos resembled the level of deployment that would be expected if a high-profile assassination had just occurred, and the armed suspect was on the loose, holding hostages, and threatening to execute them.

307. Plaintiff has *no* criminal record whatsoever, and has *never* made *any* threats to physically harm anyone, including himself, *ever*.

## I. Continued False Information Spread Amongst Law Enforcement Regarding Plaintiff

308. Central dispatch then reported that "262-HELP just called, said that he might have a friend with him, a 'Marybeth Sampson' -- they were under the impression she was driving him around in her vehicle." As noted, Marybeth Sampson is the legal assistant who reported Plaintiff's e-mail to Mahwah PD earlier in the day. No one questioned why Plaintiff would be riding in the car of a legal assistant in Livingston whom he has never met. Plaintiff's actual friend, Mary, is an entirely different person from the legal assistant.

309. Glen Rock Police then directed officers to guard "AOL" (Academy of Our Lady, a Catholic school) and Glen Rock High School. Those locations were 1.4 and 1.6 miles away, respectively, from where Plaintiff was, at his friend Mary's house.

310. Glen Rock Police also asked Central to contact NJ Transit Police because "we potentially have a party that could be in the way of the tracks -- see if they can send officers out to this location [the Glen Rock Train Station] to assist us." There was *no* rational reason for anybody to believe that Plaintiff would be throwing himself in front of a train.

311. Glen Rock Police then asked Ridgewood PD to send someone to Borough Hall in Glen Rock "due to past history with him and our court clerks and municipal staff." Central then dispatched units to Borough Hall, stating that Plaintiff "has an extensive history with Glen Rock." Ridgewood PD responded, "we have extensive history with him here, as well. Same thing on our end." In fact, Plaintiff does *not* have any history with Ridgewood PD whatsoever. He had received a parking ticket once, in Ridgewood, in 2016, almost ten years prior. That was the extent of Plaintiff's history with the Ridgewood PD.

312. During this time, the 'Central' dispatcher told Glen Rock PD and Ridgewood PD that she had tried to call Mahwah multiple times, but "twice they hung up on me. I keep trying to get through to them."

313. At one point, Central told Ridgewood PD that another call had come in regarding a dispute between neighbors, where they were requesting police assistance. Ridgewood PD responded, "Received. Can you just call them back and let them know it's gonna be a little bit, I'm going to keep [unit] 411 in the area," referring to the area where they were looking for Plaintiff, instead of handling the neighbor dispute.

314. Hawthorne PD and Bergen County both then reported to Central that they were sending a drone up, and that a K-9 unit was on scene, specifically a "patrol tracking" dog.

315. Eight different law-enforcement agencies converged on "the scene," preparing for potential armed engagement, including (1) New Jersey State Police, (2) New Jersey Transit Police, (3) Bergen County Sheriff's Department, (4) Glen Rock Police Department, (5) Midland Park Police

66

Department, (6) Wyckoff Police Department, (7) Ridgewood Police Department, and (8) Hawthorne Police Department. They deployed at least one K-9 unit to track Plaintiff's scent, launched two drones into the sky, and brought in the Bergen County SWAT team with a tactical vehicle.

316. This was all done to try to locate and apprehend an allegedly short and skinny and balding man, who was an "*emotionally disturbed person*" and had a "*gun permit*" and a "*history of being charged with domestic violence,*" who was "*threatening to kill himself*" to his "*therapist in Mahwah,*" who was "*upset with his family attorney's handling of his case*" and had "*recently lost custody and visitation of his children*" to his "*estranged wife,*" who was "*angry with the Ridgewood and Glen Rock Municipal judges*" for these alleged outcomes, and who "*had been in court that day,*" and was "*super paranoid and irate.*"

317. The problem with this entire ordeal, as described above, is that **not one single aspect of the narrative summarized in Paragraph 315 was true, accurate, or factual**. The information collected and disseminated by law enforcement across multiple agencies on October 9, 2025 was a collection of dangerously *false assertions and allegations*, reflecting at best, gross incompetence, and at worst, malicious intent. These absolute falsehoods could have easily gotten Plaintiff, or someone else, seriously injured or even killed.

318. Plaintiff was *not* an "emotionally disturbed person," as confirmed by 262 screener Rebekah Orso, after she spoke with Plaintiff on the phone for approximately an hour and a half.

319. Plaintiff had *not* "threatened to kill himself," as the plain language of the e-mail at issue demonstrates.

320. Plaintiff *has* never possessed a gun permit at any time in his life, as the records show.

67

321. Plaintiff *has* never been charged with domestic violence of any kind. Objective records confirm this.

322. Plaintiff did *not* make any suicidal threats to a therapist in Mahwah; in fact, he does not even have a therapist located in Mahwah.

323. Plaintiff was *not* "upset with his former family-law attorney for the handling of his case," as he had not been represented by that attorney in over four years and was, in fact, *pleased* with her prior representation. That is why he remained in contact with her for years after he began representing himself pro se.

324. Plaintiff has *never* "lost custody" or "visitation" of his children and has *never* faced any such risk of same. Plaintiff has had 50% custody of his children since they were under three-years-old and one-year-old, respectively. In fact, the children spend more time at his home than at their mother's. His children attend public school in the town where Plaintiff resides, not in their mother's town. Thus, "visitation" has never been a factor that has *ever* arisen.

325. Plaintiff does *not* have an "estranged wife." He filed for divorce in September 2019, and the divorce was finalized in January 2021.

326. Plaintiff was *not* "angry at the Ridgewood and Glen Rock Municipal Judges for removing custody and visitation rights," as municipal judges have *no authority* to adjudicate child custody or visitation.

327. Plaintiff did *not* "have court that day." He simply did not.

328. Plaintiff was also *not* "paranoid" when he called 262 (4:40pm) and Mahwah PD (5:11pm) to report police cars slowly circling his friend's block and to ask what was happening, believing everything had been resolved earlier with Lt. McCombs and Ms. Orso, as per Ms. Orso's assurances.

329. Paranoia is defined as "suffering from delusions of being persecuted by the conspiratorial actions of others." A more accurate description of Plaintiff's mental state at that time would be "observant and clear-thinking." A person in Plaintiff's position cannot reasonably be described as "super paranoid" for reporting observable police activity outside a residence that normally has little to no passing traffic, when they *were* -- as we now know -- searching for him.

330. The unjustified and unreasonable law enforcement response also caused various residents to be concerned for their safety due to the massive police presence, several residents had the inside of their homes searched (terrified that a dangerous and unstable person was hiding in a closet or basement of their home), countless people had their commutes impacted due to the slowing of the trains on NJ Transit, and so much more.

331. Further, throughout this five-plus-hour ordeal, *not one* officer from Glen Rock, Ridgewood, Wyckoff, Hawthorne, NJ State Police, or NJ Transit Police requested to see or hear the *actual text of the e-mail* that had allegedly triggered this massive eight-agency response.

**J. Plaintiff Receives Phone Call from Sgt. Kyle Ferreira, a "Crisis Negotiator" from the Bergen County Regional SWAT team.**

332. While Plaintiff was on hold with Mahwah PD, he received a call from Sgt. Ferreira of the Wyckoff Police Department, who identified himself as a Bergen County SWAT Team Negotiator.

333. During the course of the "negotiation" and "standoff," Sgt. Kyle Ferreira, without being prompted or asked, volunteered a statement minimizing the level of force being deployed. While explaining who he was and his role in the response, Sgt. Ferreira (falsely) stated to Plaintiff, *"not that the SWAT team was called, or anything."* Plaintiff responded that he understood, and Sgt. Ferreira again re-confirmed his (false) representation.

334. That unsolicited representation was materially misleading and false. In fact, tactical/SWAT resources had already been activated and deployed as part of the multi-agency response. By

voluntarily minimizing and mischaracterizing the nature and level of armed force being brought to bear, Sgt. Ferreira deprived Plaintiff of accurate information necessary to assess the true coercive circumstances of the encounter and to make informed decisions during an active seizure. This conduct further demonstrates that the asserted "danger" narrative was contrived, pretextual, and retroactively constructed to justify an otherwise unlawful seizure and involuntary detention.

335. Plaintiff spoke with Sgt. Ferreira, who assured him that if he could simply see that Plaintiff was physically okay, and not a danger to himself, then the situation would be over, and Plaintiff would be free to leave.

336. Sgt. Ferreira repeatedly acknowledged to Plaintiff that the escalated police response did not make sense in light of the information available to him at the time, including facts indicating that Plaintiff had been engaged in ordinary, non-threatening activity, such as working out at his gym while having his vehicle serviced.

337. Despite these contemporaneous acknowledgments, Defendants did not de-escalate the response, pause the operation, or reassess the basis for the ongoing deployment of force, and instead continued with the escalated response that culminated in Plaintiff's seizure and detention.

338. Still cautious but wanting to believe that he was finally speaking with somebody with legal authority who could end the day's nightmare, Plaintiff believed the representations that Sgt. Ferreira had made to him.

339. At the time Defendants initiated the escalated and militarized police response, Plaintiff was present inside a private residence where a five-year-old child resided and had recently returned home from school.

340. Upon observing the arrival of armed officers and emergency vehicles, Plaintiff immediately recognized the risk -- both physical and emotional -- posed to the child by the unnecessary escalation, and asked the child's mother to remove her son from the residence so that he would not be exposed to danger, armed police activity, or traumatic sights and sounds. The child was taken several houses away from the residence to avoid proximity to the police operation.

341. During that call, the sound of the young child crying could be heard in the background, which Plaintiff informed Ferreira about.

342. Despite this contemporaneous and audible indication that a minor child was present and distressed, Sgt. Ferreira did not inquire about the child's age, location, or safety, did not ask whether the child was secure, and did not take any steps to pause, redirect, or mitigate the ongoing police response.

343. This, despite the massive security measures that were taking place around town due to the cascading avalanche of false information being disseminated all day long about Plaintiff, such as being an "EDP," "suicidal," and "possibly armed."

344. At no point did Defendants seek to implement child-safety measures, or adjust their tactics, despite clear notice that a young child was in close proximity to an escalating police operation in an otherwise quiet residential setting. Instead, Defendants continued to escalate their response based on a false and unverified narrative.

345. Relying on Sgt. Ferreira's assurances, and after the child had been removed from the home, Plaintiff agreed to meet with Sgt. Ferreira and his Wyckoff PD partner outside of his friend's house.

71

346. The combined actions of the various law-enforcement agencies and CarePlus New Jersey constituted joint participation under color of state law, subjecting each to liability under 42 U.S.C. § 1983 and the NJCRA.

## K. Involuntary Detention / False Imprisonment

347. As soon as Plaintiff went outside to meet with Defednant Ferreira -- confident that Ferreira would quickly see that Plaintiff was acting normally, particularly for someone who had just endured 6.5 hours of an unjustified "manhunt" -- Ferreira falsely told him that, between the time their phone call ended and his arrival in the yard, he had received "orders" from above that he had "no choice" but to take Plaintiff in a police vehicle and transport him to a psychiatric hospital.

348. Sgt. Ferreira informed Plaintiff that he had two options: (1) agree to walk to the police car so officers could take him to the psychiatric hospital, or (2) resist, in which case officers would drag him to an ambulance "kicking and screaming," and he would be taken to the psychiatric hospital anyway.

349. Feeling that he had no real choice, Plaintiff agreed to the first 'option.' Sgt. Ferreira and his partner -- ironically, the same officer who had previously responded to the TD Bank incident in Wyckoff where Plaintiff gave an injured elderly woman his sweatshirt and bought her a pillow to rest her head on -- then transported Plaintiff to New Bridge Medical Center, a psychiatric hospital in Paramus.

350. Bodycam footage from Sgt. Ferreira, obtained later by Plaintiff, shows that after Plaintiff was placed in the Wyckoff police vehicle, Ferreira disparaged Plaintiff and insulted his intelligence to other officers at the scene.

351. Upon arriving at New Bridge Medical Center, hospital staff directed Plaintiff to strip naked, and informed him that he would be subject to a cavity search, blood and urine tests, an EKG, and a psychiatric evaluation.

352. After speaking with Plaintiff for a few minutes, the psychiatrist concluded that Plaintiff was absolutely *not* a danger to himself or others, and that a massive 'misunderstanding' had resulted in his being brought to the hospital.

353. After his blood and urine tests came back clean, Plaintiff was 'cleared' for discharge. He was involuntarily detained in the psychiatric hospital for approximately three hours, from about 7:30 p.m. to 10:30 p.m.[10]

**L. Media Leak and the Illegal Disclosure of Plaintiff's HIPAA-Protected Information**

220. When his friend picked him up from the hospital at 10:30pm, she informed him that news of the "massive manhunt" had already spread like wildfire on social media. Plaintiff checked his phone and quickly found a Facebook-shared news article describing the incident, accompanied by photos of the massive police response.

221. The article was titled, "Hours-Long Search for Suicidal Man Ends Safely After Police From Different Departments Converge On Glen Rock." It began: "Some tense moments ended when Wyckoff police helped convince a suicidal man from Mahwah to go to the hospital, Glen Rock Police Chief Dean Ackermann said."

222. The article went on to state, outrageously, that "there was concern that the 41-year-old subject might be armed."

---

[10] Plaintiff later received an invoice in the mail from New Bridge, dated October 23, 2025, in the amount of $4,571.00. On November 24, 2025, New Bridge called Plaintiff's cell phone, and asked when they can expect to receive that $4,571.00 payment from him. On December 2, 2025, Plaintiff received another invoice from New Bridge, in the mail. On December 8, 2025, Plaintiff received an invoice from Stadium Emergency Associates, for the EKG they performed on him at New Bridge, for $935.00.

223. It further reported that authorities had converged "at a home on Isabella Place... out of concern for a resident there," clearly referring to the Bergen County Superior Court Judge's residence, and that "the resident was warned to wait until the situation had been resolved before returning home."

224. The article continued: "Citizens also reported armed officers responding to Glen Rock schools during dismissal, as well as at Borough Hall." "Meanwhile, police warned people to stay away from the neighborhood throughout the four-hour ordeal."

225. It also stated that "Authorities' concern was well-placed: The man eventually surrendered... just around the corner from the house on Isabella."

226. Disturbingly, the article included highly specific identifying details about Plaintiff --information that, with a 5 second google search, would immediately reveal his full name as the first result. Clearly, the reporter knew *exactly* who Plaintiff was, and *effectively identified him* in every manner possible, short of publishing his name. Plaintiff's identity was supposed to be protected health information under HIPAA. Both law enforcement and 262 assured Plaintiff of this fact, multiple times.

227. The article concluded with a quote from Glen Rock Police Chief Dean Ackermann, who "insisted, 'the man was only a danger to himself.'" That public statement made by Chief Ackermann was either knowingly false, or reflected complete ignorance of his department's repeated statements throughout the day portraying Plaintiff as a danger to multiple other people. Upon information and belief, the statement was knowingly false.

228. The article was widely disseminated across numerous Facebook community groups throughout Bergen County. It quickly attracted many reactions and comments from members of the public.

74

229. The following day, believing that his confidential, HIPAA-protected information had been leaked by someone within the Glen Rock Police Department, Plaintiff e-mailed Chief Ackermann and demanded that he investigate his own department to ascertain who had leaked his HIPAA-protected confidential information to the press. Chief Ackermann replied within just a few hours, boldly claiming that neither he nor anyone in the Glen Rock Police Department was responsible for any leak. This was plainly asserted by Chief Ackermann without having conducted even a cursory investigation. It is also noteworthy that Chief Ackermann was 'off duty' that day.

230. As revealed on bodycam footage produced by the Glen Rock Police Department, it was confirmed that at least one or more Defendants provided or confirmed HIPAA-protected information about Plaintiff to non-privileged third parties, causing widespread reputational harm.

231. Such disclosures violated HIPAA, N.J.S.A. 26:2H-12.8, and Plaintiff's common-law privacy rights.

232. The publication of false statements portraying Plaintiff as dangerous constitutes defamation, as defined in Durando v. Nutley Sun, 209 N.J. 235 (2012).

## M. Sgt. Ferreira's Unjustified Dishonesty, Undermining the Public's Trust in Law Enforcement

233. On the morning of October 10, 2025, Plaintiff received a phone call from Sgt. Ferreira, who claimed that he was "following up" to make sure Plaintiff was doing okay. Upon information and belief, that was not the true intent of his call.

234. With the October 9 'incident' officially over, and New Bridge having found that Plaintiff was absolutely not a danger to himself or others, Plaintiff used the opportunity on the phone with Sgt. Ferreira to seek answers regarding what had actually happened the previous day.

235. Plaintiff asked Ferreira clear and direct questions, including whether it was true that Sgt. Ferreira had the authority to "clear" Plaintiff upon seeing him, as he had promised, or whether that was a "white lie" used to persuade Plaintiff to come outside.

236. Ferreira falsely told Plaintiff at least eight (8) times that he was not lying. In doing so, Ferreira made repeated assurances of honesty, including stating: "I'm not going to lie to you."

237. When Plaintiff reported this phone call to the Wyckoff Police Department's Internal Affairs officer (because he did not believe it was proper conduct for a police officer to lie to a civilian), IA investigated and found that Sgt. Ferreira had indeed lied to Plaintiff the day after the incident had concluded. IA nevertheless proclaimed Sgt. Ferreira's lies to be "justified," because he allegedly wanted to preserve the "rapport" that he had built with Plaintiff, despite the fact that there was no reason for Plaintiff and Ferreira to ever interact again.

238. Plaintiff gave Ferreira every opportunity to be candid about what had occurred on October 9. Plaintiff understands that, in the "fog of war," certain representations might be made during an active operation. However, during their follow-up conversation the next day—after Plaintiff had already been taken to and discharged from the hospital -- there was no lawful or legitimate reason to lie to him.

239. According to the New Jersey Attorney General's Internal Affairs Policy and Procedures Manual (IAPP), "An officer's credibility is their most essential attribute. Once truthfulness is compromised, the integrity of every action they take thereafter is suspect.

**N. Immediate Danger and Constitutional Injury**

243. The unwarranted mobilization of eight law-enforcement agencies, including a SWAT team, created an imminent and unjustified danger to Plaintiff's life and liberty. Heavily armed officers were deployed in residential areas, while inter-agency communications falsely described

Plaintiff as "emotionally disturbed," "unstable," "potentially armed," and a "known threat to judges" -- falsehoods directly traceable to Morante's unilateral and unconstitutional directives to law enforcement about Plaintiff.

244. These actions were also calculated to damage Plaintiff's reputation and to frighten and intimidate him. Had officials truly believed he was armed, unstable, and even homicidal, they would have shown some concern for the woman and her young, crying child, who were alone in the house with him. Yet, no one ever inquired about the safety of Plaintiff's friend or her child.

245. Had Plaintiff gone outside for a walk or accompanied his friend to pick up her child from school, officers could easily have misperceived him as an imminent threat to the safety of a Bergen County Superior Court Judge, and very well may have used deadly or serious physical force, causing grave injury or death to Plaintiff.

246. The fear, stigma, and emotional trauma inflicted by these events constitute compensable injury under Carey v. Piphus, 435 U.S. 247 (1978).

247. The incident has chilled Plaintiff's willingness to contact courts or law enforcement in the future, effectively silencing his constitutionally protected petitioning activity.

**O. Causation and Link to Morante**

249. The October 9, 2025 operation was a foreseeable and direct result of Morante's prior misuse of authority and her dissemination of defamatory information about Plaintiff, and it occurred without Plaintiff being afforded any due process whatsoever.

250. But for Morante's false classification of Plaintiff as a "security threat" to judges, no reasonable officer or clinician would have initiated or joined such a massive, multi-agency operation, nor would they have leaked such obviously harmful information about Plaintiff to the press.

251. Morante's conduct thus proximately caused the deprivation of Plaintiff's rights to be free from unreasonable searches and seizures and to petition the government for redress of grievances without retaliation.

**P. Recap of October 9, 2025 -- A Day Spent in Plaintiff's Shoes**

252. Plaintiff began the morning of October 9, 2025 by leaving his home to have his vehicle serviced and to work out at his gym across the street. He dropped off his vehicle at Firestone in Wyckoff and walked to the Wyckoff YMCA.

253. While at the gym, Plaintiff sent a follow-up email from his phone to a former attorney who had represented him more than four years earlier. In that email, Plaintiff wrote that he "has had" thoughts of ending his life over a professional recommendation she had previously made to him. The email referred to thoughts in the *past tense*, not the *present* or *future*; Plaintiff was using that history to convey the seriousness of prior harm and to press for a return call. Plaintiff was unaware the attorney was on vacation at the time, and she did not have an auto-response enabled.

254. Unbeknownst to Plaintiff, the email was misinterpreted by the attorney's assistant (who had never met Plaintiff and was acting while the attorney was away), and the assistant contacted the Mahwah Police Department around 12:05 p.m. to report alleged "concern" that Plaintiff was at risk of self-harm.

255. Because his vehicle was still being serviced after he finished working out, Plaintiff asked his friend Mary, who lives in Glen Rock, to pick him up and drive him to her home so Plaintiff could work from his phone while waiting for Firestone to finish.

256. When Plaintiff entered Mary's car, he saw through the Ring Doorbell app that two officers had recently come to his home and rang his doorbell. Plaintiff proactively called the Mahwah Police Department to ask why officers had come to his residence.

78

257. After being placed on hold, Plaintiff spoke with Lt. Kevin McCombs, who stated there was "a problem" because someone had contacted Mahwah PD about an allegedly "concerning" email Plaintiff had sent. Plaintiff immediately recognized which email was at issue and attempted to clarify that it referenced *past* thoughts, not any present or future intent. Each time Plaintiff attempted to clarify, McCombs stated that he "didn't want to get into it," and repeatedly insisted Plaintiff disclose his location so McCombs could "see him in person." Plaintiff reasonably concluded McCombs intended to apprehend him and transport him for psychiatric evaluation despite Plaintiff engaging in ordinary daily activities and posing no danger to himself or others.

258. Plaintiff asked McCombs if he wished to speak with Plaintiff's friend—who was physically present with Plaintiff at the time—so McCombs could hear from a corroborating witness that Plaintiff was not in danger of self-harm. McCombs responded, "No, I don't want to talk to them," rejecting an immediately available opportunity to verify Plaintiff's welfare.

259. McCombs directed Plaintiff to speak with a mental-health screener at 262-HELP. Plaintiff waited for 262-HELP to call, received no call, and then proactively called 262-HELP himself. When Plaintiff called, the screener who answered, Defendant Rebekah Orso, stated she did not know who Plaintiff was or why he was calling.

260. Unbeknownst to Plaintiff, approximately fifteen minutes after ending his call with Plaintiff, McCombs called 262-HELP and provided false and exaggerated information about Plaintiff, including the outrageously false statement that Plaintiff had "a history of being charged with domestic violence," which Plaintiff has never been charged with. McCombs also caused Plaintiff's cell phone location data to be obtained and disseminated by "pinging" Plaintiff's phone, despite Plaintiff's assurances that he was fine, was with a friend, and was not contemplating self-harm.

261. During Plaintiff's call with Orso, Plaintiff voluntarily offered to forward Orso the email at issue. After reviewing it, Orso agreed that it was "not concerning" and repeatedly told Plaintiff she did not view him as suicidal or a threat. While Plaintiff and Orso were speaking, McCombs called Plaintiff; Plaintiff answered and merged the calls into a three-way conversation. McCombs stated that if 262-HELP reported, in their professional opinion, that Plaintiff was "fine" and did not need to be "taken in," he would stop trying to locate Plaintiff, but insisted he needed to receive that "clearance" directly from 262-HELP without Plaintiff on the line.

262. Orso assured Plaintiff she would call Mahwah PD and "clear" him, and the call ended. Only after Plaintiff arrived at Mary's home and ended the call -- believing the matter resolved based on 262-HELP's assurances -- did Plaintiff realize he was being pursued and tracked as though he were a dangerous fugitive.

263. In forty-two (42) years, Plaintiff has never had *any* criminal record *whatsoever* -- not even a minor offense beyond a parking/traffic ticket. He is a law-abiding citizen, and a devoted father to his two young children, as he is frequently told by others. If Plaintiff *had* actually done anything illegal, such as "threatening a judge," *there is no question whatsoever that he would have been criminally charged for it.* Especially given Morante's involvement, and with her relationship with law enforcement and the judiciary. But, he was not. Because *he did not ever commit any crimes.* Morante, instead, operated in the shadows of the judicial system, trampling on Plaintiff's rights, *for years,* completely unchecked. Because she, in her position, *knew that she could get away with it.*

**Q. Aftermath - Consequences of the October 9, 2025 Incident and its Effect on Plaintiff**

264. After the incident, Plaintiff experienced severe psychological distress, humiliation, and social ostracization. An unknown and immeasurable number of people learned of the false allegations

through the widely shared article, particularly via community Facebook groups in Bergen County, where Plaintiff lives with his children.

265. Plaintiff also sought records of the incident and related communications through Open Public Records Act (OPRA) requests. Multiple agencies delayed their responses and, in some cases, intentionally withheld materials to which Plaintiff was lawfully entitled, knowing that disclosure would expose them to liability in this lawsuit.

266. The October 9, 2025 militarized operation had severe and lasting effects on Plaintiff's physical, emotional, and psychological well-being. Plaintiff was seized, searched, transported, and subjected to involuntary medical procedures based entirely on fabricated information and retaliatory narratives that had been escalating for more than two years. Plaintiff experienced fear for his life during the tactical response, humiliation in front of neighbors and community members, and ongoing anxiety resulting from the realization that multiple government agencies had acted on knowingly false information. The event continues to impair Plaintiff's sense of safety, his ability to trust law-enforcement and judicial institutions, and his ability to participate fully and freely in legal processes without fear of retaliation or further escalation. These harms are ongoing and will require judicial relief to remedy.

267. To date, no Defendant has issued any correction, clarification, or apology regarding the false and defamatory information that was circulated about Plaintiff that day.

**R. The AOC's December 11, 2025 Letter Confirming and Ratifying Constitutional Violations**

268. On December 11, 2025, the Administrative Office of the Courts, through Counsel to the Administrative Director, sent a letter to Plaintiff. The letter contained multiple factual admissions, misrepresentations, and ratifications of the unconstitutional conduct challenged in this action:

81

1. Admission: No Judge ever Ordered the Restrictions. "All communications with the courts... be via U.S. Postal Service."

    (a) The AOC admits the restriction was administrative, not judicial.

    (b) This confirms no due process, no notice, no hearing, no order, no findings, no right of appeal.

    (c) This renders the restriction unconstitutional.

2. Admission: Restrictions are Ongoing into 2025 and 2026.

    (a) The letter states that it reminds Plaintiff of the restrictions, confirming they are still being enforced.

    (b) This proves ongoing injury, ongoing retaliation, and the basis for injunctive relief.

3. False Allegations Published by the Judiciary: Plaintiff 'threatened' a judge; Plaintiff "harassed" staff; Plaintiff made "outlandish allegations"; Plaintiff was engaged in "improper" or "intimidating" interactions.

    (a) Plaintiff was never notified, never charged, never investigated, and never adjudicated on any of these statements.

    (b) These are false, stigmatizing, and published by the government, creating a stigma-plus due process violation.

4. Admission: AOC Implements Statewide Blacklist.

    (a) This letter confirms the AOC, not any judge, implemented a statewide communication ban.

    (b) The AOC acknowledges Plaintiff may only communicate with any court through USPS only.

    (c) This is a direct admission relevant to the First Amendment access-to-courts claim.

5. Retaliatory Threat: "Any such suit will be vigorously defended."

82

(a) This is a threat made in direct response to Plaintiff's protected activity (intention to file a civil rights lawsuit).

269. Despite the absence of any criminal charge, judicial finding, or due process whatsoever, Defendants have attempted to retroactively justify their unlawful statewide communication ban by characterizing Plaintiff's constitutionally protected communications as "threatening" or "harassing." This contention is legally baseless, factually untrue, and addressed below.

**S. The AOC's Claim that Plaintiff sent "Threatening" or "Harassing" Emails is Not a Legally Valid Justification for the Constitutional Violations at Issue**

270. Defendants have asserted -- most recently in the December 11, 2025 letter from the Administrative Office of the Courts -- that Plaintiff allegedly engaged in "threatening," "harassing," or otherwise improper written communications with court personnel.

271. This anticipated defense is legally irrelevant, factually unsupported, and constitutionally insufficient to justify any of the actions taken against Plaintiff.

**(a) Political Speech, Criticism of Judges, and Petitioning Government for Redress Are Core First Amendment Protections**

272. Even assuming *arguendo* that some of Plaintiff's emails contained sharp criticism, urgent demands, or accusatory language, such communications are fully protected under the First Amendment. See *Guarnieri*, 564 U.S. 379 (2011); *Watts v. United States*, 394 U.S. 705 (1969).

273. The Supreme Court has repeatedly held that speech directed at government officials -- including judges -- is protected unless it constitutes a **"true threat"** of unlawful violence, a category interpreted *narrowly* and "confined to serious expressions of an intent to commit an act of unlawful violence." *Virginia v. Black*, 538 U.S. 343 (2003).

274. Plaintiff's communications concerned judicial misconduct, improper administrative actions, and unlawful interference with access to courts -- all subjects squarely within the Petition Clause and entitled to the highest level of constitutional protection.

**(b) No Court Ever Found Plaintiff's Communications Improper, and the Absence of Any Criminal Charge Is Dispositive**

275. Despite Defendants' repeated characterizations of Plaintiff's emails as "threatening," the State:

- never filed a criminal complaint,
- never sought a restraining order,
- never issued a judicial warning,
- never brought the matter before any judge, and
- never initiated any formal disciplinary process.

276. The complete absence of any charge, investigation, judicial order, or hearing over a period of nearly three years is dispositive evidence that Plaintiff's communications did not meet the legal threshold of *true threats* or criminal harassment.

277. If such communications had truly endangered any court official, Defendants would have been obligated to initiate criminal, administrative, or judicial proceedings. They did not. That failure fatally undermines their post-hoc assertions.

**(c) Even If Communications Were Unwelcome or Repetitive, They Do Not Justify a Statewide Secret Ban on All Access to Courts**

278. Defendants' administrative response was grossly disproportionate, unauthorized, and unconstitutional. Even if the emails were irritating or persistent, no legal principle permits:

- a statewide phone and email blockade,
- interception or rerouting of court filings,
- prevention of emergent appellate filings,
- *ex parte* communications with judges instructing them to "handle" a litigant,
- dissemination of false "security" classifications, or
- ordering police responses and psychiatric detentions without cause.

279. No statute, directive, regulation, or judicial rule authorizes the Administrative Office of the Courts or Court Security to impose punitive communication restrictions on a private litigant. See *Mathews v. Eldridge*, 424 U.S. 319 (1976) (due process required before deprivation of liberty interests); *Bounds v. Smith*, 430 U.S. 817 (1977) (access to courts fundamental).

84

Because these actions were taken without judicial approval, without notice, and without any opportunity to be heard, they are categorically unconstitutional regardless of the content of Plaintiff's emails.

### (d) The First Amendment Prohibits Government Retaliation Based on the Tone or Frequency of a Litigant's Communications

280. Even if Defendants disliked the tone, persistence, or content of Plaintiff's messages, the State may not retaliate against protected expression. See *Mt. Healthy*, 429 U.S. 274 (1977). Plaintiff's filings, ethics complaints, transcript requests, appeals, and communications with court personnel were all activities protected by both the Petition Clause and the right of access to courts. Government officials cannot impose punitive restrictions merely because a citizen is outspoken, persistent, or critical of judicial conduct.

### (e) Any Argument That Plaintiff's Emails Justified Defendants' Conduct Fails as a Matter of Law

281. Defendants' reliance on Plaintiff's communications is legally invalid because:

- Protected speech cannot be the basis for restricting access to courts.
- No judicial finding supports Defendants' characterizations.
- No charges were brought, confirming no "true threat" existed.
- Administrative employees lack authority to impose sanctions on litigants.
- The measures taken were wildly disproportionate and unlawful.
- The State's own letters contain provable falsehoods and contradictions.
- Retaliation for protected conduct is itself an independent constitutional violation.

282. Accordingly, any argument that Plaintiff's constitutionally protected emails justified Defendants' actions is meritless, pretextual, and incapable of defeating liability on any claim pled in this action.

**T. December 16, 2025: Bergen County Courthouse "Order," Large, Printed, Color Photos, and Enforcement of Morante's December 21, 2023 "Mail-Only Ban"**

283. On December 16, 2025, Plaintiff went in person to the Bergen County Courthouse for lawful court business.

284. While inside the courthouse, Plaintiff was stopped by a Bergen County Sheriff's Officer, who demanded Plaintiff's name. After Plaintiff identified himself, the officer produced two large, printed color photographs of Plaintiff that were being kept at/near the courthouse security station. Plaintiff saw five different photographs -- two of which were of himself.

285. Upon information and belief, those photographs of Plaintiff were located at the security desk of all three (3) entrances to the Bergen County Courthouse. It is unknown how many other County Courthouses Defendant Morante sent his photos to.

286. At least one of the photographs appeared to be a private image not publicly accessible on the internet, and obtainable only through Plaintiff's Facebook account (or through access to Plaintiff's private social-media content).

287. The Sheriff's Officer told Plaintiff he had an "Order" stating that Plaintiff was not permitted to be in the courthouse unsupervised and unaccompanied, and that Plaintiff would be required to be escorted.

288. Plaintiff was then taken to the officer's supervisor (also unidentified at this time), who handed Plaintiff an "Amended Access" letter dated December 21, 2023, authored by Defendant Robin Morante, which stated in substance that Plaintiff's "access to the New Jersey Judiciary and all its offices has been amended to United States Postal Service communication only," and that "emails, phone calls, voicemails and faxes will not be accepted or returned," with hand-delivery allowed only for emergent matters.

86

289. They also handed Plaintiff the letter from Meryl Nadler, Esq., Counsel to the Administrative Director of the AOC, dated December 11, 2025. Upon information and belief, Nadler's December 11, 2025 letter was distributed into courthouse-security channels and used as additional justification for placing Plaintiff's photographs at security posts and enforcing an escort-only access regime.

290. The supervisor and Sheriff's Officer repeatedly referred to the Morante letter as a binding "Order" that they had "no choice" but to follow.

291. Plaintiff explained that there was no judicial order, and that Morante is not a judge and is not authorized to issue binding court-access "orders." Plaintiff further explained that the "Amended Access" letter is not a court order and does not satisfy due process.

292. The officers nevertheless insisted that the "Order" existed and that they would enforce it, including requiring Plaintiff to call in advance for any future courthouse visit so that an officer can be arranged to "escort" Plaintiff throughout the building.

293. Plaintiff recorded the encounter while standing outside the courthouse (including the officers' statements that they were enforcing an "Order").

294. Plaintiff requested that the officers provide him a copy of the printed photographs they had displayed. The officers refused. Plaintiff asked to take a photograph of the printed photos with his phone; the officers refused.

295. This incident demonstrates that the statewide restrictions are not theoretical or dormant; they are actively implemented at the courthouse-security level, including through (a) distribution and display of Plaintiff's photographs at security, (b) an escort requirement imposed under claimed "order" authority, and (c) continued enforcement of Morante's mail-only restrictions.

296. The Administrative Office of the Courts has admitted that the restrictions were imposed through the Court & Judicial Security unit on December 21, 2023 and that all communications with courts are restricted to U.S. Postal Service.

297. The AOC further claims -- falsely -- that these restrictions were "consistent with due process" and that Plaintiff had a "meaningful opportunity to be heard."

298. Plaintiff has denied (and will prove) that any such process occurred, including the absence of notice, hearing, neutral decision-maker, findings, or judicial order.

299. The December 16, 2025 courthouse encounter is further proof of ongoing injury and supports the need for prospective injunctive relief to halt continued enforcement and dissemination of false "security" designations and restrictions.

300. On information and belief, Defendants disseminated and relied upon a December 11, 2025 letter authored by Meryl G. Nadler, Counsel to the Administrative Director of the Courts, which falsely asserted that Plaintiff had been afforded "a meaningful opportunity to be heard" and had engaged in threatening, harassing, and improper conduct. That letter was printed, circulated, and treated as authoritative justification for courthouse-security enforcement, including by the Bergen County Sheriff's Office on December 16, 2025, despite the absence of any judicial order, hearing, findings, or due-process proceeding of any kind.

## CAUSES OF ACTION

### COUNT 1 - UNLAWFUL SEIZURE
*(Fourth Amendment; 42 U.S.C. § 1983)*
*Against All Defendants*

301. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

302. The Fourth Amendment prohibits the seizure of a person without probable cause or lawful justification.

303. Defendants seized Plaintiff on October 9, 2025 despite the absence of any threat, criminal conduct, or reasonable suspicion.

304. The seizure was effectuated based on false information and irrational emergency responses driven by Defendant Morante's multi-year campaign of disseminating baseless security alerts.

305. Defendants acted jointly and in coordination, amplifying the false narrative and triggering an unlawful and unnecessary response.

306. The seizure was willful, objectively unreasonable, and carried out with reckless disregard for Plaintiff's constitutional rights.

307. Plaintiff suffered loss of liberty, humiliation, fear, physical discomfort, and emotional and psychological distress.

308. At all relevant times, it was clearly established that seizing or detaining an individual without probable cause, reasonable suspicion, or exigent circumstances violates the Fourth Amendment. It was further clearly established that law enforcement officers may not rely on fabricated, exaggerated, or knowingly false information to justify a seizure. No reasonable officer could have believed that the conduct alleged herein was lawful under existing constitutional standards.

309. As a direct and proximate result of Defendants' actions, Plaintiff suffered severe emotional distress, including a formal diagnosis of Post-Traumatic Stress Disorder (PTSD), as confirmed by treating professionals.

89

## COUNT 2 - UNLAWFUL SEARCH / FORCED MEDICAL PROCEDURES
### *(Fourth Amendment; 42 U.S.C. § 1983)*
*Against All Defendants Except Morante*

310. Plaintiff repeats and realleges all prior paragraphs.

311. Compelled medical procedures - including forced physical handling, removal of clothing, and involuntary medical evaluations - constitute searches under the Fourth Amendment.

312. Defendants subjected Plaintiff to such searches without warrant, probable cause, consent, or exigent circumstances.

313. These intrusions were unnecessary, unreasonable, and undertaken solely because of the false "security threat" narrative spread by Defendant Morante.

314. The forced procedures were invasive, degrading, and performed in complete disregard of Plaintiff's objections and constitutional protections.

315. Such conduct would deter a reasonable person from seeking assistance from emergency services or courts.

316. Plaintiff suffered physical violation, emotional trauma, and constitutional injury.

317. As a direct and proximate result of these Defendants' actions, Plaintiff suffered severe emotional distress, including a diagnosis of Post-Traumatic Stress Disorder (PTSD), as confirmed by treating professionals.

## COUNT 3 - PROCEDURAL DUE PROCESS VIOLATIONS
### *(Fourteenth Amendment; 42 U.S.C. § 1983)*
*Against All Defendants*

318. Plaintiff repeats and realleges all prior paragraphs.

319. This claim is pled independently and in the alternative to Plaintiff's substantive due process and stigma-plus claims. While arising from related conduct, this count focuses on the denial of notice, hearing, and meaningful opportunity to be heard prior to deprivation of protected liberty interests, and seeks to vindicate procedural safeguards distinct from other constitutional guarantees.

320. The Fourteenth Amendment guarantees notice and a meaningful opportunity to be heard before deprivation of liberty or access to the courts.

321. Defendants blocked Plaintiff's communications with courts, denied him notice of hearings, intercepted emails, prevented access to ACJC during an active complaint, and interfered with a Prosecutor-approved probable cause hearing.

322. For example, Morante imposed and enforced 'amended access' restrictions (mail-only/in-person-only; no phone/email) that functioned as a *de facto* court order, yet Plaintiff received no written order, no notice of appeal/review procedure, and no hearing, as confirmed by the NJSP detective's statement that such restrictions are typically 'court mandated.'

323. On October 9, 2025, Defendants detained Plaintiff without any process whatsoever.

324. These actions deprived Plaintiff of fundamental procedural protections recognized by decades of constitutional jurisprudence.

325. Defendants acted arbitrarily and intentionally, seeking to deprive Plaintiff of judicial recourse and to undermine his ability to protect his rights.

326. Plaintiff suffered loss of procedural protections, reputational harm, emotional distress, and constitutional injury.

327. At all relevant times, it was clearly established that government officials may not deprive an individual of liberty, bodily integrity, or personal security without due process of law, nor fabricate or disseminate false information that foreseeably results in deprivation of liberty or physical harm. It was further clearly established that affirmatively creating or increasing danger to an individual through misuse of official authority violates the Fourteenth Amendment. No reasonable official could have believed the conduct alleged herein was constitutionally permissible.

91

328. As a direct and proximate result of Defendants' actions, Plaintiff suffered severe emotional distress, including a diagnosis of Post-Traumatic Stress Disorder (PTSD), as confirmed by treating professionals.

329. The December 16, 2025 enforcement action confirms that Defendants imposed and continue to impose significant liberty restrictions on Plaintiff without due process. Plaintiff was subjected to security monitoring, escort requirements, and threats of police investigation based on a purported "Order" that does not exist and was never issued by a judge.

330. Defendants provided Plaintiff with no notice, no statement of charges, no evidence, no neutral decision-maker, no opportunity to contest the restrictions, and no mechanism for appeal. The post-hoc production of an internal administrative letter authored by a non-judicial employee does not satisfy the requirements of procedural due process where the consequences include stigmatization, restriction of movement within public courthouses, and impaired access to the judicial system.

331. Defendants compounded this deprivation by officially asserting -- through counsel to the Administrative Director -- that Plaintiff had received due process and a meaningful opportunity to be heard, when in fact no notice, hearing, evidence, or adjudication ever occurred, and Defendants have been unable to identify any such proceeding despite formal demand.

332. The continued enforcement of these restrictions -- more than two years after their imposition -- demonstrates an ongoing due process violation warranting immediate injunctive relief.

**COUNT 4 - FIRST AMENDMENT RETALIATION – INTERCEPTION OF PLAINTIFF'S MARCH 2024 TRANSCRIPT REQUEST *(42 U.S.C. § 1983)***
*Against Defendant Morante*

333. Plaintiff repeats and realleges all prior paragraphs.

334. On March 21, 2024, Plaintiff emailed Defendant Morante reporting that she had improperly interfered with his March 5 transcript request and violated his civil rights. These emails

constituted protected First Amendment activity, including petitioning the government for redress.

335. The adverse actions occurred immediately after, and in close temporal proximity to, Plaintiff's protected speech and petitioning activity, supporting a strong inference of retaliatory motive.

336. On March 22, 2024 -- within 24 hours -- New Jersey State Police troopers from the Judiciary's Central Security Unit appeared at Plaintiff's home after receiving Plaintiff's emails directly from Morante's office, as confirmed by Detective Plaza in a recorded conversation.

337. Detective Plaza acknowledged that Plaintiff made no threats, that Plaintiff's conduct was "well within your rights," and that Plaintiff was "not in trouble," yet the officers still initiated a security-based investigation.

338. The State Police visit lacked lawful basis and constituted an adverse action that would deter a person of ordinary firmness from engaging in protected speech, accessing transcripts, or communicating with judicial officials about misconduct.

339. Defendant Morante referred Plaintiff's protected communication to law enforcement with retaliatory intent, mischaracterizing Plaintiff's lawful complaints as "harassment," and causing law enforcement to treat Plaintiff as a threat.

340. The State Police acted under color of state law and in coordination with Morante to intimidate Plaintiff and chill his protected expression regarding government misconduct.

341. Defendants' retaliatory actions caused Plaintiff emotional distress, fear, and a significant chilling effect on his willingness to communicate with the courts or pursue appellate rights.

342. At all relevant times, it was clearly established that government officials may not retaliate against an individual for engaging in protected speech or petitioning activity, nor obstruct access to the courts in response to such activity. It was further clearly established that adverse actions taken because of protected expression violate the First Amendment. No reasonable official could have believed that the retaliatory conduct alleged herein was lawful.

93

343. Plaintiff seeks compensatory and punitive damages, and all available relief under 42 U.S.C. §§ 1983 & 1988.

## COUNT 5 - FABRICATION OF EVIDENCE
### *(Fourteenth Amendment – Due Process; 42 U.S.C. § 1983)*
### *Against All Defendants*

344. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

345. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

346. It is clearly established that government officials violate the Due Process Clause of the Fourteenth Amendment when they deliberately fabricate evidence, manufacture false "danger" narratives, or supply knowingly false or recklessly inaccurate information that is used to justify seizures, detentions, adverse judicial actions, or restrictions on constitutional rights. *See Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) (en banc); *Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997); *Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014).

**A. Defendants Knowingly Created and Disseminated False Information About Plaintiff**

347. As detailed in above, Defendants -- including but not limited to Morante, McCombs, Ferreira, Ackermann, Carter, Orso, and multiple Bergen County dispatch personnel -- knowingly created, embellished, or disseminated false statements describing Plaintiff as:

- dangerous,
- unstable,
- threatening to judges or court staff,
- suicidal,
- a "security risk," or
- otherwise requiring extraordinary law-enforcement intervention.

94

348. None of these statements had any factual basis. Defendants possessed or were presented with contradictory information proving that Plaintiff had never threatened anyone, had no criminal history, and had no behavioral history consistent with the labels imposed upon him.

**B. Defendants Fabricated "Security Narratives" and False Danger Assessments**

349. Morante unilaterally generated false "security advisories," false "access restrictions," and a "Wanted-style" bulletin containing fabricated risk information, all of which falsely portrayed Plaintiff as dangerous.

350. These fabricated materials were disseminated to municipal police, county dispatch, Superior Court staff, and judicial chambers, and were relied upon by those recipients in taking adverse actions against Plaintiff.

351. Defendants in law enforcement -- including McCombs, Ferreira, Ackermann, and Carter -- relied on fabricated or unverified information when:

- falsely describing Plaintiff as "suicidal,"
- misrepresenting his emails as threats of self-harm,
- falsely asserting he was suicidal despite contradictory evidence,
- falsely stating that Plaintiff was emotionally disturbed or unstable ("EDP"),
- falsely declaring that Plaintiff possessed a firearm permit or was potentially armed,
- falsely claiming that Plaintiff had a history of domestic violence charges,
- escalating an alleged "welfare check" into a multi-agency armed response.
- falsely claiming that Plaintiff had threatened judges or posed a threat to judicial officers,
- falsely stated that Plaintiff was involved in a custody or visitation battle with his estranged wife,
- falsely claiming that Plaintiff had lost custody of his children,
- falsely stating that Plaintiff had appeared in court earlier that day,
- falsely claiming that Plaintiff was dangerous to others, including Family court personnel and members of the public.

352. Their statements were not merely mistaken -- they were recklessly indifferent to accuracy, consciously disregarded contrary facts, and intended to justify unconstitutional actions.

**C. Dispatchers and CarePlus Clinicians Repeated and Amplified False Information**

353. Bergen County dispatch personnel, acting under color of law, repeated fabricated narratives when communicating with multiple municipal agencies, embellishing the alleged "threat level" associated with Plaintiff and escalating their descriptions of risk despite possessing no evidence supporting such claims.

354. Defendant Orso, acting jointly with county law enforcement, relied on fabricated danger assessments conveyed by police and dispatch, adopted those statements as fact, and transmitted them to hospital clinicians as the basis for involuntary psychiatric detention.

355. These fabricated and misleading statements directly caused medical staff and police to view Plaintiff as a credible danger, prompting forced medical procedures, searches, and confinement.

**D. Fabricated Evidence Was Used to Justify the October 9, 2025 Seizure and Medical Procedures**

356. As detailed in PART II, fabricated statements about Plaintiff's alleged dangerousness, instability, or suicidal intent were used to justify:

- the unlawful seizure of Plaintiff at gunpoint,
- the use of K-9 tracking and tactical units,
- an unlawful cell-phone location ping,
- involuntary transportation to a psychiatric facility,
- strip searches and forced blood draws,
- continued detention and interrogations,
- dissemination of false "risk" information to clinicians.

357. These actions were causally linked to the fabricated narratives originating from Morante and amplified by municipal and county personnel.

**E. Fabrication of Evidence Violated Clearly Established Constitutional Rights**

358. It is clearly established that government officials may not:

- fabricate evidence,
- knowingly provide false information in official communications,

96

- disseminate false risk assessments, or
- use fabricated information to justify seizures or detentions.

359. It is also clearly established that a due process violation occurs when the state fabricates evidence and such fabrication is later used to deprive a person of liberty. *Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014).

360. Defendants' conduct therefore violated clearly established Fourteenth Amendment rights.

**F. Injuries**

361. As a direct and proximate result of Defendants' fabrication of evidence, Plaintiff suffered:

- unlawful seizure,
- involuntary medical procedures,
- emotional trauma,
- reputational injury,
- ongoing security classifications and access restrictions,
- and loss of constitutional rights.

**G. Relief Sought**

362. Plaintiff seeks compensatory damages, punitive damages against all individual defendants responsible for fabrication, declaratory relief, and such additional relief as the Court deems just and proper.

**COUNT 6 - SUBSTANTIVE DUE PROCESS - BODILY INTEGRITY**
***(Fourteenth Amendment; 42 U.S.C. § 1983)***
*Against All Defendants*

363. Plaintiff repeats and realleges all prior paragraphs.

364. The Fourteenth Amendment protects the fundamental right to bodily integrity against arbitrary government intrusion.

365. Defendants strip-searched, physically handled, restrained, and compelled medical procedures upon Plaintiff without lawful justification.

366. This conduct shocks the conscience and violates well-established substantive due process protections.

367. Defendants' conduct was undertaken with deliberate indifference to Plaintiff's autonomy and personal dignity.

368. No reasonable government official could have believed such conduct to be lawful under clearly established precedent.

369. Plaintiff suffered severe emotional and constitutional injury.

370. As a direct and proximate result of Defendants' actions, Plaintiff suffered severe emotional distress, including a diagnosis of Post-Traumatic Stress Disorder (PTSD), as confirmed by treating professionals.

## COUNT 7 - STATE-CREATED DANGER
### *(Fourteenth Amendment – Substantive Due Process; 42 U.S.C. § 1983)*
### *Against All Defendants*

371. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

372. Under the state-created danger doctrine, government officials violate the Fourteenth Amendment when their affirmative actions create or substantially increase the risk of harm to an individual, and they act with deliberate indifference to that risk.

373. Defendants, through their actions spanning 2023 to 2025 and culminating on October 9, 2025, affirmatively created, manufactured, and escalated a dangerous environment in which Plaintiff faced a foreseeable, imminent, and unjustified risk of serious bodily harm or death.

374. Defendants, including Morante, municipal police officers, county dispatchers, county mental-health providers, and state and local supervisors, engaged in a series of affirmative actions that created or heightened the danger to Plaintiff:

- deliberately generating and disseminating false allegations that Plaintiff was suicidal, dangerous, armed, emotionally disturbed, hostile to judges, or involved in violent domestic disputes;
- initiating a multi-agency search using drones, long guns, SWAT resources, K-9 tracking units, NJ Transit Police, aerial surveillance, and tactical staging in residential neighborhoods;

98

- misinforming residents and judges' families that Plaintiff was a violent threat, thereby escalating public fear and police readiness to use force;

- placing officers, including armed tactical units, around Plaintiff's general location based on fabricated data;

- repeatedly circulating inaccurate descriptions of Plaintiff's appearance, location, intentions, mental condition, and alleged criminal history;

- instructing officers to treat Plaintiff as a dangerous fugitive despite the absence of any articulable threat;

- leaking sensitive information to the public and media, which further increased the likelihood of misidentification, confrontation, or violent escalation;

- initiating an unlawful warrantless "ping" of Plaintiff's cellphone, heightening tactical engagement based on false exigency; and

- failing to correct known falsehoods despite having ample opportunity and knowledge of contradictory facts.

375. These affirmative acts created a volatile, fear-driven, militarized environment in which heavily armed officers were primed to perceive Plaintiff as a lethal threat based solely on misinformation that Defendants themselves manufactured and circulated.

376. At multiple points on October 9, 2025, Defendants coordinated police to encircle areas near Plaintiff's location with assault rifles drawn, drones deployed overhead, and K-9 teams positioned for tactical engagement. Officers were informed—falsely—that Plaintiff might be armed, had threatened judges, had lost custody of his children, and was "super paranoid," all of which increased the likelihood that officers would resort to deadly force.

377. Defendants' actions collectively created a lethal environment that did not previously exist, placing Plaintiff at substantial risk of wrongful injury or death during any potential encounter with the officers deployed.

378. The danger Defendants created was foreseeable. It was also a direct and proximate result of their false narratives, reckless escalation, and deliberate indifference to the truth.

99

379. Plaintiff had no ability to protect himself from the danger Defendants created. Plaintiff was unaware of the deployment of drones, K-9 units, SWAT, or armed officers until it was too late. Moreover, Plaintiff reasonably relied on the assurances of 262-HELP that the incident was resolved, which further impeded his ability to avoid the danger Defendants intentionally amplified.

380. Defendants acted with deliberate indifference to the danger they created. Numerous officers and dispatchers received contradictory information showing Plaintiff was not suicidal, not dangerous, and not armed, yet continued to escalate. Defendants ignored exculpatory evidence -- including Plaintiff's clear communication with 262 and the absence of any threat in the triggering email -- and instead advanced a predetermined, false narrative.

381. The collective conduct of Defendants shocks the conscience, violates the core guarantees of substantive due process, and constitutes an independent constitutional violation under the state-created danger doctrine.

382. As a direct and proximate result of Defendants' actions, Plaintiff suffered severe emotional trauma, reputational harm, unlawful seizure, forced medical procedures, involuntary detention, and loss of liberty.

383. As a direct and proximate result of Defendants' actions, Plaintiff suffered severe emotional distress, including a diagnosis of Post-Traumatic Stress Disorder (PTSD), as confirmed by treating professionals.

384. Plaintiff is entitled to compensatory damages, punitive damages against individual defendants, and all other relief this Court deems just and proper.

## COUNT 8 - INTERFERENCE WITH FAMILIAL INTEGRITY
### *(Fourteenth Amendment; 42 U.S.C. § 1983)*
### *Against Morante and Participating Defendants*

385. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

386. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

387. The Fourteenth Amendment protects the fundamental liberty interest of parents in the care, custody, companionship, and management of their children, free from unwarranted state interference.

388. Defendants, acting under color of state law, engaged in a course of conduct that foreseeably and directly interfered with Plaintiff's ability to safely exercise his parental role and maintain familial relationships with his minor children.

389. Through false security classifications, dissemination of stigmatizing information, and the imposition and enforcement of non-judicial access restrictions, Defendants portrayed Plaintiff as dangerous, unstable, or a threat to judges and court personnel, despite the absence of any criminal history, judicial finding, or due-process proceeding.

390. This conduct culminated in law-enforcement involvement and heightened security treatment that created a substantial and unreasonable risk that Plaintiff could be misidentified as a dangerous individual during routine daily activities, including activities undertaken while caring for or transporting his children.

391. Defendants' actions foreseeably chilled Plaintiff's willingness to engage in ordinary parental conduct -- such as attending school-related matters, public activities, or court proceedings involving his children -- out of fear that law enforcement or courthouse security would escalate encounters based on Defendants' false designations.

392. The interference with Plaintiff's familial integrity was not justified by any legitimate governmental interest, was not narrowly tailored, and was imposed without notice, hearing, judicial authorization, or any procedural safeguards.

393. Defendants knew or should have known that falsely labeling a parent as a security threat and circulating that designation across judicial and law-enforcement systems would foreseeably interfere with the parent-child relationship and expose the parent and children to heightened risk and emotional harm.

394. As a direct and proximate result of Defendants' conduct, Plaintiff suffered emotional distress, fear, stigma, and a concrete disruption of his ability to exercise his parental rights on equal footing with other parents.

395. Defendants' actions violated Plaintiff's clearly established constitutional right to familial integrity, and no reasonable official could have believed that imposing or enforcing such restrictions without judicial process was lawful.

**COUNT 9 - STIGMA-PLUS (DUE PROCESS)**
*(Fourteenth Amendment; 42 U.S.C. § 1983)*
*Against All Defendants*

396. Plaintiff repeats and realleges all prior paragraphs.

397. This claim is pled in the alternative to Plaintiff's other Fourteenth Amendment claims. Although certain factual allegations overlap, this count vindicates a distinct constitutional injury -- namely, the public stigmatization of Plaintiff through false statements combined with concrete alterations of Plaintiff's legal status and rights. This claim does not merely restate procedural due process violations, but addresses an independent stigma-plus deprivation recognized under the Fourteenth Amendment.

398. Defendant Morante publicly disseminated false and defamatory claims that Plaintiff was a security risk, including a "Wanted-style" bulletin with his photo.

399. These statements were accompanied by concrete liberty deprivations, including statewide communication blocks, access restrictions, and adverse judicial treatment.

400. Such conduct satisfies both the stigma and "plus" requirements for a Fourteenth Amendment due process claim.

401. The false publication caused lasting reputational harm and fostered unwarranted suspicion among law enforcement and judicial personnel.

402. Defendants' conduct was reckless, malicious, and undertaken without the slightest evidentiary basis.

403. Plaintiff suffered constitutional injury, humiliation, and emotional distress.

404. At all relevant times, it was clearly established that government officials may not publicly stigmatize an individual through false statements while simultaneously altering that individual's legal status or rights without due process of law. It was further clearly established that such stigma-plus deprivations violate the Fourteenth Amendment. No reasonable official could have believed the conduct alleged herein was lawful.

405. Defendants have also deprived Plaintiff of a protected liberty interest through stigma-plus conduct. On December 16, 2025, courthouse security personnel possessed and displayed large printed photographs of Plaintiff at the security station and treated Plaintiff as subject to a special security directive, falsely representing that Plaintiff was the subject of a binding "Order."

406. This stigmatizing designation -- communicated to law enforcement officers and courthouse personnel -- was coupled with tangible legal consequences, including mandatory escort, restricted movement within the courthouse, advance notification requirements, and the threat of police investigation. The combination of reputational harm and altered legal status satisfies the "stigma-plus" doctrine and continues to cause ongoing injury.

407. The false stigmatizing statements were accompanied by concrete deprivations, including:

- statewide denial of telephonic and electronic access to courts;
- instruction to court staff not to communicate with Plaintiff;
- obstruction of transcript requests and appellate filings;
- interference with Family Court notice and proceedings;
- armed police response and involuntary psychiatric detention; and
- imposition of *de facto* security restrictions without process.

408. As a direct and proximate result of Defendants' actions, Plaintiff suffered severe emotional distress, including a diagnosis of Post-Traumatic Stress Disorder (PTSD), as confirmed by treating professionals.

## COUNT 10 - DENIAL OF ACCESS TO COURTS
### (First & Fourteenth Amendments; 42 U.S.C. § 1983)
### Against Morante, County of Bergen, Municipal Defendants

409. Plaintiff repeats and realleges all prior paragraphs.

410. This claim is pled in the alternative and is based on a distinct constitutional interest—the right of access to the courts and the right to petition for redress of grievances. Although certain conduct also implicates due process protections, this claim addresses separate harms arising from Defendants' obstruction of Plaintiff's ability to pursue judicial relief and participate meaningfully in legal proceedings.

411. Defendants blocked Plaintiff from calling or emailing any Superior Court, municipal court, the ACJC, the AOC, the Appellate Division, and even the New Jersey Supreme Court.

412. These facts are confirmed in the AOC's December 11, 2025 letter to Plaintiff.

413. As a result of Defendants' communication blocks, Plaintiff was thereby prevented from pursuing claims/filings (e.g., appeals/transcript requests/motions), causing actual injury.

414. Plaintiff was denied notice of hearings and prevented from pursuing legitimate legal claims.

415. The AOC's December 11, 2025 letter reaffirms that Plaintiff is still prohibited from contacting the courts except by U.S. mail.

416. Defendants' denial of Plaintiff's right of access to the courts is not hypothetical or historical. On December 16, 2025, Defendants, acting through Bergen County courthouse security and sheriff personnel, physically enforced the statewide restrictions by stopping Plaintiff inside the Bergen County Courthouse, declaring that a purported "Order" prohibited Plaintiff from being present unsupervised, and requiring advance notice and armed escort for any future court access.

417. These restrictions were imposed and enforced without any judicial order, without findings, without notice, and without any opportunity to be heard. The enforcement of Morante's December 21, 2023 "Amended Access" letter as a binding "Order" operated as a functional bar

to Plaintiff's normal use of the courts, chilled Plaintiff's willingness to appear in person, and imposed burdens and stigma not applied to other litigants.

418. By conditioning Plaintiff's physical access to the courthouse on prior approval, escort, and security supervision -- and by threatening police investigation for noncompliance -- Defendants have imposed a substantial and ongoing interference with Plaintiff's constitutional right of access to the courts.

419. These Defendants' actions directly impeded Plaintiff's ability to participate in judicial processes and seek redress.

420. Such actions foreclosed meaningful access to the courts and undermined the integrity of judicial processes.

421. Plaintiff's constitutional right to petition the government was significantly burdened.

422. Plaintiff suffered substantial harm as a result.

## COUNT 11 - FIRST AMENDMENT RETALIATION
### *(42 U.S.C. § 1983)*
*Against all Defendants Except Orso*

423. Plaintiff repeats and realleges all prior paragraphs.

424. Plaintiff engaged in protected First Amendment activity by filing judicial misconduct complaints, communicating with courts, and petitioning the government for redress.

425. Defendant Morante and others retaliated by issuing false security directives, expanding unauthorized access restrictions, and interfering with Plaintiff's Family Court matter.

426. The retaliatory conduct was substantially motivated by Plaintiff's protected activity.

427. The adverse actions taken against Plaintiff would deter a person of ordinary firmness from continuing to engage in protected speech.

428. The retaliation served no legitimate governmental purpose and was undertaken maliciously.

429. Plaintiff suffered emotional distress, reputational harm, and constitutional injury.

430. As a direct and proximate result of these Defendants' actions, Plaintiff suffered severe emotional distress, including a diagnosis of Post-Traumatic Stress Disorder (PTSD), as confirmed by treating professionals.

## COUNT 12 - FIRST AMENDMENT RETALIATION FOR COMPLAINTS REGARDING MISCONDUCT BY THE VILLAGE OF RIDGEWOOD'S MUNICIPAL JUDGE
### *Against the Village of Ridgewood*

431. Plaintiff repeats and realleges all prior paragraphs.

432. Earlier in 2025, Plaintiff exercised his First Amendment rights by submitting written complaints and communications to the Ridgewood Mayor, Ridgewood Village Council, and Ridgewood Town Attorney concerning misconduct by the Ridgewood Municipal Judge.

433. Plaintiff's criticisms constituted protected speech under the First Amendment, addressing matters of public concern involving judicial integrity and municipal governance.

434. Ridgewood PD officers knew or reasonably should have known of Plaintiff's protected speech, as these communications were directed to Ridgewood municipal leadership, including officials responsible for overseeing or communicating with Ridgewood PD.

435. On October 9, 2025, Ridgewood PD officers fabricated a false "extensive history" with Plaintiff, requested unnecessary protective posting at the Town Attorney's home, and participated in an escalated police response based on misinformation -- all of which materially exceeded any reasonable law-enforcement response to the situation.

436. These actions were taken in retaliation for Plaintiff's protected speech, or were substantially motivated by negative views of Plaintiff that Ridgewood PD developed following his First Amendment activity.

437. Ridgewood's retaliatory actions chilled Plaintiff's speech, caused significant harm, and violated his First Amendment rights as enforced through 42 U.S.C. § 1983.

438. As a direct and proximate result of Defendants' actions, Plaintiff suffered severe emotional distress, including a diagnosis of Post-Traumatic Stress Disorder (PTSD), as confirmed by treating professionals.

## COUNT 13 - §1983 CIVIL RIGHTS CONSPIRACY
### *Against All Defendants*

439. Plaintiff repeats and realleges all prior paragraphs.

440. Defendants formed an agreement, express or implied, to deprive Plaintiff of constitutional rights.

441. Overt acts in furtherance of the conspiracy included dissemination of false security bulletins, blocking Plaintiff's communications, improper court interference, and coordinated participation in the unlawful seizure.

442. These acts were undertaken jointly and cooperatively by multiple actors across multiple agencies.

443. Defendants' conduct was intentional, malicious, and retaliatory.

444. Plaintiff suffered constitutional injury and substantial emotional harm.

445. As a direct and proximate result of Defendants' actions, Plaintiff suffered severe emotional distress, including a diagnosis of Post-Traumatic Stress Disorder (PTSD), as confirmed by treating professionals.

## COUNT 14 - NEW JERSEY CIVIL RIGHTS ACT (NJCRA)
### *Against All Defendants*

446. Plaintiff repeats and realleges all prior paragraphs.

447. Defendants, acting under color of law, deprived Plaintiff of substantive and procedural rights under the New Jersey Constitution.

448. These deprivations included unlawful seizure, denial of due process, retaliation, and interference with familial rights.

449. The NJCRA provides an independent cause of action parallel to §1983.

450. Plaintiff is entitled to compensatory damages, punitive damages (against individuals), and attorney's fees.

451. As a direct and proximate result of Defendants' actions, Plaintiff suffered severe emotional distress, including a diagnosis of Post-Traumatic Stress Disorder (PTSD), as confirmed by treating professionals.

452. Defendants' actions were intentional, reckless, and malicious.

## COUNT 15 - MONELL LIABILITY - POLICY, PRACTICE, CUSTOM
### *Against Municipal Defendants and County of Bergen*

453. Plaintiff repeats and realleges all prior paragraphs.

454. Municipal and county entities maintained customs of accepting unverified security alerts, mishandling mental-health responses, and improperly restricting court access.

455. These customs were widespread, well-known, and deliberately ignored by policymakers.

456. Such customs directly caused Plaintiff's constitutional deprivations.

457. This custom is evidenced by the repeated practice across Bergen County and all six Defendant municipalities of treating Morante's unverified 'security' assertions as authoritative and escalating responses (including tactical deployment and detention) without independent corroboration, as reflected in dispatch/incident communications on Oct. 9, 2025, repeating the same false narrative.

458. Defendants' customs were not abstract or theoretical. On October 9, 2025, multiple municipal police departments and Bergen County dispatch accepted Morante's unverified security narrative as authoritative, escalated the response without independent assessment, and treated Plaintiff as a dangerous individual despite the absence of probable cause or exigent circumstances.

459. Supervisory personnel within the municipal defendants and Bergen County approved, directed, or failed to intervene in this response in real time, and later failed to correct or discipline the conduct, thereby ratifying the unconstitutional actions taken.

108

460. These policies and ratification practices were the moving force behind Plaintiff's unlawful seizure, detention, and deprivation of constitutional rights.

461. The December 16, 2025 incident further demonstrates that Plaintiff's injuries were caused by official policy, custom, and practice. Bergen County sheriff personnel stated that they were required to follow a written "Order" and had "no choice" in enforcing the restrictions, evidencing institutional adoption and implementation of the AOC's access restrictions.

462. The possession of Plaintiff's photographs at the courthouse security desk, the uniform characterization of Morante's letter as an "Order," and the coordinated enforcement across judicial facilities reflect a centralized policy disseminated through Court and Judicial Security channels, not isolated discretionary acts.

463. The policies were the moving force behind the harms suffered.

464. Plaintiff suffered significant injury as a result.

465. At all relevant times, the constitutional rights at issue were clearly established, and the need for training, supervision, and lawful policy was obvious. Defendants' policies, customs, practices, and failures were the moving force behind the constitutional violations alleged.

466. These policies, customs, practices, and failures to train and supervise were the moving force behind the constitutional violations alleged herein.

467. As a direct and proximate result of Defendants' actions, Plaintiff suffered severe emotional distress, including a diagnosis of Post-Traumatic Stress Disorder (PTSD), as confirmed by treating professionals.

468. The December 16, 2025 incident necessarily implicates Defendants' courthouse-security data systems, including Court & Judicial Security repositories, sheriff and courthouse access-control databases, and any platforms used to store photographs, security flags, or access restrictions. Discovery will include the source, acquisition method, metadata, storage location, dissemination history, and access logs for Plaintiff's photographs, including whether such images were

obtained from private social-media accounts or shared across judicial and law-enforcement systems without authorization. Plaintiff will further seek all documents, communications, training materials, and directives instructing courthouse personnel to treat administrative correspondence as a binding "order," and all records reflecting the creation, modification, or enforcement of Plaintiff's security designation statewide.

## COUNT 16 - MONELL - FAILURE TO TRAIN
*Against Municipal Defendants and County of Bergen*

469. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

470. At all relevant times, Municipal Defendants and the County of Bergen were responsible for the training, supervision, and discipline of law enforcement officers, dispatch personnel, and associated clinicians involved in mental-health responses, court-related security designations, and inter-agency information sharing.

471. Defendants maintained policies, customs, and practices that failed to provide constitutionally adequate training regarding:

a. the Fourth Amendment limits on seizure and detention based on vague or unverified "security threat" labels;

b. the due-process requirements governing mental-health evaluations and involuntary commitments; and

c. the obligation to independently verify the factual basis for inter-agency alerts before acting upon them.

472. Defendants' failure to train and supervise reflected deliberate indifference to the known and obvious risk that, absent such training, officers, dispatchers, and clinicians would rely on conclusory or stigmatizing labels as a substitute for individualized constitutional analysis.

110

473. This risk was highly predictable because mental-health calls, court-security communications, and inter-agency alerts routinely involve liberty interests, stigmatization, and the potential for coercive state action.

474. As a direct and proximate result of Defendants' inadequate training and supervision, officers and associated personnel repeatedly treated a vague "security threat" designation as sufficient justification for:

    a. locating Plaintiff's phone;

    b. seizing Plaintiff without probable cause or a warrant;

    c. subjecting Plaintiff to involuntary mental-health detention and medical procedures; and

    d. disregarding less intrusive and constitutionally required alternatives.

475. Proper training and supervision would have required personnel to assess the reliability, source, and factual basis of any alleged threat and to apply clearly established constitutional standards before initiating seizure or detention.

476. Defendants' policies, customs, and failures to train were the moving force behind the violations of Plaintiff's clearly established rights under the Fourth and Fourteenth Amendments.

477. As a result of these violations, Plaintiff suffered loss of liberty, emotional distress, reputational harm, and other damages.

478. At all relevant times, the constitutional rights at issue were clearly established, and the need for training, supervision, and lawful policy in these circumstances was obvious.

**COUNT 17 - MONELL - FAILURE TO SUPERVISE**
*Against Municipal Defendants and County of Bergen*

479. Plaintiff repeats and realleges all prior paragraphs.

480. Supervisory officials failed to monitor or discipline subordinates who repeatedly acted unlawfully.

481. These failures allowed misconduct to continue unchecked, culminating in significant constitutional violations.

482. Supervisors either knew of the misconduct or deliberately ignored it.

483. Policymakers and supervisors within Bergen County and the municipal departments allowed personnel to disseminate and rely on escalating false claims about Plaintiff on Oct. 9, 2025 without correction, despite contrary information being available through the triggering emails and Plaintiff's communications with 262-HELP.

484. The absence of oversight was a substantial factor in causing Plaintiff's harm.

485. Plaintiff suffered emotional, reputational, and constitutional injury.

486. At all relevant times, the constitutional rights at issue were clearly established, and the need for training, supervision, and lawful policy was obvious. Defendants' policies, customs, practices, and failures were the moving force behind the constitutional violations alleged.

487. These policies, customs, practices, and failures to train and supervise were the moving force behind the constitutional violations alleged herein.

488. As a direct and proximate result of Defendants' actions, Plaintiff suffered severe emotional distress, including a diagnosis of Post-Traumatic Stress Disorder (PTSD), as confirmed by treating professionals.

## COUNT 18 - SUPERVISORY LIABILITY (§1983)
### Against McCombs, Ackermann, Carter, CarePlus Supervisors

489. Plaintiff repeats and realleges all prior paragraphs.

490. Supervisory defendants were aware of subordinates' unconstitutional actions but failed to intervene, prevent, or correct them.

491. Supervisors approved, condoned, or acquiesced in the wrongful conduct, making them liable under §1983.

492. Their deliberate indifference enabled the violations to escalate and multiply.

112

493. Supervisory defendants are liable because they were on notice -- through CAD notes/bodycam/dispatch logs/incident reports, documenting the escalating false narrative and resulting seizure -- and nevertheless approved, ratified, or failed to stop subordinates' unconstitutional conduct during and after the Oct. 9, 2025 incident.

494. Supervisors' inaction was reckless, malicious, and unconstitutional.

495. Plaintiff suffered injury directly traceable to these supervisory failures.

496. As a direct and proximate result of Defendants' actions, Plaintiff suffered severe emotional distress, including a diagnosis of Post-Traumatic Stress Disorder (PTSD), as confirmed by treating professionals.

## COUNT 19 - VIOLATION OF NEW JERSEY CONSTITUTION (Art. I, Pars. 1, 6, 7)
*Against All Defendants*

497. Plaintiff repeats and realleges all prior paragraphs.

498. Defendants deprived Plaintiff of rights to due process, equal protection, free speech, petitioning the government, and freedom from unreasonable seizures.

499. The protections under the New Jersey Constitution are broader than those provided under federal law.

500. Defendants acted without lawful justification and in violation of fundamental rights protected by the State Constitution.

501. Plaintiff suffered independent and substantial injury as a result.

502. As a direct and proximate result of Defendants' actions, Plaintiff suffered severe emotional distress, including a diagnosis of Post-Traumatic Stress Disorder (PTSD), as confirmed by treating professionals.

503. Plaintiff is entitled to compensatory and punitive damages and other relief.

## COUNT 20 - ABUSE OF GOVERNMENTAL PROCESS
*(NJ Common Law)*
*Against All Defendants Except CarePlus*

113

504. Plaintiff repeats and realleges all prior paragraphs.

505. Defendant Morante used judicial security systems, communication restrictions, and inter-agency channels for retaliatory and improper purposes.

506. These uses of governmental mechanisms were wholly outside lawful authority.

507. Morante's actions were undertaken intentionally to harm Plaintiff and interfere with judicial outcomes.

508. This conduct constitutes an improper use of governmental process for an ulterior motive.

509. Plaintiff suffered emotional and reputational harm.

510. As a direct and proximate result of Defendants' actions, Plaintiff suffered severe emotional distress, including a diagnosis of Post-Traumatic Stress Disorder (PTSD), as confirmed by treating professionals.

## COUNT 21 - FALSE IMPRISONMENT
*Against All Defendants*

511. Plaintiff repeats and realleges all prior paragraphs.

512. Plaintiff was unlawfully detained without probable cause, warrant, or lawful basis.

513. The detention occurred solely because of false information orchestrated or amplified by Defendants.

514. Defendants' conduct constituted intentional and unlawful restraint of Plaintiff's liberty.

515. The confinement was unreasonable, unjustified, and unlawful.

516. Plaintiff suffered fear, humiliation, and constitutional injury.

517. As a direct and proximate result of Defendants' actions, Plaintiff suffered severe emotional distress, including a diagnosis of Post-Traumatic Stress Disorder (PTSD), as confirmed by treating professionals.

## COUNT 22 - INTRUSION UPON SECLUSION
*Against All Defendants*

114

518. Plaintiff repeats and realleges all prior paragraphs.

519. Defendants intentionally intruded on Plaintiff's solitude by monitoring, analyzing, and disseminating private information.

520. The intrusion was unauthorized, unwarranted, and highly offensive to a reasonable person.

521. Plaintiff had a reasonable expectation of privacy in the matters intruded upon.

522. Defendants' actions were reckless and malicious.

523. Plaintiff suffered humiliation, distress, and harm to his privacy.

524. As a direct and proximate result of Defendants' actions, Plaintiff suffered severe emotional distress, including a diagnosis of Post-Traumatic Stress Disorder (PTSD), as confirmed by treating professionals.

## COUNT 23 – FIRST AMENDMENT RETALIATION
### (Retaliatory Threat in AOC's December 11 Letter)
*Against Morante*

525. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

526. Plaintiff engaged in constitutionally protected activity, including:

   (a) submitting a judicial misconduct complaint to the ACJC;

   (b) reporting unlawful conduct by court personnel;

   (c) communicating with government agencies about misconduct; and

   (d) preparing to file this federal civil rights lawsuit.

527. On December 11, 2025, the Administrative Office of the Courts ("AOC"), through Counsel to the Administrative Director, issued an official letter to Plaintiff.

528. In that letter, the AOC:

   (a) reaffirmed the unconstitutional statewide communication restrictions placed on Plaintiff;

   (b) repeated false and stigmatizing allegations about Plaintiff's conduct; and

115

(c) expressly threatened that any civil rights lawsuit Plaintiff might file "will be vigorously defended."

529. The AOC's December 11 letter was issued in direct response to Plaintiff's protected activity and was intended to deter, punish, or chill Plaintiff's exercise of his First Amendment right to petition the government for redress of grievances.

530. Defendants' actions -- including the reaffirmation of unlawful restrictions, publication of false allegations, and explicit litigation-related threats -- would deter a person of ordinary firmness from engaging in future protected activity.

531. The retaliatory actions of the AOC and its officials caused Plaintiff constitutional injury, including emotional harm, reputational damage, heightened restrictions on court access, and the continuation of the statewide communication ban.

532. Defendants acted intentionally, maliciously, and with reckless disregard for Plaintiff's constitutional rights.

**WHEREFORE**, Plaintiff demands compensatory damages, punitive damages against individual defendants, declaratory relief, and injunctive relief lifting the statewide restrictions, together with attorney's fees and costs under 42 U.S.C. § 1988.

## COUNT 24 - FOURTEENTH AMENDMENT - STIGMA-PLUS DUE PROCESS VIOLATION
### (42 U.S.C. § 1983) (False Government Accusations + Deprivation of Rights)
*Against Morante*

533. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

534. On December 11, 2025, the Administrative Office of the Courts issued an official letter to Plaintiff, containing false, stigmatizing, and defamatory statements about Plaintiff's conduct, including claims that Plaintiff "threatened" a judge, "harassed" court staff, made "outlandish allegations," improperly recorded staff, and intimidated the Office of Attorney Ethics.

116

535. These statements are factually false. Plaintiff was never:

(a) notified of any such allegations;

(b) investigated for any such conduct;

(c) charged with any violation;

(d) afforded an opportunity to respond;

(e) given any hearing; or

(f) sanctioned or warned by any judicial officer.

536. The AOC's December 11 letter constitutes publication by a government actor of stigmatizing accusations that impugn Plaintiff's integrity, honesty, and character.

537. The stigmatizing statements were accompanied by, and used to justify, a tangible deprivation of liberty and constitutional rights, including:

(a) a statewide prohibition on Plaintiff's ability to call or email any court;

(b) denial of access to the ACJC, Appellate Division, and Superior Courts;

(c) interference with Plaintiff's ability to obtain transcripts, file motions, and communicate with chambers; and

(d) other impairments of Plaintiff's First and Fourteenth Amendment rights.

538. The combination of governmental defamation plus the deprivation of court access constitutes a "stigma-plus" constitutional violation under *Paul v. Davis*, 424 U.S. 693 (1976), and its progeny.

539. The AOC imposed these restrictions and published these accusations without any notice, hearing, evidence, findings, or judicial order, in violation of the procedural protections guaranteed by the Fourteenth Amendment.

540. Defendants acted maliciously, arbitrarily, and with deliberate indifference to Plaintiff's constitutional rights.

117

**WHEREFORE,** Plaintiff demands compensatory damages for reputational injury, emotional distress, and constitutional harm, punitive damages against individual defendants, and all other available relief, including attorney's fees under 42 U.S.C. § 1988.

## COUNT 25 - OFFICIAL CAPACITY LIABILITY FOR ONGOING CONSTITUTIONAL VIOLATIONS

### *(42 U.S.C. § 1983; Ex parte Young)*

### *Against Morante in her official capacity*

541. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

542. Plaintiff seeks declaratory and prospective injunctive relief only against Defendant Morante in her official capacity, not monetary damages.

543. The New Jersey Administrative Office of the Courts ("AOC"), acting through its Administrative Director and Counsel to the Director, is the final policymaker for statewide court-security and communication policies, and communication protocols.

544. On December 11, 2025, the AOC -- through its Counsel to the Administrative Director, acting under delegated authority from the Administrative Director of the Courts—issued an official letter expressly:

    (a) reaffirming the unconstitutional statewide communication ban imposed on Plaintiff;

    (b) endorsing the baseless accusations used to justify the restrictions;

    (c) asserting, falsely, that Plaintiff had been afforded due process;

    (d) declaring that Plaintiff's access to the courts "has never been denied," contrary to overwhelming evidence; and

    (e) threatening retaliatory treatment should Plaintiff file suit.

545. The AOC's December 11 letter constitutes formal ratification by a final policymaker of the unconstitutional conduct originally undertaken by Defendant Morante and others within the Judiciary.

546. Through the December 11 letter, the AOC:

(a) adopted the unconstitutional practices as official policy;

(b) approved and perpetuated the denial of Plaintiff's First and Fourteenth Amendment rights;

(c) misrepresented material facts in an effort to legitimize unlawful actions; and

(d) confirmed that the unconstitutional restrictions remain in effect in 2025.

547. A policymaker's ratification of unconstitutional conduct renders the government entity directly liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

548. The AOC's ratification was done knowingly, deliberately, and with full awareness of Plaintiff's repeated warnings that the actions were unlawful and constitutionally defective.

549. As a direct and proximate result of the AOC's ratification and continued enforcement of unconstitutional practices, Plaintiff suffered ongoing injury, including denial of court access, emotional distress, reputational harm, impaired ability to litigate his cases, and deprivation of due process and First Amendment rights.

**WHEREFORE**, Plaintiff seeks declaratory relief and prospective injunctive relief against Defendant Morante in her official capacity, barring the continued enforcement, ratification, or reliance upon the unconstitutional policies, practices, classifications, and access restrictions described herein, and requiring their removal from operational use. Plaintiff further seeks reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 and such other equitable relief as the Court deems just and proper. Plaintiff does not seek monetary damages against Defendant Morante in her official capacity.

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and grant the following relief:

### A. Declaratory Relief

550. A declaration that Defendants' imposition and enforcement of courthouse-access restrictions -- including escort requirements, advance-notice mandates, and mail-only communication limitations -- without notice, hearing, findings, or a judicial order violate the First and Fourteenth Amendments to the United States Constitution;

551. A declaration that Defendants' dissemination, display, and use of Plaintiff's photographs and security designations within courthouse-security and law-enforcement systems, absent lawful authority and due process, violate Plaintiff's constitutional rights and protected liberty interests;

552. A declaration that administrative correspondence authored by non-judicial personnel does not constitute a binding court order and may not be enforced as such against a litigant.

### B. Injunctive Relief

553. A temporary, preliminary, and permanent injunction prohibiting Defendants, their officers, agents, employees, contractors, and all persons acting in concert with them from enforcing any requirement that Plaintiff be escorted, supervised, pre-cleared, or otherwise restricted in his physical access to any courthouse, absent a valid judicial order issued after constitutionally adequate due process;

554. A temporary, preliminary, and permanent injunction prohibiting Defendants from enforcing or treating any administrative letter, directive, bulletin, or internal communication as a binding "order" affecting Plaintiff's access to the courts unless issued by a judge of competent jurisdiction;

555. A temporary, preliminary, and permanent injunction requiring Defendants to immediately remove from operational use, deactivate, and segregate for preservation, all photographs, alerts, flags, bulletins, watchlists, access-control notations, or security designations relating to Plaintiff from all courthouse security desks, Court & Judicial Security systems, law-enforcement databases, and internal repositories, and to certify compliance under oath;

556. A temporary, preliminary, and permanent injunction prohibiting Defendants from collecting, scraping, storing, displaying, disseminating, or relying upon Plaintiff's social-media images or personal identifying information for courthouse-security or access-control purposes absent lawful authority and constitutionally sufficient process;

557. An injunction prohibiting Defendants from disseminating false or misleading statements regarding Plaintiff's alleged conduct, security status, or purported receipt of due process in connection with courthouse access or judicial security.

## C. Preservation and Transparency Relief

558. An order requiring Defendants to preserve and not alter, delete, or destroy any records relating to Plaintiff, including but not limited to courthouse-security photographs, watchlists, access flags, internal advisories, bulletins, emails, distribution lists, metadata, access logs, and records reflecting the source, printing, or dissemination of Plaintiff's images or security designations;

559. An order requiring Defendants to provide written certification, under oath, that no active courthouse-access restrictions or security designations remain in effect as to Plaintiff absent a judicial order.

## D. Monetary Relief

560. Compensatory damages in an amount to be determined at trial;

561. Nominal damages for the violation of Plaintiff's constitutional rights.

## E. Statutory and Equitable Relief

562. An award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provision of law;

563. Pre-judgment and post-judgment interest as permitted by law;

564. Such other and further relief as the Court deems just, proper, and equitable.

## IX. JURY DEMAND

565. Plaintiff hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## X. SIGNATURE BLOCK & PRO SE CERTIFICATION

Respectfully submitted,

___/s/ C.D._____          Dated: <u>December 17, 2025</u>

**C.D.**, Plaintiff *Pro Se*
Email: plaintiff.confidential@gmail.com

I, the undersigned Plaintiff, certify that I am proceeding *pro se*, that I have read the foregoing Complaint, and that the factual statements contained herein are true and correct to the best of my knowledge, information, and belief. I understand that false statements made herein may subject me to penalties under federal law.