**"C.D.", Plaintiff, *Pro Se***
*Plaintiff.Confidential@gmail.com*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **C.D.,**<br><br>Plaintiff,<br><br>v.<br><br>**ADMINISTRATIVE OFFICE OF THE COURTS OF THE STATE OF NEW JERSEY; ROBIN A. MORANTE, in her official capacity; and MERYL G. NADLER, ESQ., in her official capacity,**<br><br>Defendants. | Civil Action No. 2:25-cv-18718-JKS-AME<br><br><br>**PLAINTIFF'S REPLY TO DEFENDANT MORANTE'S OPPOSITION TO PLAINTIFF'S REQUEST FOR PRELIMINARY INJUNCTION** |

*Plaintiff files this Reply pursuant to the Court's inherent authority to consider responsive briefing on applications for preliminary injunctive relief, and to ensure a complete record addressing Defendants' opposition.*

### PRELIMINARY STATEMENT

This case presents a narrow but serious constitutional question: whether a non-judicial administrative official may impose and maintain an indefinite, statewide "security" designation on a private litigant -- treated as binding across agencies -- without any judicial order, written findings, notice, hearing, defined duration, or neutral review mechanism.

For more than thirty-two months, Plaintiff has been subject to such restrictions. Defendant's opposition does not meaningfully dispute the structural features of the challenged regime: the restrictions remain in effect statewide; contain no expiration date; provide no standards for reinstatement; and offer no appeal, periodic review, or neutral decisionmaker. Instead, Defendant attempts to justify the continued enforcement of an unreviewed statewide designation by reciting *disputed* allegations and by reframing Plaintiff's protected criticism and petitions for redress as the reason the designation should continue.

1

That argument is inconsistent with settled constitutional principles. The First Amendment protects the right to criticize government officials and to petition the government for redress of grievances; those protected activities cannot be converted into a basis for indefinite punishment through administrative "security" labeling. Further, the Fourteenth Amendment does not permit an unreviewed, non-judicial designation to persist indefinitely where it operates in practice as a statewide restriction on a litigant's ability to communicate with, appear before, and seek relief from the courts. Whatever legitimate security interests exist in general, the State must implement them through defined standards and neutral procedures -- *not* through perpetual, unreviewable administrative discretion grounded in *disputed* allegations.

Plaintiff does *not* seek to dismantle legitimate security measures or to compel any particular security outcome. He seeks narrowly tailored, procedurally adequate safeguards: notice of the operative basis for the designation, defined standards, a meaningful opportunity to respond, and neutral review -- so that any continued restrictions are lawful, bounded, and tied to objective criteria, rather than disputed allegations and one individual's unilateral administrative discretion.

Because the restrictions remain active, statewide, and operationally enforced today -- without neutral process -- the constitutional injury is ongoing. The continuing impairment of access to courts and the chilling effect on protected petitioning activity constitute irreparable harms that cannot be remedied after the fact. The Court should grant preliminary injunctive relief requiring prompt, neutral review and constitutionally adequate procedures governing any continued restrictions.

## I. THE STRUCTURAL FACTS ARE NOT DISPUTED

Defendant's opposition confirms that the restrictions imposed in 2023 remain in effect, apply statewide, contain *no* expiration date, are *not* subject to periodic review, were imposed *without* a hearing, and are *not* accompanied by written findings or *any* appeal mechanism.

Defendant's opposition also does not dispute that the "Amended Access" directive functions as an operational security designation across agencies. As set forth in Plaintiff's sworn declarations already in the record, Defendant Morante disseminated the directive to law-enforcement entities, including the Bergen County Sheriff's Office, where officers have stated that they were required to follow Morante's directive as an "order." Plaintiff also personally observed his photograph displayed at courthouse security and was stopped and subjected to escort procedures pursuant to the directive. These facts confirm that the challenged restrictions are not merely an internal "communication preference," but an active, statewide security

classification maintained without notice, without written findings, without defined duration, without neutral review, and without any reinstatement mechanism. (*Decl. of C.D.* ¶¶ 2–4, 8.)

The restrictions have now persisted for *more than thirty-two months*.  Nearly *three years*.

This case therefore presents a narrow constitutional question:

Whether indefinite, statewide court-access restrictions grounded in disputed factual allegations may continue for *more than thirty-two months* without *any* neutral procedural safeguards.  Because these restrictions remain in effect today -- without notice, duration, review, or any mechanism for reinstatement -- the constitutional injury is ongoing, operationally enforced, and irreparable.

## II. DEFENDANT'S CERTIFICATION INTRODUCES *POST HOC* FACTUAL ALLEGATIONS

Defendant's opposition attempts to reframe this case as an attack on Plaintiff's character rather than a question of constitutional process, relying on allegations that are disputed and, in several instances, contradicted by objective recordings and documents. Where the underlying evidence is capable of direct verification, the Court need not accept unsupported characterizations. Several sworn assertions are demonstrably inaccurate.

Defendant's Certification provides characterizations of specific alleged communications or interactions as justification for the restrictions.

Those detailed allegations were not provided to Plaintiff in 2023, 2024, or 2025, despite his repeated, documented attempts to have Defendant Morante present him with same. Plaintiff was never given written notice of the specific incidents being relied upon, provided detailed characterizations of the recordings, afforded an opportunity to respond to those allegations, permitted to submit the full recordings for review, or granted access to any neutral decisionmaker.

The detailed narrative now presented in federal court appears for the first time as *post hoc* justification for restrictions that have already endured for more than *thirty-two months*.

Due process requires, at minimum, notice of the factual basis and a meaningful opportunity to respond when the government imposes ongoing restrictions grounded in contested facts.

For purposes of this motion, the Court need *not* resolve any factual disputes or make any credibility determinations; the constitutional violation arises from the *absence of any neutral process to evaluate disputed allegations before imposing statewide, indefinite restrictions*.

3

## III. DEFENDANT MORANTE'S CERTIFICATION RESTS ON CONTESTED FACTUAL PREDICATES THAT HAVE NEVER BEEN SUBJECTED TO NEUTRAL REVIEW

Plaintiff disputes the factual accuracy and characterization of numerous paragraphs of Defendant Morante's Certification, including ¶¶ 6, 7, 8, 10, 16, 18, 19, 21, 29, and 31. Those paragraphs advance an "escalation" narrative based on disputed descriptions of Plaintiff's communications and alleged conduct. Plaintiff disputes both the underlying facts and the inferences drawn from them.

Two examples illustrate the structural problem.

First, Defendant asserts in ¶10 that Plaintiff sent "44 emails" to the Glen Rock Court Administrator "during the relevant period," without defining the time window or providing reciprocal context. Plaintiff's records reflect extensive bidirectional communication during that same period, reflecting an ongoing administrative exchange rather than a one-sided campaign of harassment. Defendant failed to mention that the Glen Rock Court Administrator sent Plaintiff *127* emails *in May 2023 alone*[1]. Presented without temporal boundaries or reciprocal correspondence, such volume-based characterizations cannot reliably function as a factual predicate for indefinite statewide restrictions.

Second, Defendant Morante's ¶16 allegation concerning a July 6, 2023 "phone conference" with the "Hackensack County Municipal Court Manager," where Plaintiff alleged referenced 'firearms' *is directly contradicted by objective carrier records*. As set forth in *Plaintiff's Sixteenth Supplemental Declaration*, Plaintiff's Verizon call-detail records reflect no incoming or outgoing voice call on July 6, 2023 to or from the publicly listed Hackensack Municipal Court number (201-646-7777), *or* the Bergen County Courthouse number (201-221-0700). (*Sixteenth Supp. Decl*. ¶¶ 5–7; Ex. A.)

The records instead reflect calls to unrelated numbers, but no call to either court number identified in Defendant's narrative. Defendant provides no recording, transcript, sworn participant statement, or contemporaneous documentation substantiating the alleged "phone conference," and the record reflects no contemporaneous law-enforcement contact or security response associated with the alleged remark.

Where an asserted factual predicate for indefinite, statewide restrictions is directly contradicted by objective carrier records, the absence of neutral review mechanisms presents an acute risk of erroneous deprivation.

---

[1] The Glen Rock Court Administrator sent **55** emails to Plaintiff within a span of just five days (May 15th to 19th, 2023), a number that *exceeds* the 44 total emails that Defendant attributes to Plaintiff as being a "harassing" number over an undefined "relevant period." This underscores that the correspondence was reciprocal and administrative in nature, and *not* unilateral "harassment" by Plaintiff.

Critically, Defendant Morante does not even claim that this alleged (and refuted) statement was directed at a judge, law clerk, or any member of the Judiciary or court staff. That distinction matters here not as a merits determination, but to *nexus and tailoring*: Defendants seek to justify an indefinite, statewide restriction on court access based on *disputed assertions that are not even alleged to involve the Judiciary as a target*, and that have never been subjected to neutral evaluation or written findings.

The sequence is also notable with respect to the April–May 2023 Glen Rock Court Administrator communications. The record reflects no contemporaneous security action tied to those exchanges; but rather, the "amended access" directive followed *the Bergen County Courthouse impersonation incident* in June 2023[2]. That chronology underscores the need for neutral review before statewide restrictions are imposed, maintained, or expanded.

By contrast, on March 21, 2024, after Plaintiff emailed Defendant Morante upon discovering and confirming her interference with his emailed transcript request, two New Jersey State Police officers were dispatched to Plaintiff's residence the next day to "check up" on him. The disparity in institutional response is notable: an alleged (disputed) firearm-related comment -- later cited in this litigation as a purported "security concern" -- produced no contemporaneous police response and no formal or informal proceedings, whereas Plaintiff's non-threatening emails to Defendant Morante complaining of transcript interference (and stating only that Plaintiff believed she would lose her job based on her actions) were followed by an immediate law-enforcement presence at Plaintiff's home. This disparity reinforces the risk of error inherent in relying on unilateral characterizations by a single official, without defined standards, written findings, or any structured mechanism for neutral review before disputed allegations are used to justify indefinite, statewide restrictions. (See *Compl*. ¶¶ 94–103, 108–111.)

For purposes of this motion, the Court need not resolve these disputes. The constitutional defect is procedural: an individualized, statewide restriction has remained in effect for more than thirty-two months based on *contested factual characterizations* -- many capable of *objective verification* -- without written findings, defined standards, or neutral review. Where the asserted security rationale depends upon disputed and verifiable factual predicates, *minimal* procedural safeguards are constitutionally required before such restrictions may persist.

---

[2] This is addressed in detail on Pages 9-10.

## IV. NUMEROUS PARAGRAPHS OF DEFENDANT MORANTE'S SWORN CERTIFICATION ARE *OBJECTIVELY CONTRADICTED* BY ACTUAL RECORDINGS AND DOCUMENTS

Defendant Morante repeatedly attempts to insulate the challenged restrictions from constitutional scrutiny by labeling them "administrative security protocols," rather than adjudications or punishment. But due process turns on *substance, not self-serving labels*. That is, a restriction that operates as a statewide, multi-year deprivation of fundamental rights triggers the Fourteenth Amendment regardless of how the State describes it. Whether termed a "protocol" or an "order," the functional result here is the same -- an indefinite, statewide restraint maintained for more than thirty-two months without notice, written findings, defined duration, or neutral adjudication.

More significantly, several assertions in Defendant's Certification are not merely contested; they are *objectively contradicted* by preserved evidence already in the record, including recordings and documentary exhibits. Specifically, ¶¶ 12, 14, 15, 17, 28, and 30 conflict with objective materials that a neutral decisionmaker can review directly.

Plaintiff possesses significant evidence that directly refutes various assertions contained in Defendant Morante's sworn Certification, including (1) complete recordings of the specific interactions and incidents alleged, (2) certified mobile carrier call-detail records contradicting the July 6, 2023 'firearm' allegation, (3) contemporaneous e-mail logs documenting the volume of Glen Rock court-initiated correspondence sent *to Plaintiff*, (4) records concerning BCPO's probable cause approval of a criminal complaint against the Glen Rock Court Administrator, (5) the Hawthorne Municipal Court probable cause letter, (6) an audio recording of Hawthorne personnel acknowledging Defendant Morante's contact with them via phone, (7) audio recordings proving that Plaintiff was *not* the individual in the June 9, 2023 impersonation incident at the Bergen County Courthouse, and (8) the formal admissions of the Municipal Defendants (ECF 39) confirming their blind reliance on the AOC's security designations without independent knowledge or verification of the underlying facts.

No neutral adjudicator has reviewed this evidence prior to or during the continuation of statewide restrictions. Plaintiff has never been afforded notice of the specific allegations, an opportunity to respond, or neutral review supported by written findings. The lack of independent review is confirmed by the Municipal Defendants themselves, who admit they "*rely on the actions of the Administrative Office of the Court*," despite conceding they "*do not have intimate knowledge of all of the reasons as to why the AOC issued this security protocol*." (See ECF 39 at 8). This confirms that local entities are blindly enforcing a statewide 'security' designation without any independent due process or verification of the underlying facts.

6

Several sworn assertions are materially contradicted by preserved recordings and documents. Where objective recordings permit direct verification, continued indefinite restrictions without neutral review present a heightened risk of erroneous deprivation.

In ¶12 of Defendant Morante's Certification, she swears that Plaintiff "filed a criminal complaint against Judge Pfund," yet Defendant cites no filing, docket number, or court record. Plaintiff denies this assertion. If Defendant maintains this claim under penalty of perjury, then surely she can identify the court, date, and docket or complaint number for the alleged filing.

In *Morante Cert*. ¶14, she swears that on June 27, 2023, she "wrote to Plaintiff to clarify that he was permitted to communicate with Glen Rock Municipal Court personnel verbally regarding court appearances." *This is false*. Defendant Morante's June 27, 2023 letter to Plaintiff *expressly* states that "[e]-mails, phone calls, voicemail and faxes will not be accepted or addressed by the Court … Verbal communication will only be entertained when you are summoned to appear in person or virtually for a court session." Defendant Morante's sworn assertion is false *on its face*.

In *Morante Cert*. ¶15, Plaintiff believes that Defendant is mistaken about the conversation that occurred between himself and the Glen Rock Court Administrator. Plaintiff possesses a recording of the entirety of that verbal exchange, over the phone. A copy of the recording of that conversation was forwarded by Plaintiff to the Bergen County Prosecutor's Office, which promptly *approved multiple felony criminal charges* to proceed to a probable cause hearing *against the Glen Rock Court Administrator* for *her* conduct during the course of that call. (**Exhibit A**) Conversely, absolutely n*o* criminal charges were initiated *against Plaintiff*, even though the BCPO had the full audio recording of the call, which included *the full context* of the verbal exchange that Defendant Morante relies upon in justifying restrictions *against Plaintiff*.

Similarly, at ¶17 of Defendant Morante's Certification, she swears that Plaintiff "repeatedly called" the Hawthorne Municipal Court and "harassed" and "baited" staff. *This is false*. Plaintiff had *one* single phone conversation with Hawthorne court personnel, on December 20, 2023, which lasted eight minutes, and which Plaintiff recorded. The complete transcript of that call is attached as **Exhibit A**. It contains no threats or profanity. Defendant does not identify any call logs, affidavits, or other documentation substantiating the claim of "repeated" or "harassing" communication between Plaintiff and Hawthorne court personnel.

Again, in ¶28, Defendant swears that Plaintiff "accused" Defendant Morante of "having his children taken away from him," and presents that characterization in a manner implying that such an event *had even occurred*. It categorically, and plainly, did not. And Plaintiff did not accuse Defendant Morante of having done so. Plaintiff has *never* had his children taken away from him. At no time -- not temporarily, not conditionally, *not even for one minute* -- has Plaintiff lost custody of his children. He has *continuously*

7

maintained 50% shared custody of his two children, pursuant to court order, ever since he filed for divorce many years ago.

To the extent Defendant Morante attempts to inject "taken away" language into Plaintiff's December 23, 2025 email, that phrasing does not appear in her quoted text, in any e-mail, and does *not* reflect *any* factual reality.  Any implication that Plaintiff's children were removed from his custody is *categorically false*, and unsupported by the record.  The Court should evaluate the actual words used, not Defendant's inflammatory and misleading (at best) paraphrasing.

In ¶30, Defendant Morante swears that Plaintiff is able to engage in "verbal (telephonic) communications with court staff regarding scheduling." However, Defendant's *own written directives* state the exact opposite. In June 2023, Defendant Morante issued two "Amended Access" directives providing that "E-mails, phone calls, voicemail and faxes will not be accepted or addressed by the Court," that communications must be made only through the United States Postal Service or by leaving written correspondence at the municipal court, and that "[v]erbal communication will only be entertained when you are summoned to appear." (**Exhibit B**). Defendant identifies no subsequent written communication rescinding or modifying those mail-only directives. "Defendant's sworn representation in ¶30 is therefore *flatly inconsistent, on its face, with Defendant's own written restrictions*.

Defendant's mail-only restriction was not confined to a single courthouse. On August 22, 2023, Defendant Morante further directed Plaintiff that his access to the Advisory Committee on Judicial Conduct ("ACJC") was restricted to United States Postal Service, and that he may conduct business with the ACJC only "via United States Postal Service." (**Exhibit B**). At the time, Plaintiff had a pending complaint before the ACJC -- a complaint concerning Glen Rock Municipal Judge Pfund which was filed *prior* to any access restrictions -- and the mail-only limitation thus imposed a concrete burden in an active oversight proceeding.

Consistent with these written restrictions, Plaintiff's personal telephone number has been systemically blocked from reaching courthouses *statewide*, and when a third party calling on Plaintiff's behalf attempts to contact a courthouse regarding Plaintiff, court staff refuse to discuss the matter, state that they have been instructed not to speak with Plaintiff or any third parties calling on his behalf, and abruptly terminate the call. These facts have been documented through audio and video recordings. (*Emergency Declaration*, Dec. 18, 2025; *Fourteenth Supplemental Declaration* ¶¶ 7–12; *Fifth Supplemental Declaration* ¶¶ 5–9; *Declaration of A.S.* ¶¶ 7–12; *Ninth Supplemental Certification* ¶¶ 4–12 & Ex. C; *Tenth Supplemental Declaration* ¶ 11).

These are just a handful of examples of assertions made by Defendant Morante, sworn under penalty of perjury and submitted to this Court, that are materially contradicted by actual, *objective evidence*.

## V. THE JUNE 2023 IMPERSONATION REPORT AND SUBSEQUENT 'AMENDED ACCESS' LETTER DEMONSTATE THE NEED FOR NEUTRAL REVIEW

### A. The Courthouse Impersonation of Plaintiff and Law-Enforcement Interaction/Investigation

On Friday, June 9, 2023, Plaintiff was *informed by an employee of the Bergen County Courthouse* that somebody had attempted to *impersonate him* to her, in person, around 9:15am that morning. Plaintiff asked that employee whom he should speak to about the impersonation attempt, and she informed him that the Bergen County Sheriff's Department ("BCSD") handles Courthouse security. Plaintiff immediately reported the impersonation attempt to the BCSD, and spoke with Officer Brian Smith about what the employee had told him.  Officer Smith took down the information that Plaintiff provided to him, and told Plaintiff that he would immediately look into the situation.

After the weekend passed without Plaintiff receiving any updates from the BCSD, Plaintiff met Officer Smith of BCSD in person, on the morning of Monday, June 12, 2023, shortly after the courthouse opened, in an attempt to obtain answers regarding the impersonation attempt.

After Officer Smith informed Plaintiff that the matter was being transferred to the BCSD Detective Unit to conduct a formal investigation, Plaintiff asked Officer Smith if he would accompany him to meet/speak with the singular witness to the impersonation attempt, the courthouse employee.  Officer Smith agreed to do so, and brought that courthouse employee to a public area of the Bergen County Courthouse to discuss and confirm with Plaintiff specifically what had happened a few days prior.  Plaintiff possesses a contemporaneous audio recording of that Bergen County courthouse employee -- the only witness to the June 9, 2023 impersonation attempt -- informing him that an impersonation attempt of him occurred at the courthouse, and *confirming* that the individual who claimed that they were the Plaintiff was indeed *not* the Plaintiff himself. The audio recording includes participation of a BCSD officer, and was immediately provided to the BCSD in connection with the matter for investigation.  See **Exhibit C**.[3]

Defendant further characterizes Plaintiff's recorded interaction with the BCSD officer as an "accusation" against Judge Pfund and asserts that Plaintiff "filed criminal charges" against him. (*Morante Cert*. ¶12)  That is inaccurate. Plaintiff is unaware of any such filing, and Defendant cites no docket, complaint number, or court record.

During the recorded exchange, the courthouse employee stated that the three individuals Plaintiff had previously identified as potential suspects were not the impersonator.  Plaintiff had previously been asked

---

[3] Plaintiff does not offer **Exhibit C** to assert any theory of identity of the impersonator; it is offered solely to confirm that courthouse personnel reported an impersonation attempt, and that the resulting restrictions were imposed and continued without neutral review of the objective recording.

by BCSD whether he could identify any individuals who might have a motive to engage in impersonation of him, which is what the courthouse employee was referring to. Plaintiff identified three separate individuals in response to that inquiry, and expressly stated that he was *not* asserting that any of them *had in fact* committed the act. (**Exhibit C**). Plaintiff did *not* file criminal charges against Judge Pfund, and no prosecutorial authority initiated or pursued any such action. The recording reflects Plaintiff's response to law-enforcement questioning regarding potential motives -- not a formal criminal accusation/complaint.

The *very first time* that Defendant Morante *ever* contacted Plaintiff *was on that very day, June 12, 2023*, via e-mail, at 10:20am.  Defendant Morante sent Plaintiff a short e-mail -- addressing Plaintiff by an incorrect name -- attaching an (undated) so-called "Amended Access" letter.  No neutral adjudicator reviewed the recording of the Courthouse employee who witnessed the impersonation prior to the commencement of the restrictions, *or at any time during the more than thirty-two months they have remained in effect*.

## B. The June 12, 2023 Amended Access Letter Was Not Issued During the April-May 2023 Glen Rock Municipal Court Communications

Defendant now attributes the June 12, 2023 Amended Access letter, in part, to Plaintiff's April 2023 communications with the Glen Rock Municipal Court Administrator. However, *no* amended access directive was issued during April or May 2023, despite those communications having already occurred. The very *first* amended access letter was only issued on June 12, 2023 – *shortly after* Plaintiff reported an impersonation attempt at the Bergen Courthouse (and provided contemporaneous information to law enforcement as evidence to assist in the investigation, including the names of three individuals as potential suspects – one of whom was Judge Pfund).

The Bergen County Sheriff's Department later characterized the impersonation incident as a "misunderstanding," without addressing the recorded statement that Plaintiff provided of the courthouse employee who actually reported the impersonation attempt to him. The omission is significant for a narrower reason: it confirms that objective evidence exists, yet has *never* been subjected to any neutral review before or during the continuation of statewide restrictions. *See infra* § XVII.B (*Mathews* - Risk of Erroneous Deprivation).

## C. The "Amended Access" Restriction Issued *Immediately* After Plaintiff Reported the Courthouse Impersonation, *and Was Maintained After Defendant Morante Received the Contemporaneous Eyewitness Recordings*

On June 27, 2023, Defendant Morante emailed Plaintiff and declared to him, *sua sponte*, that the impersonation allegation was "to date unfounded." *Within an hour of receiving that e-mail, Plaintiff responded and provided Defendant Morante with the two contemporaneous audio recordings relating to the*

*June 9, 2023 impersonation incident, from the courthouse employee who witnessed it*. A copy of that email is attached as **Exhibit C**.[4]

Those two recordings reflect, among other things: (1) the courthouse employee eyewitness *confirming* that the individual who appeared and identified himself *was not Plaintiff*; and (2) the same eyewitness adamantly insisting that she had *not* changed her account of the incident, notwithstanding BCSD's later characterization of the matter as a "misunderstanding" (without explaining the nature of the misunderstanding, *and* without referencing the recorded eyewitness statement). Both recordings were created contemporaneously with the incident and include participation by BCSD personnel.

Defendant Morante therefore had *actual notice*, at the very latest as of June 27, 2023, that *contemporaneous objective recordings existed* and that Plaintiff had provided evidence *materially inconsistent* with any characterization of the impersonation allegation as merely "unfounded." Despite this, the restrictions were not withdrawn, narrowed, or subjected to neutral review.

Instead, it is now clear that *Plaintiff himself* was treated as *the security problem,* immediately after reporting that *he* was the target/victim of a security incident, and without *any* adjudicative process explaining why.

Moreover, Plaintiff was *not* informed at the time that the June 9, 2023 impersonation incident was being treated as a predicate for "amended access." The very first time that Plaintiff learned that Defendants were invoking the incident as a justification for his 'amended access' was when Plaintiff received AOC counsel's December 12, 2025 letter, which characterized Plaintiff as having made "outlandish allegations" regarding the incident. That characterization was made *notwithstanding that Defendant Morante had been provided the contemporaneous eyewitness recordings in June 2023* -- more than two and a half years before counsel's letter.

In her sworn Certification, dated February 13, 2026, Defendant Morante described the courthouse impersonation incident as follows:

> On June 6, 2023[5], I was advised that Plaintiff entered the Bergen County Courthouse, identified himself to court staff, and complained about various issues related to his cases. Later, he called court staff to complain about the same issues. Plaintiff was reminded that he made the same complaints when he visited the Courthouse in-person. Plaintiff responded that it must have been an imposter who made the earlier complaint. Plaintiff later filed a criminal complaint against Judge Pfund for impersonating him. (*Morante Cert.* ¶12).

---

[4] The bottom of the email chain reflects that two separate audio files were attached.

[5] This was not the date of the impersonation attempt.

First, Defendant Morante's sworn statement that Plaintiff "filed a criminal complaint against Judge Pfund," is false, and she identifies no docket, complaint number, or court record substantiating that claim.

Second, and more broadly, Defendant Morante's sworn statement does more than 'recount events': it effectively converts Plaintiff's report of an impersonation attempt *conveyed to him by courthouse personnel* into an *adverse characterization of Plaintiff* -- i.e., that Plaintiff advanced an "imposter" narrative to somehow deflect responsibility for his own conduct (that Plaintiff stated "it must have been an imposter" who made the earlier complaints). Yet, Defendant Morante's Certification omits that Plaintiff *provided her directly with multiple contemporaneous eyewitness recordings* in June 2023 reflecting that an individual *who was not Plaintiff* identified himself at the courthouse, and that the eyewitness courthouse employee *adamantly* maintained her account. The omission is consequential because Defendant Morante continues to invoke the same episode to justify ongoing statewide restrictions, nearly three years later, *while withholding acknowledgement of the objective evidence bearing directly on that episode's factual predicate*. Where an official uses an adverse narrative to support ongoing restrictions, due process requires a meaningful opportunity to contest the factual predicate -- *especially* where objective evidence exists *and* was produced.

Defendant's Certification does *not* disclose that she received the contemporaneous eyewitness recordings in June 2023. It does *not* acknowledge that Plaintiff provided her with *objective evidence* reflecting that *an individual other than Plaintiff identified himself at the courthouse*. Nor does it disclose that Plaintiff informed her that the eyewitness courthouse employee forcefully denied altering her account. There is likewise no record that, after receiving that evidence, Defendant Morante initiated or caused to occur any neutral review of the factual basis for the continued restrictions, issued written findings, or afforded Plaintiff any meaningful opportunity to be heard.

Instead, the individualized restrictions that she issued, *just three days* after Plaintiff lodged the impersonation report, remained in effect and continue to be justified *more than thirty-two months later*, by the same factual narrative, *without* judicial authorization, neutral adjudication, or procedural safeguards. This sequence -- restriction first, evidence later received, and no subsequent neutral review -- underscores the absence of constitutionally adequate process.

## VI. THE GLEN ROCK / HAWTHORNE SEQUENCE CONFIRMS *POST-HOC* ENFORCEMENT AND DEMONSTRATES WHY NEUTRAL REVIEW IS REQUIRED

Plaintiff's singular December 2023 interaction with the Hawthorne Municipal Court demonstrates precisely why neutral procedural safeguards are constitutionally required before indefinite statewide restrictions may continue.

**A. Transfer for Probable Cause Hearing and No-Notice Determination**

Plaintiff pursued a lawful criminal complaint through the Bergen County Prosecutor's Office ("BCPO") against the Glen Rock Court Administrator, for violations of multiple felony-level offenses she had committed against him.

The BCPO *approved* the complaint for a probable cause hearing and, on December 5, 2023, confirmed in writing that the matter had been transferred to Hawthorne Municipal Court for a probable cause hearing before the Hon. John Meola, with notice to issue by mail. (**Exhibit A**).  This Court is surely aware that the BCPO does *not* approve of felony-level criminal charges to progress to a formal probable cause hearing, *against a long-time Bergen County Municipal Court Administrator*[6], unless the evidence and proofs are extremely strong, clear, and well-documented.

To the surprise of Plaintiff, on December 14, 2023, the Hawthorne Municipal Court issued a letter stating that "No Probable Cause was found," despite Plaintiff having received no notice of any hearing and no opportunity to appear. (**Exhibit A**).

Plaintiff had never previously contacted or communicated with Hawthorne Municipal Court.

**B. December 20, 2023 -- Single Recorded Inquiry Call and AOC "USPS-Only" Instruction**

After receiving Hawthorne's December 14, 2023 letter, Plaintiff made a phone call to the Hawthorne Municipal Court on December 20, 2023 to inquire about the absence of a hearing. The complete audio recording is preserved and attached as **Exhibit A**. The call contains no threats and no profanity. Plaintiff's comments were directed at Defendant Morante's administrative conduct, and Plaintiff *expressly* clarified that he was not blaming Hawthorne personnel ("*I'm not blaming you … I know you're just doing what the judge told you to do.*"). (**Exhibit A**).

During that call, Hawthorne personnel stated they had been instructed by the AOC that Plaintiff was to communicate via USPS only, and the Court Administrator stated she had *spoken directly with Defendant Morante, by telephone*. (**Exhibit A**). Plaintiff requested written confirmation of any such restriction, but no such written documentation was provided to Plaintiff.

**C. December 21, 2023 -- Written "Amended Access" Issued *After* Enforcement**

The *very next day* -- December 21, 2023 -- Plaintiff received a written "Amended Access" letter from Defendant Morante. (**Exhibit A**).

---

[6] That Glen Rock Court Administrator's alleged statements to Defendant Morante are what Defendant Morante has relied upon so heavily in her Certification and Brief, and in her decision to ban Plaintiff from accessing the courts, statewide.

Thus, the chronology is undisputed:

1. On December 20, Hawthorne enforced a USPS-only communication restriction and attributed it to AOC instruction communicated via telephone by Defendant Morante.

2. Plaintiff requested written confirmation.

3. On December 21, a written "Amended Access" letter was issued.

Plaintiff had not been provided written documentation specifically restricting communication with Hawthorne Municipal Court prior to that enforcement.

No hearing accompanied issuance of the December 21 letter. No written findings were issued. No duration was defined. No objective reinstatement criteria were articulated. No neutral review mechanism was provided.

**D. The Attorney General Has Possessed the Objective Hawthorne Recording Since December 2023**

On December 29, 2023, Plaintiff transmitted the complete, unedited recording of the Hawthorne call to the Office of the New Jersey Attorney General, together with the relevant correspondence. (**Exhibit A**). After receiving no substantive response, Plaintiff followed up on January 14, 2024. (**Exhibit A**).

The State itself has therefore possessed the objective recording since December 2023.[7] [8]

It cannot be overstated how **Exhibit A** underscores the core constitutional defect under *Mathews v. Eldridge*. The State possessed objective, dispositive evidence -- a complete contemporaneous recording -- by December 2023, when Plaintiff transmitted it to the Office of the Attorney General, in connection with his official complaint lodged against Defendant Morante due to her improper *ex parte* conduct in interfering with the Hawthorne probable cause proceedings, *and* Plaintiff *expressly* cited that recording in *both* his TRO application *and* his Civil Complaint.  Yet, the challenged statewide restrictions continued for more than two

---

[7] It bears emphasis that Plaintiff's Sixth Supplemental Declaration expressly states -- in the very first line of Exhibit A -- that the Office of the Attorney General was provided with the complete audio recording of the December 20, 2023 Hawthorne call, together with the relevant court correspondence, and identifies the specific individual at the Attorney General's Office to whom it was transmitted, as well as the exact date of transmission. (*Sixth Supp. Decl.*, Ex. A). The State has therefore possessed the complete, objective recording since December 2023.

Despite that possession -- and despite the ease with which the recording's contents could have been verified -- Defendant Morante now submits sworn filings characterizing the call as "harassing," and invoking that characterization as justification for continued statewide restrictions, without identifying any prior neutral review, written findings, or formal process evaluating the recording. Where objective evidence is readily verifiable, yet the government proceeds by litigation-stage characterization rather than pre-deprivation (or prompt post-deprivation) neutral review, the risk of erroneous deprivation under *Mathews v. Eldridge* is materially heightened.

[8] Notably, Plaintiff's Civil Complaint specifically references the existence of an audio recording of this phone call. (*Plaintiff's Complaint* ¶¶ 74-75). Defendant Morante was therefore on notice that the interaction was preserved in objective form. Despite that notice, Defendant's Certification characterizes the call (**Exhibit A**) as "harassment." (Morant Cert. ¶17).

14

years after receipt of that evidence, without any neutral adjudicator ever reviewing the evidence, issuing findings, or reconciling it with the characterizations now advanced in litigation. Where the factual predicate for an ongoing deprivation is objectively verifiable, the risk of erroneous deprivation under existing procedures is substantial, while the value of additional safeguards -- notice, neutral review, and written findings -- is exceptionally high and the administrative burden minimal. Under *Mathews*, the continued reliance on unilateral characterizations in the face of preserved, contradictory evidence weighs decisively in favor of requiring procedural safeguards before indefinite restrictions may persist.

At no time during the subsequent two-plus years was Plaintiff notified that the call (allegedly) constituted "harassment"; no disciplinary process was initiated; no hearing was conducted; no written findings were issued; and Defendant supplies no certification from Hawthorne personnel asserting that Plaintiff harassed or threatened staff.

Only now -- in litigation -- does Defendant Morante characterize Plaintiff on the December 20, 2023 call to the Hawthorne Municipal Court as "harassing" and "baiting."

### E. Constitutional Significance

The December 20, 2023 call is preserved in a complete recording (**Exhibit A**) that has been in the State's possession since December 29, 2023 and is capable of direct, objective review. Yet Defendant identifies no notice, written findings, or neutral review of that recording before relying on her characterization of it in her sworn submission to this Court in an attempt to justify continuing statewide restrictions.

This is precisely the *Mathews* problem. Where the factual predicate for an ongoing deprivation is objectively verifiable, the risk of erroneous deprivation under existing procedures is substantial, while the value of additional safeguards -- notice, neutral review, and written findings -- is exceptionally high and the administrative burden minimal.

The Glen Rock/Hawthorne sequences illustrate the defect: enforcement before written articulation; no hearing before or after enforcement; and more than two years of State possession of objective evidence without review -- followed by a "harassment" characterization emerging only in litigation, despite the existence (and actual possession) of a complete recording showing otherwise.

### VII. DEFENDANT IDENTIFIES NO STAFF-DIRECTED ALLEGED MISCONDUCT *SINCE MID-2023*

Even accepting Defendant Morante's allegations as presented (which Plaintiff clearly does not do), nothing in the record justifies statewide, indefinite, multi-year restrictions imposed without notice, hearing, written findings, duration, or neutral review. The procedural defect is independent of the factual dispute: the

Constitution requires process before the State may maintain such restrictions, regardless of how it characterizes the underlying conduct.

**Plaintiff has *no* criminal record whatsoever – he has *never* been arrested, pled guilty to, or been convicted of any offense, at any level, *in his entire life***, and *no* law-enforcement agency has *ever* initiated or recommended any criminal process in connection with any allegation Defendant now cites. Despite this, Defendant's Certification and brief repeatedly portray Plaintiff as if he were a dangerous or criminal individual, even though *no* court, law-enforcement agency, or neutral authority has *ever* made any such finding. Defendant's reliance on *character attacks* in lieu of any contemporaneous findings, criminal process, or neutral review underscores that the State's position rests on *post hoc* narrative, rather than any objective or adjudicated basis whatsoever. The disparity between Defendant's characterizations and Plaintiff's actual record underscores why neutral procedural safeguards are required before maintaining statewide, indefinite restrictions.

These omissions are especially striking given that every individual subject to any form of judicial action -- *including those contesting nothing more than a routine $50 parking ticket* -- is afforded notice of the allegations, an opportunity to be heard, and a neutral adjudicator empowered to issue findings. These basic procedural protections apply across the entire judicial system regardless of the severity of the alleged conduct. Plaintiff, by contrast, received none of them before being subjected to statewide, multi-year restrictions on his fundamental constitutional right to access the courts -- restrictions that have had significant, well-documented consequences for his ability to protect his legal interests, as detailed in his Complaint and Motion for Temporary Relief.

Defendant Morante's Certification identifies alleged incidents involving court personnel occurring in April through July *2023*. (*Morante Cert.* ¶¶ 9–16). Defendant additionally references a December 20, *2023* phone call to the Hawthorne Municipal Court. (*Morante Cert.* ¶ 17).

As shown *supra* § VI.D–E and *infra* § XVII.B, the complete December 20, 2023 recording has been in the State's possession since December 2023, yet Defendants identify no neutral review or written findings associated with it.

Setting aside that disputed December 2023 episode, Defendant's sworn Certification identifies no alleged incident involving any judge, municipal clerk, court administrator (other than Defendant Morante), appellate staff member, or other courthouse personnel occurring after the summer of 2023.

Consistent with that absence, Defendant Morante identifies no complaint, report, or communication from any judge, law clerk, or court staff in 2024, 2025, *or* 2026 alleging that Plaintiff engaged in harassing,

threatening, or otherwise improper communications. Defendant Morante likewise attaches no correspondence and cites no record evidence from court personnel asserting operational disruption, threats, or improper contact during that period.

Rather, the *only* post-2023 communications Defendant Morante cites in support of continued statewide restrictions consist of *emails directed to Defendant Morante herself* concerning her ongoing administration and enforcement of the restrictions at issue without having provided Plaintiff with any due process whatsoever. (*Morante Cert.* ¶¶ 23–28).   While Plaintiff's communications at times reflected pointed criticism of Defendant Morante's conduct as a public official, such criticism of governmental action *lies at the core of protected political expression* and does *not* eliminate the requirement of neutral procedural safeguards before imposing indefinite statewide restrictions.

Defendant characterizes Plaintiff's statements such as, "the chickens are coming home to roost," as a dangerous threat. In ordinary usage, however, the idiom refers to the natural consequences of one's prior actions. Plaintiff's statement conveyed his long-standing and communicated view to Defendant Morante that she would face legal/employment accountability for conduct that he believed (and still believes) to be unlawful -- a prediction of legal consequences, *not* a threat of physical harm. Criticism of a public official's actions, including pointed predictions of legal exposure, *lies at the core of protected First Amendment expression*. Treating such speech as "threatening" would risk converting routine criticism of government conduct into a basis for continued court-access restrictions, a result the Constitution *does not permit*.

Accordingly, on Defendant Morante's own sworn account, the asserted basis for continuing statewide restrictions rests on historical allegations that predate August 2023, and then on speech directed to the decisionmaker maintaining those restrictions.  She cites *no* complaint from *any* judge, law clerk, *or* court staff in 2024, in 2025, or in 2026. The only 'recent' conduct that Defendant Morante identifies is Plaintiff's speech directed *to Defendant Morante herself* regarding her enforcement of *these very restrictions*. If criticizing an official's conduct while seeking to restore one's rights justifies permanent punishment, then no litigant could ever challenge an unconstitutional restriction without forfeiting their right to do so.

### *This chronology is constitutionally significant*.

Indefinite, statewide restrictions remain in effect against Plaintiff across twenty-one counties. Yet, Defendant Morante identifies *no* staff-directed misconduct in the subsequent two-and-a-half year period. Where sweeping and ongoing restrictions are justified by historical allegations dating to mid-2023 -- and where more recent communications involve only speech directed to the official responsible for maintaining those restrictions -- the continued necessity and narrow tailoring of such measures become increasingly attenuated.

The record further reflects that Plaintiff's disputes in the Spring of 2023 arose in connection with one singular municipal court matter in Glen Rock. In that matter, the presiding municipal judge was subsequently reassigned from Plaintiff's matter, and the former Court Administrator who was involved in those communications is no longer employed by the court. Plaintiff has not had *any* business/proceedings in the Glen Rock Municipal Court *since 2023*, and has had *no* comparable disputes with *any* other municipal, Superior, or appellate court in the State.

Nevertheless, the access restrictions imposed in June 2023 remain in effect, statewide, in 2026. The absence of *any* subsequent incidents with judicial staff -- combined with the fact that the underlying personnel and circumstances giving rise to that prior 2023 dispute in Glen Rock no longer exist -- underscores the lack of narrow tailoring and the attenuated necessity for indefinite statewide restrictions.

Under *Mathews v. Eldridge*, the risk of erroneous deprivation is heightened where restrictions of indefinite duration rest on disputed factual predicates and historical allegations without structured procedural safeguards. The absence of any identified staff-directed incident since mid-2023 underscores the need for neutral review before such statewide measures may persist.

## VIII. THE ONLY RECENT CONDUCT IDENTIFIED CONSISTS OF COMMUNICATIONS *DIRECTED TO DEFENDANT MORANTE HERSELF*

Defendant's Certification identifies several emails sent by Plaintiff in 2024 and 2025. (Certification ¶¶ 23–28), and argues that those e-mails justify the continuous ban of Plaintiff from the court system across the entire State of New Jersey. However, every single one of those communications was directed *to Defendant Morante personally*, regarding her ongoing enforcement of the challenged access restrictions themselves.

Defendant identifies *no* contemporaneous complaint from court staff, *no* report of operational disruption, and *no* allegation of improper contact with judges or clerks during that entire period of more than two years. The continuation -- and escalation -- of statewide restrictions, thus rests on *speech directed to the official responsible for maintaining those same restrictions*.

Communications criticizing or challenging the official enforcing a restriction are categorically distinct from misconduct directed at court personnel. Where ongoing limitations are justified by speech directed to the decisionmaker herself, rather than by staff-directed conduct, the necessity *and neutrality* of those restrictions warrant careful scrutiny.

Absent neutral review, the risk arises that restrictions may persist based upon unilateral characterizations of protected speech rather than demonstrable operational necessity.

**IX. PHONE ACCESS IS NOT AVAILABLE TO PLAINTIFF AS REPRESENTED**

Defendant Morante asserts that Plaintiff retains the ability to contact courts by telephone for scheduling and related administrative purposes. (*Morante Cert* ¶14). Defendant's Certification suggests phone scheduling access remains available. The preserved recordings and *Defendant Morante's own letters* demonstrate that it *does not*. This is not a dispute over convenience, but over functional access. Meaningful access to the courts is a constitutionally protected interest. See *Bounds v. Smith*, 430 U.S. 817, 821 (1977). Access in name only does not constitute meaningful access.

Plaintiff's inability to access emergent appellate procedures further illustrates the *functional* scope of the restrictions. Attempts to contact the Appellate Division regarding emergent matters were unsuccessful due to the same statewide communication limitations described above. No alternative mechanism was provided to ensure timely appellate access.

Plaintiff is *technically unable* to place calls to New Jersey courts from his own telephone number. Attempts to dial multiple courthouses result in consistent call failure. These attempts have been recorded and are available for review.

Further, when third parties have attempted to place calls on Plaintiff's behalf from different telephone numbers, court personnel have stated that they are not permitted to speak with Plaintiff. Those calls have also been recorded. Thus, even when calls are placed from third-party numbers, court personnel have refused communication with Plaintiff.

*No* neutral adjudicator has *ever* reviewed this evidence.

The practical result is that Plaintiff does not, in fact, retain meaningful phone access for scheduling or administrative purposes, contrary to Defendant Morante's sworn statements. The restriction operates not merely as a routing preference to U.S. Mail, but as an actual, technical, functional, and operational prohibition on telephonic communication.

This distinction is material. If phone access is unavailable both technically and operationally, the scope of the restriction is significantly broader than Defendant's characterization suggests. The continued enforcement of such restrictions for thirty-two months, grounded in disputed factual premises and without any neutral review mechanism, underscores the need for structured procedural safeguards.

## X. DEFENDANT'S MISREPRESENTATION OF PLAINTIFF'S "E-FILING" ACCESS

Defendant Morante's central defense -- that Plaintiff retains "meaningful access" because he may utilize the "Judiciary's e-filing system" -- is a material misrepresentation of the Judiciary's technical infrastructure and the functional reality of Municipal Court practice.

**1. Technical Impossibility in Municipal Courts:** When Defendant Morante blocked Plaintiff's email and telephone access, she did not merely "circumscribe" his method of communication; she terminated his only functional digital link to the court.

Plaintiff has submitted sworn declarations describing the technological blocking of his telephone number across multiple levels of the New Jersey court system. (*Plaintiff's Emergency Declaration, Dec. 18, 2025; Plaintiff's Fourteenth Supplemental Declaration, Feb. 5, 2026*). Defendant's opposition does not refute those sworn assertions or provide any factual clarification regarding the mechanics or scope of the blocking. The restriction therefore appears to operate systemwide and technologically, rather than as a limited, courthouse-specific administrative measure.  This practical reality bears directly on the narrow tailoring inquiry, as a categorical statewide technological block differs materially from a localized security protocol tied to specific conduct or personnel.

**2. The "Procedural Gap" of Probable Cause (PC) Hearings:** The inadequacy of Defendant's "U.S. Mail" and "E-Filing" arguments is most apparent in the context of Probable Cause hearings. Plaintiff was recently the victim in a criminal matter where the Bergen County Prosecutor's Office approved a complaint for a PC hearing (referenced in Plaintiff's Tenth Supplemental Declaration). Because a PC hearing occurs *before* a docket number is assigned, there is no electronic "slot" in any existing system to file into or receive notices from.

By instructing court staff to refuse all digital communication with Plaintiff, Defendant Morante created a "procedural gap," as evidenced within Plaintiff's Thirteenth Supplemental Declaration. Plaintiff was left with no way to ascertain the time, date, or format (Zoom vs. In-Person) of the hearing, nor could he clarify administrative procedures. In the fast-moving environment of Municipal Court scheduling -- where notices are often issued mere days before a hearing, and *sometimes even the day of* -- reliance on USPS mail substantially increases the risk of non-appearance and the forfeiture of rights.

**3. Actual Injury vs. Theoretical Access:** The Supreme Court has held that access to the courts must be "adequate, effective, and meaningful." *Bounds v. Smith*, 430 U.S. 817, 822 (1977). Access that exists only in the Defendant's Brief, but is effectively blocked by her "instructions" in the real world, is a constitutional

nullity. Defendant cannot satisfy the Fourteenth Amendment by offering a "mail-only" communication channel that she knows is designed to fail in time-sensitive, non-docketed Municipal matters.

Even if Defendant's factual allegations were undisputed -- which they are not -- the restrictions fail the constitutional requirement for *narrow tailoring*. Defendant relies upon localized incidents in one municipality (wherein the Glen Rock Municipal Court judge was subsequently disqualified from Plaintiff's matter -- despite his repeated refusal to voluntarily recuse -- and, his Court Administrator was facing criminal liability, as per the BCPO's approval of a complaint against her) to justify a *statewide ban* affecting twenty-one counties, including Municipal Courts, Superior Courts, the Appellate Division, and the New Jersey Supreme Court[9]. Defendant has not produced competent evidence supporting a *statewide, indefinite* digital-communication ban -- no contemporaneous incident report, sworn statement from any percipient witness, neutral security finding, or written criteria for duration and reinstatement. A restriction untethered to geography, time, or articulated standards is overbroad under the State's own asserted security rationale and fails narrow tailoring.

Defendant's argument that 'filing' access remains available ignores the reality that litigation requires more than the mere submission of PDFs. Effective court access relies on the ability to communicate with court clerks regarding deficiency notices, scheduling, and procedural requirements -- the very 'clerk-litigant relationship' that Defendant has severed. By blocking telephone and email access, Defendant has not merely changed the *method* of filing; she has blocked Plaintiff's ability to *prosecute* his cases. Access that allows a litigant to file a document but prevents him from ever speaking to the clerk to ensure it is processed -- which Plaintiff has shown via his various Supplemental Declarations as *actual harm suffered* -- is the definition of an 'illusory' and 'ineffective' channel.

## XI. THE RECORD DEMONSTRATES *ACTUAL AND ONGOING* PROCEDURAL HARM

Defendant asserts that Plaintiff has suffered "no harm." The record reflects the opposite as true. The challenged restrictions have not operated in theory. They have produced documented interference with Plaintiff's ability to prosecute active litigation, receive timely administrative communication, and participate in judicial proceedings on neutral terms. And, if the restrictions continue, Plaintiff will continue to suffer comparable harm.

### A. Documented Appellate Impairment and Dismissal

Plaintiff submitted appellate filings, and sought to promptly remit the required filing fee to avoid procedural deficiency. He sent multiple follow-up emails requesting instructions to ensure timely

---

[9] This includes the Advisory Committee on Judicial Conduct ("ACJC").

compliance. No response was provided to those inquiries. A deficiency notice was later transmitted solely by U.S. Mail and received days after issuance. During this period, a third party attempting to communicate with the Appellate Division on Plaintiff's behalf was informed that communication would not be accepted due to the "amended access" restrictions. The appeal was subsequently dismissed.

That dismissal -- caused by the inability to timely cure a deficiency under the challenged communication regime -- constitutes concrete, completed irreparable harm (*Fifth Supplemental Declaration* ¶¶ 5–9; *Declaration of A.S.* ¶¶ 7–12; *Ninth Supplemental Certification* ¶¶ 4–12 & Ex. C (Order Dismissing Appeal)).

This is *not* 'speculative harm'. It is a completed procedural deprivation consistent with, and exacerbated by, the communication limitations pursuant to Defendant Morante's directive.

The right of access to the courts guarantees meaningful, timely access -- not access conditioned on communication barriers that prevent routine compliance with filing requirements. When a litigant actively attempts to cure a deficiency and is met with silence, mail delay, and refusal of third-party communication channels available to other litigants, that constitutes concrete injury.

Loss of appellate review cannot be remedied retroactively by monetary damages. It is irreparable *by definition*.

**B. Family Part Procedural Distortion Through Extra-Record Communication**

Plaintiff possesses written communication from Defendant Morante to chambers staff in his Family Part matter stating: "***Please see the attached two emails from [Plaintiff] and his amended access letter sent by this office. I would ask you to share the letter with your Judge and ensure that this litigant is handled accordingly***."

This communication was not entered on the docket, disclosed in open court, or subject to adversarial testing. It directed that Plaintiff's "amended access" designation be shared with the assigned judge and that he be "handled accordingly." Following this communication, Plaintiff's Family Part proceedings were subjected to heightened enforcement measures tied to the administrative security designation (*Fourteenth Supplemental Declaration* ¶ 5; Ex. B).

Whether characterized as security coordination or otherwise, the injection of a non-judicial administrative designation into chambers -- outside the record and without notice or opportunity to respond -- constitutes tangible procedural harm. At minimum, it altered the adjudicative environment in which Plaintiff's matter was processed.

Due process protects not only the right to file documents, but *the right to neutral adjudication uncolored by undisclosed administrative characterizations*.

## C. Ongoing Structural Harm and Forward-Looking Injury

The restrictions remain in force *statewide*. Plaintiff continues to be subject to technological blocking of calls placed from his telephone number; refusal of communication when calls are placed by third parties; email routing interception and monitoring; and mail-only directives for time-sensitive matters (*Emergency Declaration*, Dec. 18, 2025; *Fourteenth Supplemental Declaration* ¶¶ 7–12).

These are not 'isolated inconveniences'. They are structural limitations that affect every municipal, Superior, and appellate court in the State.

Defendant characterizes these restrictions as mere "administrative protocols." But when such protocols delay appellate compliance, prevent timely cure of deficiencies, block third-party assistance, inject extra-record designations into chambers, and persist indefinitely without review, they operate as substantive deprivations of meaningful court access.

The harm is ongoing. The restrictions have no expiration date, no periodic review, and no articulated reinstatement criteria. Absent injunctive relief or structured procedural safeguards, the interference will continue.

Defendant's "no harm" argument rests on reframing documented procedural impairment as administrative inconvenience. The record demonstrates otherwise.

Plaintiff has shown:

1. Completed appellate injury;
2. Structural interference with compliance efforts;
3. Extra-record influence in Family Part proceedings;
4. Continuing statewide communication impairment; and
5. Ongoing in-person courthouse access restrictions.

That is *more* than sufficient to establish irreparable harm for purposes of preliminary injunctive relief.

## XII. EXTRA-DOCKET IMPLEMENTATION UNDERSCORES THE NEED FOR NEUTRAL REVIEW

The record reflects that restrictions on Plaintiff's communications and access have been implemented through administrative instruction *outside* of any docketed order, written findings, or contemporaneous notice to Plaintiff. This mode of implementation materially increases the risk of error because it deprives

Plaintiff of any meaningful opportunity to learn the operative basis for the restriction, correct inaccuracies, or obtain neutral review before the restriction is operationalized.

Plaintiff *does not* ask the Court at this stage to adjudicate motive or to resolve collateral factual disputes about why particular courts proceeded as they did. The point is procedural and narrow: where restrictions are imposed and implemented through non-judicial administrative channels, due process requires defined standards, written notice, and neutral review mechanisms -- particularly where objective evidence exists and the restriction is indefinite and statewide.

## XIII. MORE THAN THIRTY-TWO MONTHS OF INDEFINITE STATEWIDE RESTRICTIONS REQUIRE MORE THAN UNILATERAL ADMINISTRATIVE DETERMINATION

Plaintiff fully recognizes the judiciary's broad authority to maintain courthouse security and administrative order. Plaintiff acknowledges that some communications reflected frustration at the continuation of indefinite restrictions without any hearing, findings, or neutral review. Frustration, however, is *not* a threat. The Constitution does not permit long-term restrictions grounded in disputed factual predicates to persist without notice of the specific allegations and an opportunity for neutral review -- *particularly where objective recordings exist and remain unreviewed*.

As shown *supra* § VI and *infra* § XVII, Defendants continue to enforce indefinite statewide restrictions grounded in disputed factual predicates -- including recorded communications -- without written findings or any structured mechanism for neutral review.

Plaintiff does *not* dispute that *legitimate security concerns* may warrant *immediate administrative* action. The issue presented here is not initial action, but the absence of neutral procedural safeguards while individualized, statewide restrictions grounded in disputed factual allegations have continued *for more than thirty-two months* without review. *Even in prosecutions against violent repeated criminal offenders,* the State proceeds through formal process -- notice, an opportunity to be heard, and written findings -- yet Plaintiff's restrictions have persisted without comparable procedural safeguards.

If the evidence supporting Defendants' position is as strong and unambiguous as they contend, *neutral review would only confirm it*. Due process does not *weaken* legitimate security determinations; it *validates* them. The refusal to provide notice, written findings, defined duration, or neutral adjudication for an individualized, statewide restriction of indefinite length *is therefore telling*. The stronger and more objective the evidence, the less justification there is for insulating it from neutral scrutiny. Where the government invokes safety to impose ongoing deprivations, *yet resists the most basic procedural safeguards*, the constitutional concern is *not* the initial security response, but the continued reliance on *unilateral, unreviewable determinations*.

24

When restrictions endure for more than thirty-two months, and are justified by specific disputed factual predicates, the distinction between administrative security management and adjudication narrows substantially, and minimal procedural safeguards are *constitutionally required*.

*Temporary* security measures may be justified without prior hearing; multi-year statewide restrictions are *not* -- at least absent *minimal procedural safeguards*.

## XIV. DEFENDANTS TAKE INCONSISTENT POSITIONS ON WHETHER DUE PROCESS WAS REQUIRED OR PROVIDED

Defendants' submissions present *shifting* positions regarding procedural due process. In administrative correspondence, Defendant Nadler -- counsel for the AOC -- asserted in her December 11, 2025 letter to Plaintiff that he *had been afforded "due process"* in connection with the challenged restrictions. In Defendant Morante's opposition brief, however, Defendants contend that no pre-deprivation or ongoing process was constitutionally required at all, characterizing the measures as non-adjudicative "administrative security protocols" beyond the reach of due-process safeguards.

If process was provided, Defendants must identify *when* it occurred, *before whom, on what record*, and *pursuant to what authority*. If no process was required, then prior representations that "due process" was afforded cannot substitute for the procedural safeguards the Constitution demands in fact.

Under either framing, Defendants identify no judicial order, no hearing, no advance notice of specific allegations, no opportunity to respond, no neutral decisionmaker, and no written findings supporting the continued enforcement of individualized, statewide restrictions of indefinite duration. The absence of *any* identifiable adjudicative process confirms why neutral review is required before such restrictions may persist.

## XV. CONTINUATION OF INDEFINITE STATEWIDE RESTRICTIONS BASED ON SPEECH DIRECTED SOLELY TO DEFENDANT MORANTE HERSELF

Defendant Morante's Certification identifies no complaint or report from any judge, law clerk, or court staff in 2024, 2025, or 2026 alleging that Plaintiff engaged in harassing or otherwise improper communications. Rather, the only recent communications cited in support of continued statewide restrictions consist of emails *directed to Defendant Morante herself* concerning her ongoing administration and enforcement of those restrictions.

Speech directed to the official imposing the challenged measures -- even if forceful, critical, or accusatory -- does not, standing alone, justify the indefinite interception, monitoring, or restriction of unrelated adjudicative communications with judicial staff statewide.

If the continuation of statewide restrictions is justified, as reflected in Defendant's Certification, by Plaintiff's *criticism of Defendant Morante's administrative conduct*, then the asserted basis is no longer grounded in courthouse safety or protection of court personnel, but in disputed speech directed to a party to this litigation.  Criticism of the official who imposed the restriction is not, without more, an escalation toward court personnel or institutional security. Especially where the speech is directed to the official responsible for the restriction and seeks redress or accountability.

Even assuming Defendant Morante may consider such communications in an initial administrative response, the prolonged continuation of indefinite, statewide restrictions -- without notice, neutral review, or adjudicative findings -- cannot rest solely on unilateral reliance upon speech addressed to the very official maintaining those restrictions for a period of several years.

## XVI. *MATHEWS v. ELDRIDGE* BALANCING

Under *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Court considers:

(1) the private interest affected;

(2) the risk of erroneous deprivation under existing procedures and the probable value of additional safeguards; and

(3) the government's interest, including fiscal and administrative burdens.

The Third Circuit has held that when government action is directed at a specific individual and affects protected interests, procedural due process requires notice of the basis for the action and a meaningful opportunity to respond before a neutral decisionmaker -- even when the government characterizes the action as administrative rather than adjudicative. *Hill v. Borough of Kutztown*, 455 F.3d 225, 234–35 (3d Cir. 2006). The Third Circuit has likewise emphasized that "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000).

Once a protected interest is implicated, "the right to due process is conferred not by legislative grace, but by constitutional guarantee." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). The State may not avoid constitutionally required safeguards by characterizing an ongoing deprivation as merely "administrative."  Even where the government invokes significant safety concerns, due process requires notice of the factual basis for the action and a meaningful opportunity to respond. *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004). The State's interest in courthouse security, while compelling, does not eliminate the requirement of minimal procedural safeguards when restrictions of indefinite duration are imposed.

## A. The Private Interest

The private interest at stake is meaningful access to the courts. That interest is *fundamental*. See *Bounds v. Smith*, 430 U.S. 817, 821 (1977). The restrictions here are statewide, indefinite, and affect Plaintiff's ability to communicate with trial and appellate courts regarding filings, scheduling, and emergent matters. Where access limitations endure *for more than thirty-two months* without findings or review, the private interest weighs heavily in favor of procedural safeguards.

## B. Risk of Erroneous Deprivation

The risk of erroneous deprivation is *concrete and substantial*.

The restrictions rest on specific factual characterizations of recorded communications and alleged conduct. Plaintiff disputes those characterizations, and several are materially contradicted by objective recordings and documents attached as **Exhibits A** and **C**. **Exhibit A** consists of the contemporaneous Hawthorne recording and related correspondence -- objective evidence that court staff imposed Morante-directed communication limits outside any docketed order, by telephone -- evidence that has never been reviewed by any neutral adjudicator despite being capable of immediate verification. **Exhibit C** consists of Plaintiff's June 27, 2023 email transmitting contemporaneous eyewitness recordings of the Bergen County Courthouse impersonation incident, along with the attached audio files reflecting the eyewitness's confirmation that the individual who appeared was *not* Plaintiff, and the eyewitness's adamant statement that she had not altered her account. These exhibits underscore the central due process defect: Defendants continue to maintain indefinite restrictions based on disputed factual predicates *without neutral review of readily verifiable objective evidence*.

Further, Plaintiff's phone carrier records underscore that the State's asserted security narrative rests, at least in part, on allegations that are *objectively verifiable and demonstrably disputed*, yet were never subjected to notice, standards, or neutral review. (*Sixteenth Supp. Decl*. ¶¶ 5–7; Ex. A.)

Where governmental action turns on disputed factual predicates that are capable of objective verification, the absence of notice and neutral review creates a heightened risk of error. See *Hill v. Borough of Kutztown*, 455 F.3d 225, 233–34 (3d Cir. 2006). The probable value of additional safeguards -- such as written notice of the specific factual basis and submission of recordings for neutral review -- is *significant*, while the administrative burden is minimal.

## C. Governmental Interest

Plaintiff does *not* dispute that the State has a compelling interest in courthouse safety and administrative order. Immediate administrative action may be warranted in appropriate circumstances.

The issue presented, however, is *not* initial action, but prolonged continuation of indefinite restrictions grounded in disputed factual allegations without structured review. Providing written notice of the specific factual basis, permitting submission of preserved recordings, and allowing neutral evaluation would not undermine legitimate security interests. Such safeguards would merely ensure accuracy before long-term restrictions persist.

Balancing these factors, minimal procedural safeguards are *constitutionally required* before indefinite statewide restrictions may continue.

## XVII. *EVEN IF DEFENDANT'S (DISPUTED) ALLEGATIONS WERE TRUE*, THE INDEFINITE STATEWIDE RESTRICTIONS ARE CONSTITUTIONALLY DEFICIENT

Even assuming *arguendo* that Defendant's factual allegations are accurate, the restrictions imposed here remain constitutionally infirm. The procedural due process inquiry does not turn on whether the State believes its actions were justified; it turns on whether constitutionally adequate safeguards accompanied the deprivation.

Here, the deprivation is significant: multi-year, statewide restrictions on access to judicial facilities. Yet, Defendant Morante identifies no written findings, no defined duration, no articulated criteria or process for modification, no neutral review mechanism, and no avenue of appeal. The absence of these safeguards confirms the procedural deficiency under *Mathews v. Eldridge*.

For the reasons set forth above under the *Mathews* factors, Plaintiff's private interest in meaningful court access is substantial, the risk of erroneous deprivation is acute in the absence of notice and neutral review (particularly given the objective recordings and the disputed factual predicate), and the State's legitimate security interests can be fully preserved through narrowly tailored procedures rather than indefinite, unreviewed statewide restrictions.

Security discretion is not exempt from constitutional constraint. Even where safety concerns exist, restrictions of this breadth and duration require *at least* minimal procedural structure. Because no such structure was provided here, the restrictions fail constitutional scrutiny regardless of disputed factual narratives.

## XVIII. DEFENDANT'S LEGAL FRAMEWORK FAILS TO ADDRESS CONTROLLING THIRD CIRCUIT PRECEDENT GOVERNING PRELIMINARY INJUNCTIONS AND PROCEDURAL DUE PROCESS

Defendant's opposition recites the general four-factor preliminary injunction standard, but does not meaningfully engage controlling Third Circuit precedent governing how those factors apply in procedural due process cases.

In *Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017), the Third Circuit clarified that the likelihood-of-success inquiry at the preliminary injunction stage requires the Court to determine whether the movant has demonstrated a *reasonable probability* of success on the merits -- not whether success is guaranteed. Where a plaintiff demonstrates a substantial constitutional question and a likelihood of irreparable harm, the balance-of-equities and public-interest factors merge when the government is the opposing party.

Here, Defendant's opposition largely reframes Plaintiff's claim as a disagreement with "security protocols," but does not meaningfully address the core procedural due process question presented: whether indefinite, statewide access restrictions -- imposed without written findings, defined duration, or neutral review -- comport with the Fourteenth Amendment.

Nor does Defendant engage the Third Circuit's application of the *Mathews v. Eldridge* balancing test in cases involving reputational stigma coupled with the loss of a tangible interest. When governmental action labels an individual as a "threat" or "harasser," and uses that label to restrict access to public institutions, procedural safeguards are required to reduce the risk of erroneous deprivation. See *Wisconsin v. Constantineau*, 400 U.S. 433 (1971); *Mathews v. Eldridge*, 424 U.S. 319 (1976).

Defendant's brief does not explain why no neutral review was provided, why no written factual findings were issued, why no defined duration was established, or why statewide enforcement across twenty-one counties remains necessary years after the underlying events. Instead, Defendant relies primarily on *contested characterizations* of historical communications without addressing the structural safeguards required when such characterizations form the basis for ongoing restrictions.

The question before the Court is *not* whether court security measures are permissible in the abstract. It is whether indefinite, statewide restrictions grounded in disputed and objectively verifiable allegations may persist without meaningful procedural safeguards. Under controlling precedent, the answer requires analysis of risk of error, the value of additional safeguards, and the governmental interest asserted. Defendant's opposition does not meaningfully engage that framework.

## XIX. IN THE ALTERNATIVE, PLAINTIFF REQUESTS A LIMITED EVIDENTIARY HEARING

If the Court is not inclined to grant immediate injunctive relief, Plaintiff respectfully requests a *limited evidentiary hearing* focused solely on the recordings and documentary evidence referenced in Defendant's Certification.

Those recordings are preserved in full and are available for submission to the Court. Certain sworn assertions are objectively contradicted by documentary and audio evidence. Where objective recordings

exist and materially contradict sworn characterizations, credibility determinations are better resolved through limited evidentiary review, rather than solely on paper.

A limited evidentiary hearing would permit the Court to evaluate whether continued indefinite statewide restrictions may persist without procedural safeguards.

## XX. REQUESTED RELIEF

Plaintiff respectfully requests that the Court enter preliminary injunctive relief as follows:

1. **Primary Relief.** Enjoin Defendants from continuing to enforce indefinite, statewide access restrictions against Plaintiff absent constitutionally adequate procedural safeguards; or

2. **Alternative Relief.** In the alternative, order Defendants, within 14 days (or such other period as the Court deems appropriate), to provide: (a) a written statement identifying the specific factual basis for the restrictions; (b) an opportunity for Plaintiff to submit recordings and documentary evidence; (c) neutral review by an official not involved in the challenged decision-making; and (d) written findings suitable for judicial review.

At minimum, the Court should order Defendants to:

a. Issue written findings specifying the factual basis for any continuing restrictions;

b. Define the duration, scope, and geographic reach of the restrictions;

c. Articulate objective criteria and a clear process for modification, suspension, or reinstatement; and

d. Provide a prompt opportunity for neutral review.

This relief would *not* interfere with legitimate security interests. It would ensure that any continuing restrictions are grounded in articulated facts, subject to meaningful notice and an opportunity to be heard, and reviewed by a neutral decisionmaker. The rights asserted *are not novel*: basic procedural safeguards are required before disputed, multi-year restrictions on court access may persist. For more than thirty-two months, no such neutral review has occurred.

Plaintiff's requested relief is specifically detailed in the attached *Proposed Preliminary Injunction Order*, **Exhibit D**, which provides a balanced framework for restoring Plaintiff's constitutional rights through a neutral review process while maintaining legitimate, evidence-based courthouse security.

Respectfully submitted,

_____

C.D., Plaintiff *pro se*

Dated: February 17, 2026

# <u>EXHIBIT A</u>

**Capers, Kimberley** <KCapers@bcpo.net>                    Tue, Dec 5, 2023 at 10:52 AM
To: ███████████████████ ;gmail.com>

Good morning. I received this information regarding ██████████ :

██████████████████████████████████████████████

State v. Kimberly Williams, where Mr. ██████████ is the complainant, has been transferred out of county to Passaic for a pc hearing before the Hon. John Meola, PJMC, at the Hawthorne Municipal Court. The court will notice the party via US Postal service.

Cordially,
*Kimberley KB Capers*
Kimberley KB Capers
(she/her/hers)
Chief, Trial Section
Bergen County Prosecutor's Office
Two Bergen County Plaza
Hackensack, NJ 07601
201.226.5107
kcapers@bcpo.net

# EXHIBIT A



## HAWTHORNE MUNICIPAL COURT
### 445 LAFAYETTE AVE.
### HAWTHORNE, NJ 07506
### 973-427-4767    FAX: 973-427-4194

John F. Meola, JMC                                    Nora Khoury, CMCA
courts@hawthornenj.org                                Karen Palladino, DCA

_____

December 14, 2023

Mr. ███████
███████████

Re: Glen Rock Transfer Case, 2023-34
State v. McWilliams

Dear Mr. ██████,

This letter is to advise you the complaint that was file in the Glen Rock Municipal Court was transferred to Hawthorne Municipal Court for a Probable Cause Hearing.

Upon review of the above referenced complaint, No Probable Cause was found by the Honorable Judge Meola.

Thank you.

Sincerely,



Karen Palladino, Deputy Court Administrator

CC: File

# **<u>EXHIBIT A</u>**

**<u>Transcription of Recorded Phone Call with Hawthorne Municipal Court – Dec. 20, 2023</u>**

<u>Court</u>: ….office, can I help you?

<u>CD</u>: Hi, um, I'm calling about a letter I received in the mail a day or two ago about a probable cause decision by Judge Meola.

<u>Court</u>: Okay.

<u>CD</u>: Um, so am I speaking with Karen or Nora?

<u>Court</u>: This is Karen.

<u>CD</u>: Oh, hi. So, uh you signed the letter, um but it says that the matter was transferred from Glenrock to Hawthorne for a probable cause hearing. Um, I don't know if I was supposed to have gotten notice of it, but I got no notice of any hearing. I just received this letter saying no probable cause was found. I was waiting for a hearing because I was going to, uh, request slash demand that the judge recuse himself uh because the complaint was filed against the Court Administrator of Glen Rock and… I don't think I need to tell you about Glen Rock and Hawthorne uh being, you know, connecting towns. Umm… You know, the courts I think are 2.1 miles from each other. Um… And so there should have been no finding at all by Judge Meola because he should have known that that would be a conflict for him. Umm, so number one, there was no hearing. Number two, it should have been a conflict, and I was going to make a motion as soon as I showed up at the hearing that he recused himself, but I wasn't given the opportunity to do that because there was no hearing, uh, that I know of. And then the letter just says no probable cause was found, with no explanation. This charge, uh or not charge, this complaint already went through the Bergen County Prosecutor's Office and they moved it forward, for a reason. Um, so for this municipal judge to uh make a no probable cause finding, without a hearing, without letting me come in and speak about it, uh, against uh the long time court administrator from the town right next to Hawthorne, is uh, improper. So I don't know if he's able to uh go into a, you know, call us back and call a hearing so I can formally ask him to recuse himself, or if he's gonna do that himself. But to just not have a hearing, send this letter, uh, and, I mean, the facts are what they are. There's a reason the Bergen County Prosecutor's Office moved this complaint forward.  You know, it's because there was there should be probable cause here. So, to not have a hearing and then just say up no probable cause and send this letter I know you're just doing what the judge told you to do. I'm not blaming you. You know, I know you sent the letter, but you know, those were your, you know, marching orders. uh But the judge should have never touched this case seeing who uh the uh complaint was against. There's no doubt in my mind that he knows Judge Pfund of Glen Rock, Ridgewood, and Wyckoff and or Kim McWilliams of Glen Rock, Wyckoff, and Ridgewood. Um.  There's no doubt in my mind of that.

<u>Court</u>: Okay, so, I'm gonna just put you on a brief hold.  Hold on, okay?

<u>CD</u>: Sure, sure, thanks.

<u>Court</u>: Hi, Mr. [C.D.]?  My name is Nora Khoury.  I'm the Court Administrator.  How are you?

<u>CD</u>: Hi, last name is [C.D.].

Court: Oh, [C.D.], how are you?  She gave me a post-it that Mr. [C.D] was on the phone.

CD: Oh, yeah.

Court: So I apologize for that.

CD: So I guess she didn't tell you what I said because it was too quick. Haha. You picked up too quickly.

Court: Yeah she just gave me a post-it.  She just (unintelligible) to call.  **Um, we've been instructed by the AOC that you are to communicate with us via USPS**.  So at this time, I'm going to ask that you do that.

CD: That's actually not true. Umm.. there is no order in place about how I contact the Hawthorne Municipal Court. If you could send that to me, I'd love it. But there's nothing that says anything about the Hawthorne Municipal Court. uh The fact that this case was decided without a hearing, that I was not given a hearing, and that it says no probable cause, after the Bergen County Prosecutor's Office already determined that there was enough for it to move forward, and then I don't even get a hearing, and the judge makes a decision against, or sorry not against, but in the favor of, the court administrator of the Glen Rock Municipal Court right next door to Hawthorne.  Umm.. There's no way anyone will convince me that Judge Meola, who I know nothing about, uh that Judge Meola doesn't know Judge Pfund of Glen Rock and or Kim McWilliams uh of Glen Rock. I'm, you know, unless something happens here, where he uh, goes back and refers this out to a different court because he knows that he should not be touching this case, um, I'm likely going to be filing a complaint with the ACJC against him, because there is no way that I'm gonna believe that the municipal judge in Hawthorne, New Jersey doesn't know the court administrator or judge in Glen Rock, New Jersey. That is just not believable. This was unethical for him to even touch this case and not refer it out somewhere else.

Court: Okay.

CD: And can you send me that letter that says that I'm not allowed to contact the Hawthorne Municipal Court? Because I never received it.

Court: I'm going to email, um, the AOC, and have them send it over here.

CD: Well, not a new letter. Not a new letter. The letter that, I mean, you're telling me this is already in place.

Court: I was just instructed.  So (unintelligible) instructed.

CD: Were you instructed in writing?

Court: **Via phone call, yes.**

CD: No, I said, were you instructed in writing?

Court: I believe so, yes.

CD: But **you just said via phone call.**

Court: **Yes, and I spoke to Robin Morante directly.**

CD: Right, so Robin is part of the corruption that's going on here.

Court: Okay.

35

CD: And so, and there's a lot that you don't know, but the fact that...

Court: I know nothing about you, (unintelligible)

CD: No, I know. I know. I'm not blaming you for anything. I'm not blaming you for anything. You did nothing wrong.

Court: Okay.

CD: You did nothing wrong.

Court: And I am not, right, **I have to go how we're instructed**.  We no longer have this case.

CD: Right, but you shouldn't have been judged, especially without a hearing. The letter literally says it was transferred to Hawthorne Municipal Court for a probable cause hearing. There was no hearing. I would have requested and demanded that the judge recuse himself because he absolutely knows the person that he's making the decision about. He knows Kim McWilliams of Glen Rock. You probably know Kim…. Do you know Kim McWilliams?

Court: Uh, I do not.  Unfortunately we're two separate counties, so I do not know..

CD: Okay, but they're two, uh I know they're two different counties, they're technically touching towns, right? Like you could have one foot in one town, one foot in the other?

Court: Right.  But we're two separate towns, two separate counties.

CD: Right, let's just say no one will ever convince me.

Court: Mr. [C.D], I politely have to..  I have another call coming in , I do have to…

CD: And you'll send me a letter saying that, that I am NOT allowed to contact the Hawthorne Municipal Court?

Court: Yes.  I do have to end the call, and I will have the AOC contact you directly,  Mr. [C.D].

CD: No, no, no, no, no, won't, they won't. I'm asking for you to. I'm asking for you to.

Court: Thank you, Mr. [C.D].  Have a good day.

CD: Can you send it to me?

(Call terminated by Court)

36

# EXHIBIT A

████████████████████████ @gmail.com>                    Fri, Dec 29, 2023 at 7:36 PM
To: powersb@njdcj.org

Sir,

Thank you again for taking the time to call me this afternoon and speak with me about the craziness (and corruption) that has been occurring over the past several months. A lot of what I told you today is pretty unbelievable. Even to me, and I've lived through it.

As requested, please find the attached audio recording from December 20, 2023, when I called the Hawthorne Municipal Court. She told me that she was instructed by the AOC (via phone!) that I communicate with them only via USPS. It wouldn't make any sense -- unless she made a phone call to every single municipal court in the entire state -- that Robin Morante would have contacted the Hawthorne Municipal Court about me for any reason whatsoever. Again, I was the Complainant, not the Defendant, in the matter before the Hawthorne Municipal Court. There would be absolutely no reason to contact the Hawthorne Court (or ANY court) about me. ESPECIALLY not just before that particular court is about to make a probable cause determination regarding whether its neighboring town's long-time Court Administrator, Kim McWilliams, committed a crime or not.

Obviously Robin Morante put her finger/hand on the scale in her reaching out to the Hawthorne Municipal Court, causing there to not only be a 'no probable cause' finding made, but for them to not even have a probable cause hearing at all, have no record of the evidence presented, and hope that it just "goes away." This, of course, is despite the letter (attached) they sent me informing me that the matter was transferred to them from Glen Rock for a probable cause hearing. A matter that had already gone through the Bergen County Prosecutor's Office and determined that there was enough evidence for it to move forward. Yeah, it moves forward until somebody like Robin Morante steps in to protect Kim McWilliams, and the charge is 'stopped in its tracks' before it ever sees the light of day.

Thank you again.

Regards

████████████

---

2 attachments

 **Call to Hawthorne Municipal Court.m4a**
11509K

 **Letter from Hawthorne Court 12.14.23.pdf**

# EXHIBIT A

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ @gmail.com>                                    Sun, Jan 14, 2024 at 8:55 AM

To: powersb@njdcj.org

Hello,

I wanted to follow up on this matter. Have you been able to start looking into it at all? I refiled my Civilian Complaint against Ms. McWilliams, stating in it that no probable cause hearing was ever held, but have not yet heard anything back (one way or the other) on that. I assume it will make its way back to the Bergen County Prosecutor's Office, and then be cleared (again) to move to an *actual* probable cause hearing.

Regards,

▓▓▓▓▓▓▓▓▓▓

On Dec 29, 2023, at 7:36 PM, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ @gmail.com> wrote:

# EXHIBIT B



**New Jersey Courts**
Independence · Integrity · Fairness · Quality Service

Administrative Office of the Courts

| | | |
|---|---|---|
| Steven D. Bonville, ESQ.<br>Chief of Staff | **GLENN A. GRANT, J.A.D.**<br>Acting Administrative Director of the Courts | Robin A. Morante<br>Chief<br>Court & Judicial Security |

Richard J. Hughes Justice Complex · P.O. Box 037 · Trenton, NJ 08625-0037      njcourts.gov · Tel: 609-376-3000 · Fax: 609-376-3002

Mr. ███████████

███████████

    Re:     ██████████████████

██████████████

Dear ██████████:

Please be advised that your access to the Glen Rock/Wyckoff/Ridgewood Municipal Court is being amended due to your excessive and alarming communication. E-mails, phone calls, voicemail and faxes will not be accepted or addressed by the Court.   Any communication for emergent relief may be communicated by you to the Court via correspondence sent through the United States Postal Service or by leaving written correspondence at the Municipal Court of Glen Rock, 1 Harding Plaza #1, Glen Rock, New Jersey 07452. Any violation of this directive may subject you to police investigation and/or criminal charges.

Sincerely,



Robin A Morante
Chief
Court & Judicial Security Unit

39

# EXHIBIT B



**New Jersey Courts**
Independence · Integrity · Fairness · Quality Service

Administrative Office of the Courts

Steven D. Bonville, ESQ.
Chief of Staff

**GLENN A. GRANT, J.A.D.**
Acting Administrative Director of the Courts

Robin A. Morante
Chief
Court & Judicial Security

Richard J. Hughes Justice Complex · P.O. Box 037 · Trenton, NJ 08625-0037     njcourts.gov · Tel: 609-376-3000 · Fax: 609-376-3002

June 27, 2023

Re: ███████████████████████

Dear Mr. ████████

Please be advised this letter is to clarify my letter sent via email on June 12, 2023, and USPS. Your access to the Glen Rock/Wyckoff/Ridgewood Municipal Court is being amended due to your excessive and alarming communication. E-mails, phone calls, voicemail and faxes will not be accepted or addressed by the Court. Any communication for relief, as well as emergent relief may be communicated by you to the Court via correspondence sent through the United States Postal Service or by leaving written correspondence at the Municipal Court of Glen Rock, 1 Harding Plaza #1, Glen Rock, New Jersey 07452. Any questions, and communication must be in writing. Verbal communication will only be entertained when you are summoned to appear in person or virtually for a court session. Any violation of this directive may subject you to police investigation and/or criminal charges.

Sincerely,



Robin A Morante
Chief
Court & Judicial Security Unit

40

# EXHIBIT B

---

## RE: [External]Re: Access to ACJC

1 message

**Robin Morante** <robin.morante@njcourts.gov>                     Tue, Aug 22, 2023 at 4:07 PM
To: "██████████ ]gmail.com" <████████@gmail.com>

Mr. ████████,

Pursuant to the attached two letters and due to your previously articulated conduct in the Municipal Court and Superior Court, your access has been restricted to United States Postal Service.  You may conduct your business with the ACJC and any other division, or department in the Administrative Office of the Courts via United States Postal Service.  Thank you for your anticipated compliance.

Robin A. Morante
Chief, Court & Judicial Security Unit
RJH, Trenton, NJ

NICE MATTERS

-----Original Message-----
From: ████████ <████████@gmail.com>
Sent: Tuesday, August 22, 2023 12:32 PM
To: Robin Morante <robin.morante@njcourts.gov>
Subject: [External]Re: Access to ACJC

CAUTION: This email originated from outside the Judiciary organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Robin:

You need to reinstate my number immediately. You have no justification or right whatsoever to block my cell phone from calling the ACJC. You are way out of line.

You have until the end of the day today to fix this before I go over your head with it.

████████

41

# EXHIBIT C

Transcription of Recorded Conversation with Bergen County Courthouse Employee, Denise Harriott, and BCSD Officer Brian Smith – June 12, 2023

CD: Denise?

BCSD Officer Brian Smith: Denise.

Denise: Hi.

CD: Have we ever met?

Denise: No.

CD: No. But the person that came in saying they were me, [C.D], is not me, this person [*while CD showed his driver's license to Denise*]. I am the real [C.D.].

Denise: Okay. Okay.

CD: So, now we have confirmation it wasn't me.

Denise: Okay.

CD: It was someone else.

Denise: Okay.

CD: It's been freaking me out since Friday.

Denise: You suggested those three attorneys. I know who they are.

CD: Oh, you do?

Denise: It wasn't them. It wasn't them.

CD: I can't imagine who else it could be. I mean, you know, maybe. I didn't say it had to be them, but those were my first three suspects. Also, the timing of it, of them coming in to see Miss, um, what's her name again? Um, the trial court administrator.

Denise: Oh, Walsh-Wood?

CD: Yeah. The fact that they were here that morning, like the timing of it, I've never heard of her in my life until, you know, four days ago. And then when I called you on Thursday, and you said she was busy.

Denise: The person seemed to know everything about calling her, so I don't know.

CD: And they said, "I am [C.D.], and I want to meet with her"?

Denise: Mmhmm.

CD: And then they never met with her?

Denise: No, because she was busy.

CD: So they just walked out?

Denise: I told them, I told whoever that was, because they said they had an attorney, speak to the attorney.  If they had an issue with the Prosecutor's Office, I told them to go to the prosecutor's office. We have nothing to do with the prosecutor's office. Separate and apart from us.  And, um, and if they want to, if they have a problem with the judge, just call, and contact the ACJC.  That was it. Um, tried to-

CD: And as you heard, it wasn't me.

Denise: Tried to tell me the whole, the whole long story.

CD: Really?

Denise: And I was just like, I can't help you.

CD: Do you remember any part of the story that they tried to say?

Denise: Uh, basically what you told me on the phone.

CD: This must freak you out as much as it freaks me out almost.  Because you can see this person was not me. Were they like around my age?  Like, I'm 39. Like-

Denise: Yeah.

CD: They were like 35, 40?

Denise: But that's, yeah. So I'm like (unintelligible)

CD: Okay. Thank you.

Denise: Alright, thank you.

CD: At least we have that.

BCSD Officer Brian Smith: So, yeah, like I said… um.. where are you parking? Are you parked in the garage? I'm in the garage?

CD: I got free parking for an hour.

BCSD Officer Brian Smith: We'll go back that way.

CD: That's crazy, dude. Like, seriously. That's crazy, isn't it?

# EXHIBIT C



## Re: Video confirmation

**Brian Smith** <BSMITH3@bcsd.us>                                      Tue, Jun 13, 2023 at 11:55 AM
To: ███████████████████@gmail.com>
Cc: Cornelius VanDerWeert <CVanderweert@bcsd.us>

Good Afternoon Mr. █████████,

My report was approved and the case number that you can reference when you contact records is BS-23-████.

Detective Freeney has been assigned to this case. If you have any further questions please contact the detective bureau at 201-336-3500 extension 4907.

Thanks,

**Officer Brian J. Smith #1764**
**Bergen County Sheriff's Office**
**Fingerprint/Processing Unit**
10 Main Street
Hackensack, NJ 07601
201-336-3500
Fax: (201) 646-2826
Bsmith3@bcsd.us

# <u>EXHIBIT C</u>

---

## Re: Amended Access Clarification

1 message

▇▇▇▇▇▇▇▇▇▇▇▇▇▇gmail.com>                                                    Tue, Jun 27, 2023 at 4:22 PM
To: Robin Morante <robin.morante@njcourts.gov>

Attached:

Audio from when I went in person to show the eyewitness that I was NOT the person who impersonated me at the Bergen County Courthouse.

Audio of the eyewitness denying that she changed her account from "yes this person definitely said they were you and they also knew all the details about your case, and here's a description of the person" (a person who did not exist on any of the surveillance videos) to "I guess the person never really said they were him… I guess I just misunderstood."

Pfund got to her. In between her initial statement to the first officer (Smith) and when the detective (Freeney) questioned her. He had her change her testimony. And give a false description of the person to the detective.

Choose to not listen to the audio at your own risk.

Sent from my iPhone

Robin A. Morante

Chief, Court & Judicial Security Unit

RJH, Trenton, NJ

Desk: 609-815-2900 X-54501

Mobile: 609-218-1217

**courtsecurity.mailbox@njcourts.gov**

Hotline: 609-815-2929

NICE MATTERS

 ▇▇▇▇▇etter2.pdf>

---

**2 attachments**

🎵 **Denise confirming person who came in was not me.m4a**
1291K

🎵 **Denise denying changing her story.m4a**
664K

# EXHIBIT D

## *Proposed Order*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **C.D.,**<br>Plaintiff,<br><br>v.<br><br>**ADMINISTRATIVE OFFICE OF THE COURTS OF THE STATE OF NEW JERSEY; ROBIN A. MORANTE, in her official capacity; and MERYL G. NADLER, ESQ., in her official capacity,**<br>Defendants. | Civil Action No. 2:25-cv-18718-JKS-AME<br><br><br>**(PROPOSED) ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

This matter having come before the Court upon Plaintiff's Motion for Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65; and the Court having considered the parties' submissions; and for good cause shown;

**IT IS** on this ___ day of _____, 2026,

**ORDERED** as follows:

**1. Written Notice of Factual Basis**

Within fourteen (14) days of this Order, Defendants shall provide Plaintiff with written notice identifying, with reasonable specificity:

a. The specific factual incidents relied upon to justify any ongoing individualized courthouse-access or communication restrictions imposed upon Plaintiff;

b. The nature and scope of each restriction currently in effect; and

c. The asserted governmental interest served by each restriction.

**2. Neutral Review Procedure**

Within thirty (30) days of this Order, Defendants shall ensure that any continued individualized courthouse-access or communication restrictions imposed upon Plaintiff are subject to review by a neutral judicial officer or other decisionmaker not previously involved in imposing or maintaining the restrictions and not subordinate to the official who imposed them.

Such review shall include:

> a. An opportunity for Plaintiff to submit written materials responding to the stated factual basis for the restrictions;

> b. Consideration of any objective evidence offered by Plaintiff relevant to disputed factual allegations;

> c. A written determination setting forth findings sufficient to permit meaningful review.

## 3. Narrow Tailoring and Duration

Any continued restrictions shall:

> a. Be narrowly tailored to address specific, articulated security concerns;

> b. Be limited in duration; and

> c. Be subject to periodic review at reasonable intervals not to exceed six (6) months.

Absent renewal following such review, any individualized restriction shall expire.

## 4. Interim Clarification of Enforcement

Pending completion of the review process described above:

a. Defendants shall not expand the scope of any existing restrictions;

b. Defendants shall not impose new individualized restrictions absent documented exigent circumstances;

c. Pending completion of review, Plaintiff shall be permitted to communicate with court clerks and submit filings through electronic mail or other standard channels used by the general public, subject to ordinary volume and decorum rules applicable to all litigants.

d. Any individualized security designation or internal alert associated with Plaintiff shall be suspended pending completion of the neutral review described in Section 2, unless Defendants document specific, contemporaneous exigent circumstances arising after entry of this Order.

## 5. No Determination on Ultimate Merits

Nothing in this Order shall be construed as prohibiting legitimate courthouse security measures applicable to all members of the public, nor as preventing Defendants from seeking judicially authorized restrictions upon an appropriate evidentiary showing.

**IT IS SO ORDERED.**

---

**HON. JAMEL K. SEMPER, U.S.D.J.**